**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANGELA HYMAN, | ) | CIVIL ACTION |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket Number 3:17-CV-00089-KRG |
| vs. | ) | |
| | ) | |
| MICHAEL MORRIS and | ) | *Electronically Filed* |
| BRYAN DEVLIN, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF MATERIAL FACTS

AND NOW, come Defendants, MICHAEL MORRIS and BRYAN DEVLIN, by their attorneys, J. Eric Barchiesi, Senior Deputy Attorney General, and Keli M. Neary, Acting Chief Deputy Attorney General, Civil Litigation Section, and submit the following Statement of Material Facts in support of their Motion for Summary Judgment:

1.      On March 14, 2014, Plaintiff, Angela Hyman, entered into a Retail Installment Sale Contract (hereinafter "the contract") providing financing for the purchase of a new 2014 Toyota Corolla (hereinafter "the vehicle"). [*See* Retail Installment Sale Contract, marked as Appendix Exhibit "A"].

2.      In exchange for Capital One Auto Finance providing the money to Plaintiff to purchase the vehicle, Plaintiff provided Capital One Auto Finance a security interest in the vehicle. [Exhibit A, p. 2, ¶ 2b].

3.      In situations where payments are late or Plaintiff breaks other promises under the contract, the contract provided as follows:

1

> We may take the vehicle from you, if you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it.  If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

[Exhibit A, p. 2, ¶ 3d].

4.      In the beginning of June 2016, Capital One Auto Finance transmitted a monthly Statement to the Plaintiff, indicating a past due amount. [*See* Monthly Statement, dated June 7, 2016, marked as Appendix Exhibit "B"].

5.      Plaintiff received monthly statements from Capital One Auto Finance. [*See* Deposition of Angela Hyman, taken March 2, 2018, p. 51, marked as Appendix Exhibit "C"].

6.      Admittedly, Plaintiff failed to make any payment whatsoever to Capital One Auto Finance between June and October 2016. [Exhibit C, p. 155].

7.      Near the end of June 2016, Capital One Auto Finance issued a Notice of Default and Right to Cure and mailed it to Plaintiff at her address on record, i.e., Post Office Box 9492, Virginia Beach, Virginia 23450-9492. [*See* Capital One Auto Finance Notice of Default, issued June 22, 2016, marked as Appendix Exhibit "D"].

8.      Plaintiff checked the Post Office Box in Virginia Beach, Virginia on a monthly basis after she moved to Nanty Glo, Pennsylvania in April, 2016. [Exhibit C, pp. 35-36].

9.      In the Notice of Default and Right to Cure, Plaintiff was advised that if she did not "pay the amount due, [Capital One] may exercise [its] rights under the law. These rights include, but are not limited to, the right to accelerate the debt, repossess the collateral and obtain a repossession title." [Exhibit D, ¶ 2].

2

10.     Instead of paying the amount admittedly owed to Capital One Auto Finance, Plaintiff submitted an Account Modification Request Form on or about August 8, 2016, seeking to modify the loan terms in an attempt to bring the loan current. [*See* Account Modification Request Form, marked as Appendix Exhibit "E"].

11.     On the Account Modification Request Form, Plaintiff was advised that Capital One Auto Finance "may pursue further collection activity, including possible repossession of [Plaintiff's] vehicle, until [Plaintiff's] request form is received, and resume such collection activity if your request is denied." [Exhibit E].

12.     In August, 2016, Plaintiff was advised by Capital One Auto Finance that her modification request was denied. [Exhibit C, p. 52].

13.     On August 10, 2016, Capital One Auto Finance mailed to Plaintiff at the Post Office Box address in Virginia Beach, Virginia the Notification of Account Modification Denial. [*See* Account Modification Denial Notification, dated August 10, 2016, marked as Appendix Exhibit "F"].

14.     Plaintiff testified she did not receive the written denial of her modification request, but admitted she was told of the denial via a telephone conversation with a representative of Capital One Auto Finance. [Exhibit C, pp. 162-163].

15.     The Notification of Account Modification Denial provided, in pertinent part, as follows: "Please note, we may resume collection activity, including the possible repossession of your vehicle, until your account is brought current." [Exhibit F].

16.     On or about October 3, 2016, Capital One Auto Finance issued an Order To Repossess to Commonwealth Recovery Group for the vehicle. [*See* Order To Repossess, marked as Appendix Exhibit "G"].

17.     Jeff Brunner, a part-time "repossessor-collector with Commonwealth Recovery Group" since 2010, was assigned the Order to repossess the vehicle. [*See* Deposition of Jeff Brunner, taken January 12, 2018, pp. 6-7, marked as Appendix Exhibit "H"].

18.     As a part-time employee of Commonwealth Recovery Group, Mr. Brunner is paid on a per repossession basis for each successful repossession, i.e. $125 for an "involuntary" repossession and $75 for a "voluntary" repossession. [Exhibit H, pp. 7-8, 37].

19.     Mr. Brunner conducts on average 600 to 700 repossessions per year for Commonwealth Recovery Group. [Exhibit H, p. 35].

20.     On October 5, 2016, at approximately 7:20 p.m., Mr. Brunner arrived with his tow truck at 1031 Vine Street, Nanty Glo, Pennsylvania, purported to be Plaintiff's address. [*See* Statement of Jeff Brunner, marked as Appendix Exhibit "I"].

21.     Upon his arrival, he noted the vehicle was "pulled in the driveway beside the house." [Exhibit H, p. 41; Exhibit I].

22.     On the evening of October 5, 2016, the vehicle was situated in the same place as shown in the photograph identified during discovery as "Hyman Exhibit 14" (also labeled "CommonwealthRecovery000243"). [*See* Deposition of Shyree Johnson, taken 3/2/18, p. 40, marked as Appendix Exhibit "J"; *See also* Photograph marked as Appendix Exhibit "R"].

23.     Mr. Brunner "immediately backed into the car, picked it up, strapped it down." [Exhibit H, p. 41].

24.     Shyree Johnson, the Plaintiff's spouse, was upstairs in the bedroom of the house with the Plaintiff when she heard beeping and looked out the window and saw the tow truck backing up towards the vehicle. [Exhibit J, p. 18].

25.     Mr. Brunner hooked and strapped both sides of the vehicle within a minute. [Exhibit H, p. 102].

26.     The hooking of the car is mechanically operated from inside the cab of the tow truck. [Exhibit H, p. 102].

27.     As explained by Mr. Brunner, "They're dynamic trucks. It lowers the boom. You back in. You close the jaws, pick it up in the air, get out and strap it down. It's very fast." [Exhibit H, p. 103].

28.     After the vehicle was hooked, picked up and strapped, an older female, later determined to be Shyree Johnson, came out of the house and asked if she could remove items from the vehicle. [Exhibit H, p. 41; Exhibit I].

29.     With the rear of the car "up in the air" about one and one-half feet, Mr. Brunner helped remove possessions from the trunk while Ms. Johnson cleaned the passenger compartment. [Exhibit H, pp. 42, 43].

30.     Mr. Brunner removed the tags from the front and rear of the vehicle and set the tags in a basket that he had taken out of the trunk and set on the porch of the house. [Exhibit H, p. 41].

31.     Ms. Johnson took the items from the vehicle back to the house and then returned to the vehicle and sat down in the front driver's side seat of the vehicle. [Exhibit I; Exhibit J, p. 19].

32.     After entering the vehicle, Ms. Johnson locked the door and refused to exit the vehicle. [Exhibit H, p. 42; Exhibit I].

33.     With Ms. Johnson inside the vehicle and the vehicle raised, Mr. Brunner could do nothing with the vehicle. [Exhibit H, pp. 42, 45, 86].

34.     Mr. Brunner had possession of the vehicle once it was picked up and strapped down. [Exhibit H, pp. 42, 89].

35.     Soon after hearing the doors of the vehicle lock, Mr. Brunner placed a call to the Pennsylvania State Police (hereinafter "PSP") since he could "could not move the car up, down, sideways, in or out of the driveway" with someone inside the vehicle. [Exhibit H, pp. 86, 103].

36.     When he called the PSP, he spoke with Trooper Brian Black advising that he was with Commonwealth Recovery Group; that he was on the scene of a repossession; that he had a car picked up; that he helped a lady get everything out of the car; that he removed the tags from the car; and that a lady came out after the vehicle was cleaned, sat down in the vehicle and was now sitting in the car. [Exhibit H, p. 105].

37.     It took about 20 minutes for the PSP to arrive, during which time Plaintiff testified she stood in the doorway of the house, waiting for the police. [Exhibit C, p. 167].

38.     Trooper Black was the first trooper dispatched to respond to the scene. [Exhibit H, p. 48; *See* Deposition of Brian Black, 3/27/18, pp. 12, 50, marked as Appendix Exhibit "K"].

39.     Trooper Black is 29-years old, 5' 9" tall, weighs 182 pounds and has been a Pennsylvania State Trooper for four (4) years. [Exhibit K, pp. 9, 43].

40.     Pursuant to the PSP's CAD Report, Trooper Black was dispatched to the address at 7:39 p.m. and arrived on scene at 7:51 p.m. [*See* Pennsylvania State Police CAD Report, p. 1, marked as Appendix Exhibit "L"].

41.     Upon his arrival at the scene, Trooper Black spoke with the tow truck driver who provided documentation of the repossession and related that the female inside the vehicle refused to get out. [Exhibit K, p. 15].

42.     Trooper Black noted that when he arrived on scene, the vehicle was hooked up and strapped to the tow truck. [Exhibit K, pp. 16-17, 49].

43.     Neither Trooper Black nor any other State Trooper or Corporal assisted with hooking and strapping the vehicle to the tow truck. [Exhibit K, pp. 49-50].

44.     After speaking with the tow truck driver, he approached the vehicle and asked the female inside the vehicle to step out to speak with him. She refused to exit. [Exhibit K, p. 20].

45.     Soon thereafter, Trooper Black went over to the house and spoke with the female that was on the porch, later determined to be the Plaintiff, Angela Hyman. [Exhibit K, p. 21].

46.     Trooper Black obtained Ms. Hyman's information for his report and, after Ms. Hyman indicated she would not ask the female to get out of the vehicle so they could talk, he went back to his cruiser and contacted Corporal Devlin at the barracks. [Exhibit K, pp. 22-23].

47.     Thereafter, Trooper Black sat in his car and waited for Corporal Devlin to arrive. [Exhibit K, p. 31].

48.     Trooper Michael Morris was called to the scene to assist Trooper Black. [*See* Deposition of Michael Morris, 3/27/18, p. 14, marked as Appendix Exhibit "M"].

49.     Trooper Morris has been a Pennsylvania State Trooper for six (6) years. [Exhibit M, p. 9].

50.     Trooper Morris arrived on scene less than five minutes before Corporal Devlin. [Exhibit M, p. 15].

51.     Upon his arrival, Trooper Morris spoke with Trooper Black and then tried to make contact with the female inside the vehicle. [Exhibit M, p. 15].

52.     Trooper Morris attempted to communicate with the female inside the car "to talk her out of the vehicle to negotiate things peacefully where they could be handled civilly." [Exhibit M, p. 36].

53.     The female inside the vehicle would not talk to Trooper Morris. [Exhibit M, p. 17].

54.     Knowing that Corporal Devlin was en route to the scene, Trooper Morris and Trooper Black then waited for the Corporal to arrive. [Exhibit M, p. 15].

55.      Trooper Elmer Hertzog was "sitting on station" when Corporal Devlin asked him to respond to the scene with him. [*See* Deposition of Elmer Hertzog, 3/27/18, pp. 35-36, marked as Appendix Exhibit "N"].

56.     Trooper Hertzog arrived at the scene at the same time as Corporal Devlin. [Exhibit N, p. 11].

57.     At the time he arrived, Trooper Hertzog observed the apparatus on the back of the tow truck was down and hooked to the vehicle such that he could not walk between the vehicles. [Exhibit N, pp. 12, 39].

58.     Corporal Bryan Devlin has been with the Pennsylvania State Police for twenty-two (22) and a half years. [*See* Deposition of Bryan Devlin, 3/27/18, p. 10, marked as Appendix Exhibit "O"].

59.     He was promoted to Corporal in September 2016. [Exhibit O, p. 10].

60.     On October 5, 2016, Corporal Devlin was responding to "a scene of [a] disturbance, of an unknown lady locked inside of a car." [Exhibit O, pp. 52, 55, 77].

61.     Upon his arrival at the scene, Corporal Devlin was briefed on the situation and then he tried to speak to the residence owner at the doorway of the house who, without saying one word, handed him a phone with someone stating she was an attorney or a law student. [Exhibit O, pp. 18, 30].

62.     Corporal Devlin spoke briefly on the phone to the unknown lady and then went and spoke with the female inside the vehicle. [Exhibit O, p. 18].

63.    Corporal Devlin noted the vehicle was pulled in the driveway and was hooked up to the tow truck that was partially on the roadway. [Exhibit O, p. 18].

63.    The rear end of the vehicle was "lifted slightly off the ground hooked to a towing --- tow truck." [Exhibit O, p. 32].

64.    While speaking with the unknown lady on the telephone, Corporal Devlin explained to her that if the female inside the vehicle did not get out, the window was going to be broken, she was going to be removed, and she was going to be arrested for disorderly conduct. [Exhibit O, pp. 57-58; *See also* DVD of cell phone recording, marked as Appendix Exhibit "P"].

65.    As apparent from the recording, this explanation was communicated solely to the unknown lady on the telephone and was not directed to the female inside the vehicle. [Exhibit P].

66.    This explanation was not made as a threat by Corporal Devlin, but served as an indication based on his recognition of the "very limited" choices available to remove an unknown person who refused to get out of a locked vehicle. [Exhibit O, pp. 58-59].

67.    During his encounters with the unknown lady on the telephone and the female inside the vehicle, Corporal Devlin's demeanor remained calm and mellow. [Exhibit P].

68.    Corporal Devlin was on the scene for 18 minutes. [Exhibit O, p. 62; Exhibit L].

69.    Eventually, the female exited the vehicle voluntarily by opening the door herself and stepping out of the car without assistance. [Exhibit J, p. 57].

70.    Shyree Johnson, the female inside the vehicle, testified no window of the vehicle was ever broken; no weapon was ever aimed at her; and she was not arrested after exiting the vehicle on her own. [Exhibit J, p. 56-57].

71.    The PSP Troopers and Corporal left the scene immediately after "the lady got out of the vehicle." [Exhibit O, p. 71; Exhibit J, p. 34].

72.    None of the PSP Troopers or Corporal saw the vehicle get towed out of the driveway. [Exhibit O, p. 71].

73.    At no time did any PSP Trooper or Corporal threaten to pull a weapon. [Exhibit O, p. 75].

74.    At no time did Corporal Devlin or any other Trooper help the tow truck driver in hooking up the vehicle or connecting any straps. [Exhibit O, pp. 77-78].

75.    At no time did Corporal Devlin guide the tow truck driver toward the vehicle or out of the driveway. [Exhibit O, p. 78].

76.    Admittedly, Corporal Devlin knocked on the window of the vehicle with one knuckle of his hand, not a flashlight or any other device that he may have had on his belt. [Exhibit O, p. 79].

77.    At no time relative to this incident was a window of the vehicle broken. [Exhibit C, p. 178].

78.    At no time relative to this incident was anyone arrested. [Exhibit C, p. 179].

79.    At no time relative to this incident did any PSP Trooper or Corporal take his firearm out of its holster. [Exhibit C, p. 177].

80.    Plaintiff retrieved the vehicle in November, 2016, noting no physical damage to the vehicle and, apart from replacing the battery and remedying a key issue, the vehicle drove as it had before the incident. [Exhibit C, pp. 93, 191].

Respectfully submitted,

JOSH SHAPIRO
Attorney General

/s/ J. Eric Barchiesi
J. ERIC BARCHIESI
Senior Deputy Attorney General
Pa. I.D. 55825

OFFICE OF ATTORNEY GENERAL          KELI M. NEARY
1251 Waterfront Place               Acting Chief Deputy Attorney General
Mezzanine Level                     Civil Litigation Section
Pittsburgh, PA 15222
T: (412) 565-3573

Dated:   June 28, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **STATEMENT OF MATERIAL FACTS** was filed with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to all CM/ECF participants, including the following:

**Andrew M. Milz, Esquire**
FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
*(Counsel for Plaintiff)*

/s/ J. Eric Barchiesi
J. Eric Barchiesi, SDAG

*Counsel for Defendants*

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
T: (412) 565-3573

Date: June 28, 2018