IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELA HYMAN,<br><br>                    Plaintiff,<br><br>          vs.<br><br>MICHAEL MORRIS,<br>BRYAN DEVLIN,<br><br>                    Defendants. | CIVIL ACTION<br><br><br><br>NO. 3:17-cv-00089(KRG) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

One of the most basic tenets of constitutional law is the right to procedural due process of law.  "At the core of procedural due process jurisprudence is the right to advance notice of significant deprivations of liberty or property and to a meaningful opportunity to be heard." *Abbot v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998).  This means that the government cannot arbitrarily take your property—including your car—without first providing a meaningful measure of process to ensure the deprivation is warranted.  Without this liberty, government officials—including law enforcement—could assume the role of judges on the street, and in their "curbside courtroom," they could arbitrarily decide to confiscate our property without prior notice or a meaningful opportunity to be heard. *See id.* at 149.  Unfortunately, this abuse of power is a reoccurring event in the context of private repossessions of collateral, even though controlling case law plainly prohibits law enforcement from affirmatively aiding lenders and their repossession agents (i.e. "repo men"). *See id.*[1]

---

[1]       The Pennsylvania State Police is no exception.  Despite decades-old precedent barring active police involvement in nonjudicial repossessions, the Pennsylvania State Police apparently has no standard operating procedure on this issue. (Ex. 1, Devlin Dep. at p. 69:06–09).

Here, Pennsylvania State Police Corporal Bryan Devlin arrived on the scene of a repossession with the single-minded goal of helping the repossession to go forward. He almost immediately ordered the occupant of the vehicle—Shyree Johnson—out of Plaintiff's car even though Corporal Devlin *knew* that Ms. Johnson was the vehicle owner's spouse. (Defendants' Exhibit P; Ex. 5, Black Dep. at pp. 30:12–31:02). Despite ardent objections to police involvement in the repossession, Corporal Devlin threatened to break a window of the vehicle, forcibly remove Ms. Johnson, and arrest Ms. Johnson for disorderly conduct—all for the express purpose of facilitating the repossession. (Defendants' Exhibit P, Cell Phone Video). What's more, Corporal Devlin *admits* that the repossession could not have gone forward but for his assistance. (Ex. 1, Devlin Dep. at p. 52:20–23).

Corporal Devlin now seeks immunity for his blatantly unconstitutional conduct, arguing that he was responding to a "disturbance" involving an "unknown lady." His explanations lack all credibility. Corporal Devlin knew all along that Ms. Johnson was the vehicle owner's spouse— not an unknown lady. Corporal Devlin also knew that he was responding to the scene of a vehicle repossession, not some oblique "disturbance." The only person who was "disturbed" by Ms. Johnson's lawful presence in the vehicle was the repo man. A jury could readily determine that Corporal Devlin's oblique, *post hac* explanations were nothing more than a pretext for allowing the repossession to go forward. Further, this Court already rejected Defendants' arguments after reviewing virtually the same record—which largely consists of a cell phone video recording of the

unlawful repossession.[2]   Accordingly, Defendants' Motion for Summary Judgment should be denied.[3]

## II.   FACTS

### A.   Angela Hyman's Background.

Angela Hyman is a 57-year old mother of six children, originally from Virginia.  (Ex. 2, Hyman Dep. at pp. 7:17–21, 86:15–16).  Angela is married to her partner Shyree Johnson.  (Id. at pp. 22:22–23:11).  In 2016, Angela and Ms. Johnson lived with each other in Angela's home in Nanty Glo, Pennsylvania.  (Id.).

About 20 years ago, Angela was diagnosed with panic disorder, which causes her panic attacks and heart palpitations to this day.  (Id. at pp. 11:20–12:19, 98:24–99:06).  Angela continues to suffer a host of other medical issues that prevent her from working, including cardiac disorder, asthma, shortness of breath, low potassium, hypertension, headaches, heart failure, and a thoracic aortic aneurysm that requires surgery.  (Id. at pp. 30:20–31:22).

In April 2016, Angela's health issues prompted her to purchase her present home in Nanty Glo, Pennsylvania—a "quiet place" where she believed she could live out the rest of her days in peace.  (Id. at pp. 16:07–21, 19:01–16, 190:23–191:05).  Although Angela lives in Nanty Glo, she uses her car to commute back to Virginia for her doctors' appointments because they are familiar with her medical conditions. (Id. at pp. 19:01–20:01).

---

[2]      Memorandum Opinion, ECF 59 at p. 25 ("At the time the 'repo man' repossessed Plaintiff's vehicle in October 2016, it was clearly established that [] an officer's conduct during a civil repossession could constitute state action if the officer ceased to be a neutral presence and affirmatively aided the creditor's attempt to repossess the debtor's property.").

[3]      Plaintiff no longer pursues her claim against Trooper Michael Morris.

**B.  Angela Purchases a Car and Makes Payments for over Two Years.**

In 2014, Angela purchased a Toyota Corolla, which was financed by Capital One Auto Finance. (Id. at p. 36:04–15).  With few exceptions, Angela made regular, timely payments on the car for over two years.  (Ex. 3, Transaction History Report).

Then, around June 2016, Angela fell behind on payments because of medical problems. (Ex. 3, Transaction History Report; Ex. 2, Hyman Dep. at p. 48:07–10).  During that time period, Angela was in the process of making payment arrangements with Capital One. (Ex. 2, Hyman Dep. at pp. 48:22–49:15).

**C.  The Night of the Repossession.**

On October 5, 2016, Ms. Hyman and her spouse Shyree Johnson were at home when they heard a noise outside. (Id. at p. 61:17–20).  Ms. Johnson rushed downstairs and reported back to Angela that there was "a tow truck at your car." (Id. at p. 61:20–23).  At the time, the car was parked in Angela's driveway, which is adjacent to her house.  (Id. at p. 59:02–04).

After getting dressed, Angela ran downstairs and called her daughter, Makiba Gaines, believing that Ms. Gaines—as a law student—would have a better understanding of Angela's rights. (Id. at pp. 61:24–62:06).  In the meantime, Ms. Johnson went to the car and—after asking permission from the repo men—retrieved her personal items from the car. (Ex. 4, Johnson Dep. at pp. 18:18–19:24).  When Ms. Johnson returned to the house with her personal items, Angela told her to go sit in the car, which she did. (Id. at pp. 21:20–24, 23:08–17).

At the advice of Ms. Gaines, Angela walked over to the repo man and demanded him to leave her property, and she specifically told him he was trespassing. (Ex. 2, Hyman Dep. 69:12–22; Ex. 4, Johnson Dep. 25:19–25).  In response, the repo man said, "I do not see a trespassing

sign." (Ex. 2, Hyman Dep. 69:20–24; Ex. 4, Johnson Dep. 25:19–25). He refused to leave. (Ex. 2, Hyman Dep. 70:21–23).

At this point, both Angela (in the house) and Ms. Johnson (in the car) were on the phone with Ms. Gaines. (Ex. 2, Hyman Dep. at p. 70:02–08; Ex. 4, Johnson Dep. at p. 22:02–25). At the advice of Ms. Gaines, Angela used her other phone to call 9-1-1. (Ex. 2, Hyman Dep. at p. 62:12–18). During the call, Angela reported that someone was trying to take her car. (Id. at p. 73:08–18). The 9-1-1 operator told Angela that the police were already on their way. (Id. at p. 62:12–18).[4]

While everyone waited for the police to arrive, Angela demanded two more times that the repo men leave her property, but they refused. (Id. at pp. 74:16–75:15). At this time, the tow truck was *not* hooked up to Angela's car. (Id. at p. 76:07–18).

### D. The Police Arrive to the Scene and Order Ms. Johnson Out of the Car so the Repo Men Could Carry Out the Repossession.

At about 7:40 p.m., Pennsylvania State Police Trooper Brian Black was dispatched to Angela's home "for a female who'd locked herself inside of a vehicle during the process of a repossession." (Ex. 5, Black Dep. 12:02–14, 14:13–15:01; Ex. 6, CAD Report). Trooper Black was the first trooper on the scene. (Ex. 5, Black Dep. at p. 50:10–11).

When Trooper Black arrived, he spoke with the tow truck driver, who provided documentation showing that he was there to repossess the vehicle, and "related that there was a black, non-Hispanic female inside the vehicle that refused to get out." (Ex. 2, Hyman Dep. at p. 15:17–21). Trooper Black then spoke with Angela, who provided her name and driver's license.

---

[4]     Unbeknownst to Angela, the repo man had already called the police. (Ex. 8, Morris Dep. at pp. 47:02–08, 47:24–48:03).

(Id. at pp. 62:19–63:07).  Angela also told Trooper Black that she and Ms. Johnson were married. (Id. at pp. 62:19–63:07).

Trooper Black then called the shift supervisor on duty—Corporal Bryan Devlin.  (Ex. 5, Black Dep. at pp. 30:12–31:02, 40:01–05).[5]  Trooper Black told Corporal Devlin that he was at the scene of a vehicular repossession, and that a woman who was the *spouse* of the vehicle owner had locked herself in the vehicle.  (Id. at pp. 30:12–31:02, stating "Q. Did you tell him that the woman in the vehicle was the spouse of the owner of the vehicle? A. I believe I did, yeah.").

After the call, Trooper Black returned to Angela and said, "Tell her [Ms. Johnson] to get out of the car, because we are going to take the car." (Ex. 2, Hyman Dep. at p. 63:05–07).  Ms. Gaines then spoke with Trooper Black over the phone, but according to Angela, "[h]e didn't care about anything that she was saying on the phone.  So he is sitting there.  He is touching his gun. I'm terrified.  I was so scared." (Id. at p. 63:17–23).

Eventually, two other troopers arrived on the scene: Trooper Michael Morris and Trooper Elmer Hertzog.  (Ex. 5, Black Dep. at p. 31:09–17; Ex. 6, CAD Report).[6]  When Corporal Devlin arrived, he "took control of the scene . . . ." (Ex. 5, Black Dep. at p. 32:06–11).  Corporal Devlin went to speak with Angela—who was inside the house. (Ex. 1, Devlin Dep. at pp. 30:21–31:01). Angela opened the door and gave Corporal Devlin her phone. (Id. at pp. 30:21–31:01).

At this point, Ms. Gaines pleaded with Corporal Devlin over the phone to stop their involvement in the repossession "because the police cannot enforce a civil contract," but Corporal

---

[5]       At the time, Corporal Devlin had been a corporal for only one month.  (Ex. 7, Hertzog Dep. at pp. 16:22–17:02).  At the time of his deposition, Corporal Devlin could not recall having ever been dispatched to the scene of a repossession prior to one involved in this case. (Ex. 1, Devlin Dep. 40:19–21).

[6]       When Trooper Morris arrived, Trooper Black told him that the woman in the car was the car owner's "romantic partner." (Ex. 8, Morris Dep. 13:17–14:23).  Before Corporal Devlin arrived, Trooper Morris explained to Ms. Johnson that "this was a civil matter, and she wasn't going to be in any type of trouble right now, that they could get everything straightened out." (Ex. 8, Morris Dep. at p. 17:05–24).

Devlin ignored her pleas. (Defendants' Exhibit P, Cell Phone Video).[7]  Instead, Corporal Devlin

threatened to break the window of the car and arrest Ms. Johnson for disorderly conduct unless

she got out of the car. (Id.)  The conversation between Corporal Devlin and Ms. Gaines proceeded

as follows:

> **Corporal Devlin**: If she [Ms. Johnson] does not willingly come out
> we are going to have to remove her.
> **Ms. Gaines**:  Sir, sir – can he hear me mom?
> **Angela Hyman**: Yeah, he can hear you.
> **Corporal Devlin**: Is she trying to talk?  Hello, yes. Maam.
> **Ms. Gaines**: Sir, I am just trying to figure out because police cannot
> enforce a civil contract and it seems as if you're taking sides
> between my mother and the tow truck driver, but you can
> also ask him to leave her private property instead of asking
> her to get out of her car.
> **Corporal Devlin**: Maam, well what's going to happen here today is
> we already spoke with the tower they have to get the vehicle
> tonight, okay.
> **Ms. Gaines**:  Right sir, but listen this is a civil issue.
> **Corporal Devlin**: Maam, maam, okay – if you're talking with the
> young lady in the car, okay, if you would please tell her to
> get out so these men can do their job.
> **Ms. Gaines**:  Sir, listen, you are doing this unlawfully.
> **Corporal Devlin**: Okay, you can file a complaint on me later.
> That's okay.
> **Ms. Gaines**:  Sir you cannot ask her to get out of the car.
> **Corporal Devlin**: Here's what going happen, okay, if she doesn't
> get out we are going to break the window.
> **Ms. Gaines**:  Sir. I am recording you sir.
> **Corporal Devlin**: It's okay you can record it, I'm tell you what's
> going to happen.  She is going to be removed, she going to
> be arrested for disorderly conduct and the car is still going to
> get taken.
> **Ms. Gaines**:  And Sir you are breaking the law.
> **Corporal Devlin**: That's okay.
> **Ms. Gaines**: And we will bring a complaint against you and this is
> possible discrimination.
> **Corporal Devlin**: Are you not going to ask the young lady to get
> out of the vehicle?
> **Ms. Gaines**:  Well, no she is going to comply with you. You're
> enforcing a civil contract without authority of a court order.

---

[7]       The telephone call between Ms. Gaines and Corporal Devlin is reflected in a cell phone video recording
already provided by Defendants as Defendants' Exhibit P.

**Corporal Devlin**: Okay well then you can contact the state police talk to my sergeant, I am the shift supervisor tonight, you can file the complaint against me.

**Ms. Gaines:**  Have you spoken to any legal counsel about what you're doing?

**Corporal Devlin**: Maam, that is not what is happening tonight. Okay?

**Ms. Gaines:**  Have you spoken to any legal counsel.  You are breaking the law, you cannot do this.

**Corporal Devlin**: Did you tell the young lady to get out?

**Ms. Gaines:**  I haven't spoken to her yet.

**Corporal Devlin**: Well you said she was going to comply.

**Ms. Gaines:**  Well of course she is going to comply with your order.

**Corporal Devlin**: Well you call her and tell her to do that and once I know that she is going to get out we will be okay.

**Ms. Gaines:**  I am going to call you right back.

**Angela Hyman**: Okay.

**[Ms. Gaines calls Ms. Johnson]**

**Ms. Johnson:** Ok they are getting anxious.

**Ms. Gaines:**  Tell them ok.  What county are you in?

**Ms. Johnson**:  Nanty Glo, Cambria.

**Corporal Devlin**: I'm not going to wait all day.

**Ms. Johnson**: I understand.

**Corporal Devlin**: - You got about 30 more seconds.

**Ms. Johnson**: He said I got 30 more seconds then he is going to bust the window and take me in.  She said.  My lawyer is on the phone with the State Police.

**Trooper Devlin**: What? You've got 30 seconds to come out or we breaking the window and coming in, how long have we been here dealing with this? I asked nicely, I explained to you what is going to happen, okay?

**Ms. Johnson**: Okay

**Trooper Devlin**: If you refuse to come out we are going to have to remove you and I do not want to do that for a repossessed vehicle.

**Ms. Johnson**: Okay. Hello.

**Trooper Devlin**: Are you getting out?  Your time is up.  Yes or no?

**Ms. Johnson**: Alright.  Hello.  I am getting out.  I'm getting out, y'all.

(Defendants' Exhibit P).  Thereafter, the tow truck driver hooked up the car and towed it away.

(Ex. 2, Hyman Dep. at pp. 80:23–81:18).

8

Despite Corporal Devlin's threats of violence and arrest, no trooper witnessed any sort of violence, threats, or destruction of property on the part of Angela or Ms. Johnson. (Ex. 7, Hertzog Dep. 21:11–21; Ex. 5, Black Dep. at p. 37:07–38:10; Ex. 8, Morris Dep. at pp. 29:18–30:03). Corporal Devlin likewise admits that he did not witness any violence, property destruction, or threats. (Ex. 1, Devlin Dep. at pp. 58:15–59:03).

### E. Corporal Devlin's Explanations for his Conduct Lack Credibility.

Corporal Devlin claims he told Ms. Johnson to get out of the car "[b]ecause we didn't know who she was." (Id. at p. 34:15–17). He attempts to justify his assistance with the repossession by claiming he was responding to a "disturbance" involving "an unknown lady locked inside of a car." (Id. at pp. 50:12–22, 52:11–13). This oblique explanation makes no sense, and contradicts facts known to Corporal Devlin at the time of the repossession.

It is undisputed that everyone on the scene—including Corporal Devlin—understood from the beginning that they were dealing with a civil repossession. (Id. at pp. 51:05–07, 55:06–11; Ex. 8, Morris Dep. at p. 14:21–25; Ex. 5, Black Dep. at p. 12:12–14; Ex. 7, Hertzog Dep at p. 18:02–04).[8] There was never any "disturbance"—everyone on the scene admits that Angela and Ms. Johnson did not make any threats of violence or act out violently. (Ex. 1, Devlin Dep. at pp. 58:15–59:03; Ex. 7, Hertzog Dep. at p. 21:11–21; Ex. 5, Black Dep. 37:07–38:10; Ex. 8, Morris Dep. at pp. 29:18–30:03).

Corporal Devlin's own words demonstrate that he was there to help the repossession go forward. When Ms. Gaines first pleaded with Corporal Devlin to explain why he was taking sides,

---

[8]     Additionally, the dispatcher created a "CAD" report, which is seen by the dispatched police officer. (Ex. 5, Black Dep. 14:03–12; Ex. 6, CAD Report). The CAD report referred to a "repo guy" and specified (albeit incorrectly) that the person in the vehicle was the vehicle *owner*, stating, "REPO GUY SAID THE OWNER OF THE VEHICLE REFUSES TO GET OUT OF THE VEHICLE." (Ex. 6, CAD Report). In fact, it was Ms. Johnson, the owner's wife.

he responded by *admitting* he was there to help the repo man repossess the vehicle: "Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay." (Defendant's Exhibit P, Cell Phone Video). Ms. Gaines protested again that this was a "civil issue," but Corporal Devlin brazenly requested Ms. Gaines to ask Ms. Johnson "to get out *so these men can do their job*." (Id., emphasis added).

Corporal Devlin's averment that there was an "unknown lady" in the car should not be credited as it is contrary to the testimony of the other state police troopers on the scene. Before arriving to the scene, Corporal Devlin already *knew* that Ms. Johnson was the spouse of the vehicle owner because Trooper Black relayed this to him over the phone. (Ex. 5, Black Dep. at pp. 30:12–31:02).[9]

From the start, Corporal Devlin was single-mindedly focused on removing Ms. Johnson from the car so that the car could be repossessed. No one at the scene told the tow truck driver to leave Angela's property. (Ex. 1, Devlin Dep. 34:03–05). The state police did not investigate Angela's complaint that the tow truck driver was trespassing on her property. (Ex. 8, Morris Dep. 46:13–22). Indeed, Corporal Devlin admits that his involvement was necessary to accomplishing the repossession, because if he "didn't get her out of the car, the repo man wouldn't have been able to take the vehicle." (Ex. 1, Devlin Dep. at p. 52:20–23).[10]

---

[9]     Even crediting Corporal Devlin's claim that he had no idea who was in the car, he does not (and cannot) dispute that he never asked for the identity of the person in the car. (Ex. 1, Devlin Dep. at p. 63:04–06). This goes to show that Corporal Devlin was *never* concerned about investigating the identity of the vehicle occupant.

[10]     Trooper Morris likewise admits that the repossession would not have occurred without the assistance of the Pennsylvania State Police. (Ex. 8, Morris Dep. at p. 37:15–24, stating "Q. Would the repo man been able to take the vehicle were it not for the state police to ask the woman to leave the car? . . . . A. Well, not without driving away with her in it."). Similarly, the repo man on the scene admits that he would not have been able to take the car without the assistance of the police. (Ex. 9, Brunner Dep. at p. 61:11–17, stating "Q. If the police didn't show up that night, sir, would you have been able to repossess that car? . . . . A. I would have had to sit there. I wouldn't have been able to do anything. It would have been a stalemate.").

Although Corporal Devlin testified that the car was one to two feet off the ground when he arrived (Id. at p. 49:18–21), his testimony conflicts with that of his own colleagues—Troopers Hertzog and Black.  Trooper Hertzog did not see the car lifted off the ground.  (Ex. 7, Hertzog Dep. 13:16–19).  Trooper Black does not recall seeing the car lifted up in the air.  (Ex. 5, Black Dep. 17:03–12).  By contrast, Ms. Johnson testified that the car was not hooked up to the car or lifted off the ground. (Ex. 4, Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).  Similarly, Angela was 100% certain that the car was not hooked up to the tow truck. (Ex. 2, Hyman Dep. at pp. 178:17–20, 194:05–15).

Within days after the incident, Angela complained to internal affairs. (Id. at pp. 181:14–182:11). The person she spoke with in internal affairs told Angela "that the police statements **did not match up**." (Id. at p. 182:06–11, emphasis added).

## III.   Legal Argument[11]

Defendants Devlin and Morris now move for summary judgment, arguing they did not violate Ms. Hyman's constitutional rights, and that they are nonetheless immune from liability despite decades-old precedent prohibiting law enforcement from actively assisting in a private repossession.  Although Plaintiff no longer pursues her claim against Trooper Morris, Corporal Devlin remains liable for his unreasonable deprivation of Ms. Hyman's car without due process of law, as this Court previously held in the Memorandum Opinion denying Defendants' Motion to dismiss. ECF 59, Mem. Op. at 21–25.

---

[11]   Ms. Hyman omits the standard of review as the court is well aware of the legal requirements and the standards governing motions for summary judgment.

### A. Background on the Fourth and Fourteenth Amendments.

It is beyond dispute the Fourth Amendment prohibits unreasonable seizures of property, which occurs when "there is some meaningful interference with an individual's possessory interests in that property" that is objectively unreasonable. *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).   The Supreme Court's decision in *Soldal* "confirms that state actors violate the Fourth Amendment by taking an active role in private evictions and repossessions when there is no apparent legal basis for such action." *Hensley v. Gassman*, 693 F.3d 681, 694 (6th Cir. 2012).

Similarly, it is also well established that the deprivation of a "legally protected property interest" including a "possessory interest in property invoke[s] due process protections" under the Fourteenth Amendment. *Abbot*, 164 F.3d at 146 (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972)).  "It is also well established that possessory interests in property invoke procedural due process protections."  *Abbot*, 164 F.3d at 146 (citing *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972)).  "At the core" of these protections "is the right to advance notice of significant deprivations of liberty or property and a meaningful opportunity to be heard." *Abbot*, 164 F.3d at 146 (citing *LaChance v. Erickson*, 522 U.S 262 (1998)).

Armed with this jurisprudence, our Court of Appeals held (twenty years ago) that police officers should know from established precedent "that their role is not to be participants in property deprivations without notice and an opportunity to be heard." *Id.* at 149.  Such "curbside" justice is no justice at all, but "is precisely the situation and deprivation of rights to be avoided." *Id.*

### B. Angela had a Proprietary Interest in the Car.

Defendants contend Angela's proprietary interest in the car she owned somehow disappeared because she "ceded a security interest in the vehicle" and defaulted on her loan payments. (Defs.' Br. at p. 5). This argument reflects a warped understanding of property law and the nature of security interests. Angela retained an ownership interest and several other property interests in the car.

In Pennsylvania, the law governing security interests is located in Division 9 of the Uniform Commercial Code ("UCC"), 13 Pa.C.S. § 9101 *et seq.* Under the UCC, a default does not automatically eliminate all of a debtor's rights in collateral. The debtor retains all rights in the collateral until the secured party disposes of (i.e. sells) the collateral to another. 13 Pa.C.S. § 9617(a)(1) ("A secured party's disposition of collateral after default . . . transfers to a transferee for value all of the debtor's rights in the collateral"). Until the secured party has disposed of the collateral, the debtor retains the right to redeem the collateral "at any time"—a palpable property right. 13 Pa.C.S. §§ 9623(a) & (c)(2). This right can only be waived "by an agreement to that effect entered into and authenticated after default." 13 Pa.C.S. § 9624(c).

Further, Angela retained an ownership interest in the car she purchased and owns. It is undisputed that Angela owned the Toyota Corolla at issue. (Ex. 2, Hyman Dep. at p. 36:04–15). Her ownership interest did not somehow vanish upon default. As one court in our Circuit has explained, "[o]wnership of the collateral did not pass immediately upon default from [the debtor] to [the secured party]; rather, [upon the debtors' default, the secured party] gained a right to enforce a security interest in that property." *Interbusiness Bank, N.A. v. First National Bank of Mifflintown*, 318 F.Supp.2d 230, 249 (M.D.Pa. 2004) (citing 13 Pa.C.S. §§ 9611, 9624(a) (2002));

*see also Brown v. City of Philadelphia*, No. 10-2687, 2012 WL 1758172, at *4 (E.D.PA. 2012) (debtor retained possessory interest in collateral he owned, despite defaulting on the loan).

In *Brown v. City of Philadelphia*, the court rejected the same argument Defendants put forth today—that the debtor lost all property interests in the car after the default. 2012 WL 1758172, at *4. The court rejected this nonsensical argument, explaining that "[h]ad plaintiff not had an interest in the vehicle, [the secured party], by way of the tow truck operator, would not have had a need to repossess the vehicle." *Id.* This Court should follow the common sense reasoning of *Brown* and the plain language of the UCC, and find that Angela retained a sufficient proprietary interest in the car after defaulting on the loan.

### C. Trooper Devlin Engaged in State Action.

Corporal Devlin is now being held to account for his curbside injustice, but he contends he did not engage in state action because he did not play an "active" or "principal" role in the repossession, and did not "assist the tow truck driver in such a way that the repossession would not have occurred *but for* their assistance." (Defs.' Br. at 10, emphasis added). This argument is incorrect in light of the video recording of the unlawful repossession, Defendants' admissions, and this Court's previous ruling on this issue upon reviewing virtually identical record facts. ECF 59, Mem. Op. at p. 21–22.

Corporal Devlin undoubtedly engaged in state action. The state action test in the context of private repossessions "is whether the officer maintains neutrality or takes an active role in the repossession resulting in an unconstitutional deprivation." *Harvey v. Plains Township Police Dep't*, 635 F.3d 606, 609–10 (3d Cir. 2011). While the mere passive, neutral presence of a police officer does not alone constitute state action, police officers abandon neutrality as soon as they "affirmatively aid a repossession such that he can be said to have caused the constitutional

deprivation." *Id.* at 610; *Abbot*, 164 F.3d at 147 (advising debtor that other party had right to immediate possession of vehicle may be unconstitutional deprivation).

"Aid" in this context takes many forms, including "facilitation, encouragement, direction, compulsion, or other affirmative assistance in the repossession." *Harvey*, 635 F.3d at 610. All facts and circumstances are considered, and may include, among other things, whether the officer: a) told the plaintiff the seizure was legal; b) ordered to allow the repossession; c) threatened arrest; d) intervened multiple times; and e) remained on the scene until the repossession was completed. *Id.* at 610 & n.3.

Here, the Court need only watch the cell phone video to conclude that Corporal Devlin played an active role in the repossession. Corporal Devlin ordered Ms. Johnson out of the car for the *express purpose* of allowing the repossession to go forward. (Defendants' Exhibit P, Cell Phone Video). When Ms. Gaines first pleaded with Corporal Devlin to explain why he was taking sides, he responded by *admitting* he was there to help the repo man repossess the vehicle: "Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay." (Id.). Ms. Gaines protested again that this was a "civil issue," but Corporal Devlin brazenly requested Ms. Gaines to ask Ms. Johnson "to get out *so these men can do their job*." (Id., emphasis added).

Corporal Devlin was not a mere bystander; he threatened to break the car window and arrest Ms. Johnson for disorderly conduct if she did not get out of the car. (Id.). What's more, Corporal Devlin *admitted* at his deposition that his involvement was necessary to accomplishing the repossession, because if he "didn't get her out of the car, the repo man wouldn't have been able to take the vehicle." (Ex. 1, Devlin Dep. at p. 52:20–23).[12]   Thus, even under Defendants'

---

[12]   Trooper Morris likewise admits that the repossession would not have occurred without the assistance of the Pennsylvania State Police. (Ex. 8, Morris Dep. at p. 37:15–24, stating "Q. Would the repo man been able to take the

erroneous formulation of the rule,[13] Corporal Devlin has admitted to conduct constituting state action.

Defendants attempt to compare Corporal Devlin's conduct to the conduct of the police officers in *Sherry v. Associates Commercial Corp.* (Defs.' Br. at pp. 9–10), but *Sherry* is wholly distinguishable. For one, *Sherry* predated the Third Circuit's landmark opinion in *Abbott v. Latshaw*, which outlined a completely different "state action" test than that used by the District Court in *Sherry*. The court in *Sherry* concluded that the police officers' aid was not "significant." *Sherry*, 60 F. Supp. 2d at 476. That is not the test post-*Abbott*. Controlling precedent now provides that a police officer engages in state action when he "takes an *active role* in the repossession resulting in an unconstitutional deprivation." *Harvey*, 635 F.3d at 609–10 (emphasis added).

Further, the police officer's aid in *Sherry* bears no resemblance to Corporal Devlin's threats of arrest and violence. In *Sherry*, the vehicle owner got into argument with the repo man during the repossession, and the police officers who arrived with the repo man stayed back until the confrontation escalated. 60 F. Supp. 2d at 472. The repo man had provided an illegible facsimile to the vehicle owner, presumably as proof of the right to repossess. The vehicle owner asked the police officer, "You are going to let them take these trucks on this kind of paperwork?" *Id.* The officer responded, "Yes. They have a repo order." *Id.* The vehicle owner continued to object, noting that he had made the required payments and commenting that the secured party had "no right to these trucks." *Id.* In response, the officer said, "You have to let them have the trucks." *Id.*

---

vehicle were it not for the state police to ask the woman to leave the car? . . . . A. Well, not without driving away with her in it."). Similarly, the repo man on the scene also admits that he would not have been able to take the car without the assistance of the police. (Ex. 9, Brunner Dep. at p. 61:11–17, stating "Q. If the police didn't show up that night, sir, would you have been able to repossess that car? . . . . A. I would have had to sit there. I wouldn't have been able to do anything. It would have been a stalemate.").

[13]      I.e., that Corporal Devlin did not engage in state action because he did not "assist the tow truck driver in such a way that the repossession would not have occurred but for their assistance." (Defs.' Br. at 10).

The *Sherry* officer's conduct pales in comparison to Corporal Devlin's threats of arrest and violence.[14]

Corporal Devlin provided substantial aid and assistance in the repossession of Angela's car. As he admits, the repossession could not have been achieved but for his assistance. (Ex. 1, Devlin Dep. at p. 52:20–23). Corporal Devlin unquestionably engaged in state action.

### D. Corporal Devlin Violated Clearly Established Law that Forbids Law Enforcement from Providing Affirmative Assistance in the Nonjudicial Seizure of Property.

Defendants also argue that Corporal Devlin did not violate any clearly established rights (Defs.' Br. at p. 11), an argument this Court already rejected at the motion to dismiss stage under virtually the same record facts. ECF 59, Mem. Op. at 25. Essentially, Defendants' argument boils down to this: Corporal Devlin could not have known that his role in the repossession was substantial enough to constitute state action. This argument is not only absurd, but it belies clearly established precedent going back to the Third Circuit's decision in *Abbott v. Latshaw*, 164 F.3d 141 (3d Cir. 1998).

As this Court has already held, *Abbott* controls the outcome of this issue. *Abbott* involved a dispute between ex-spouses Mark Abbott and Laurie Latshaw over the ownership of a van. Latshaw believed she was entitled to the van, and enlisted a constable—Albert Diehl—to help her repossess the van from Abbott. A heated dispute ensued at the scene of the repossession with Diehl threatening to arrest Abbot if he drove away, prompting Diehl to call for the aid of additional law enforcement.

---

[14]     Additionally, it is not at all clear that *Sherry* would survive the Third Circuit's later decision in *Abbott v. Latshaw*, which used a less demanding state action test. Although the District Court's decision was affirmed without an opinion on appeal, the appellant did not *once* mention *Abbott* in their appellate briefing, despite having the opportunity to do so. *See* Brief for Appellants, 1998 WL 34085416 (Apr. 7, 1999); Brief in Reply for Appellants, 1998 WL 34085367 (May 20, 1999). As the issue was waived, our Court of Appeals had no opportunity to address whether the *Sherry* police officers' aid constituted state action under *Abbott.*

Thereafter, Lieutenant Dennis George arrived at the scene, reviewed Ms. Latshaw's paperwork, and determined she was entitled to immediate possession of the van. Abbott's attorney arrived and protested the seizure, but George ignored the protests. Latshaw was able to secure a key to the van, but before she could drive away, Abbott's attorney blocked the van with his car. Lt. George then threatened to arrest the attorney if he did not make way for the van. In other words, the repossession was *already in progress*, and the only thing stopping Latshaw from driving the car away was Abbott's attorney, who sat in his car in protest and refused to make way for Latshaw. Lt. George then grabbed Abbott's attorney, told him that he was under arrest, and issued him a summary citation—allowing Latshaw to drive away with the van.

The court held that Lt. George was not entitled to qualified immunity because "[r]easonable police officers should know from [] established precedent . . . that their role is not to be participants in property deprivations without notice and an opportunity to be heard." *Abbott*, 164 F.3d at 149. The court explained that "[t]here came a point during this incident when Lt. George's role changed from the protector of the peace to the enforcer." *Id.* The court specifically pointed out that Lt. George threatened to arrest the attorney, grabbed him, and told him he was under arrest.

Lt. George's role in the *Abbott* repossession was substantially less egregious compared to Corporal Devlin's role in the instant repossession. Both Corporal Devlin and Lt. George ignored protests to the seizure and made threats to arrest. 164 F.3d at 147.[15] But Corporal Devlin took it to the next level by also threatening to destroy property—i.e. the car window—and cause physical harm to the occupant by extracting and arresting her. (Defendants' Exhibit P).[16]

---

[15]     Lt. George also "advised" the alleged owner "that she had a right to immediate possession of the van." *Abbott*, 164 F.3d at 147.

[16]     Of course, Corporal Devlin knew all along that he was responding to a vehicular repossession. (Ex. 1, Devlin Dep. at pp. 51:05–07, 55:06–11). He also knew that Ms. Johnson was the spouse of the car owner because Trooper Black relayed this to him on the phone. (Ex. 5, Black Dep. at pp. 30:12–31:02)

Significantly, both here and in *Abbott*, the repossession was at least partially in progress. Here, although the repo man had situated his tow truck behind Angela's car, he did not hook up the car until after Ms. Johnson exited the car. (Ex. 2, Hyman Dep. at pp. 76:07–18, 80:23–81:18). The only thing that stopped the repossession from going forward was Ms. Johnson's presence in the car. Compare this to *Abbott*, where the alleged owner/repossessor (Latshaw) was already in the van and prepared to drive away. *Abbot*, 164 F.3d at 145 (stating that "Millstein [the attorney] boxed the van into its parking space with his car in order to prevent Latshaw from driving it out of the parking lot," but that "Latshaw managed to maneuver the van around Millstein's car and drove off"). The only thing stopping Latshaw from leaving with the van was Abbott's attorney, who had blocked her exit with his car.

Defendant relies on the Eighth Circuit's decision in *Moore v. Carpenter*, but that case has no application here. In *Moore*, the court found no state action, and in doing so specifically pointed out that the police officers made no threats to arrest during the repossession. 404 F.3d 1043, 1046 (8th Cir. 2005). By contrast, Corporal Devlin not only threatened to arrest Ms. Johnson for disorderly conduct if she did not leave the car, but he also threatened to break the car window. (Defendants' Exhibit P, Cell Phone Video). Such threats are far and away from "keeping the peace."

Further, the Eighth Circuit in *Moore* used a more demanding test than that used in *Abbott*. In the Eighth Circuit, police officers are on notice that their conduct constitutes state action only "if the officer affirmatively intervenes to aid the repossessor enough that the repossession *would not have occurred without the officer's help. Moore*, 404 F.3d at 1046 (emphasis added). Clearly, even that more demanding standard is met by Devlin's conduct here.

By contrast, the Third Circuit does not require the officer's conduct be the "but for" cause of the repossession. *See Harvey*, 635 F.3d at 609–10 (stating that "[t]he test is whether the officer maintains neutrality or takes an active role in the repossession resulting in an unconstitutional deprivation"). Under the Third Circuit's less demanding "active role" test, the Court in *Abbott* found that two of the police officers engaged in state action: Diehl, who played a "principal role" in the seizure, and Lt. George, who played a lesser role and was "not the instigator." 164 F.3d at 147. As explained earlier, Lt. George's conduct is virtually indistinguishable from Corporal Devlin's conduct, and they both faced very similar situations in that they both were confronted with protests and the repossessions were at least partially in progress.

Defendants also rely on a case out of the Western District of Virginia called *Goard v. Crown Auto, Inc.* (Defs.' Br. at 14), but *Goard* actually *supports* a finding that Corporal Devlin violated clearly established law. In *Goard*, the court analyzed the conduct of two police officers at the scene of a repossession and concluded that only one of them enjoyed qualified immunity. 2017 WL 2423521, at *10–11 (W.D.Va. June 2, 2017). The officer who was denied immunity—Officer Howard—threatened to arrest the property owner unless she consented to the repossession. *Id.* at *10. Officer Howard "used the weight of his authority to encourage and cajole Plaintiff to surrender her vehicle," and in doing so, Officer Howard "clearly transformed from a neutral peacekeeper into a 'participant in a property deprivation.'" *Id.* (brackets omitted).

Like Officer Howard in *Goard*, Corporal Devlin threatened to arrest Ms. Johnson unless she left the vehicle. He made his threats *knowing* Ms. Johnson was the spouse of the vehicle owner (Ex. 5, Black Dep. at pp. 30:12–31:02), and *knowing* that he was in the middle of a civil repossession. (Ex. 1, Devlin Dep. at pp. 51:05–07, 55:06–11). Corporal Devlin and the other troopers admit that they are well aware that they (law enforcement) cannot involve themselves in

a civil repossession. (Id. at p. 50:12–14; Ex. 8, Morris Dep. at p. 24:17–21; Ex. 7, Hertzog Dep. at p. 20:05–12; Ex. 5, Black Dep. at p. 26:05–14). A reasonable officer in Corporal Devlin's position would have understood that using threats of arrest and violence to help effectuate a repossession violates clearly established law. Indeed, these very troopers admitted such an understanding.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 168 (3d Cir. 2016). The law has been abundantly clear for decades that law enforcement may not make threats of arrest and violence during a repossession without violating basic tenets of due process. *See Abbot v. Harvey*. Even so, Corporal Devlin—out of either incompetence or malice—wholly disregarded this law and elected to help the repossession company in a blatant abuse of power. He must answer for his unconstitutional conduct.

## IV.   CONCLUSION

Angela Hyman clearly has property interests in the car she owns. As such, the Constitution prohibits Corporal Devlin from unreasonably seizing Angela's car and depriving her of her car without due process of law. Yet that is exactly what he did. This Court should deny the Defendants' Motion for Summary Judgment.

Date:   7/20/18

Respectfully submitted:

*/s/ Andrew M. Milz*
CARY L. FLITTER
ANDREW MILZ
JODY THOMAS LÓPEZ-JACOBS
Attorneys for Plaintiff

**FLITTER MILZ, P.C.**
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGELA HYMAN,<br>     Plaintiff,<br><br>  vs.<br><br>MICHAEL MORRIS,<br>BRYAN DEVLIN,<br>     Defendants. | CIVIL ACTION<br><br><br><br>NO. 3:17-cv-00089(KRG) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to all CM/ECF participants, including:

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
(*Counsel for Defendants*)

          /s/ Andrew M. Milz
          Andrew M. Milz, Esquire
Dated: July 20, 2018       (*Counsel for Plaintiff*)