IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELA HYMAN,<br><div align="center">Plaintiff,</div><br>vs.<br><br>MICHAEL MORRIS,<br>BRYAN DEVLIN,<br><div align="center">Defendants.</div> | CIVIL ACTION<br><br><br>NO. 3:17-cv-00089(KRG) |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANTS'**</u>
<u>**CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS**</u>

1.  Admitted.

2.  Admitted.

3.  Admitted.

4.  Admitted.

5.  Denied.  Plaintiff does not recall if she received bills regularly because they were going to her P.O. Box in Virginia. (Hyman Dep. at pp. 50:08–12, 51:24–52:01).

6.  Admitted.

7.  Admitted.

8.  Denied.  The last time Plaintiff visited the P.O. Box was either October or November 2016. (Hyman Dep. at p. 35:22–25).

9.  Admitted.

10. Admitted.  By way of further answer, around June 2016, Angela fell behind on payments because of medical problems. (Transaction History Report, COAF000346–COAF000347; Hyman Dep. at p. 48:07–10).   During that time, Angela was in the process of making payment arrangements with Capital One. (Hyman Dep. at pp. 48:22–49:15).

<div align="center">1</div>

11. Admitted.

12. Admitted.

13. Admitted.

14. Admitted.

15. Admitted.

16. Admitted.

17. Admitted.

18. Admitted.

19. Admitted.

20. Admitted.

21. Admitted.

22. Denied.   Plaintiff testified that the vehicle was positioned further into the driveway. (Hyman Dep. at pp. 183:20–186:22).

23. Denied.   Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15).  Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

24. Admitted.

25. Denied. Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15).  Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

26. Admitted.

27. Admitted.

28. Admitted in part, denied in part. It is denied that the vehicle was hooked, picked up, and strapped, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

29. Admitted in part, denied in part. It is denied that the vehicle was lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

30. Admitted.

31. Admitted.

32. Admitted in part, denied in part. It is denied that Ms. Johnson locked the car, as Plaintiff testified that she locked the car remotely. (Hyman Dep. at p. 166:04–12).

33. Denied. It is denied that the vehicle was lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

34. Denied. It is denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the

vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).   Further, both Plaintiff and Ms. Johnson were in possession of the car because Plaintiff owned the car and Ms. Johnson was sitting inside of it. (Hyman Dep. at p. 36:04–15; Johnson Dep. at pp. 21:20–24, 23:08–17).

35. Admitted in part, denied in part.  It is admitted that Mr. Brunner called the Pennsylvania State Police at that point.  It is denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15).  Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

36. Denied.  It is denied that Mr. Brunner spoke with Trooper Black, as Trooper Black testified that he was dispatched by the Ebensburg PCO, Brenda Duffy, "for a female who'd locked herself inside of a vehicle during the process of a repossession. (Hyman Dep. at p. 12:06–14).  It is also denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15).  Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

37. Admitted.

38. Admitted.

39. Admitted.

40. Admitted.

41. Admitted.

42. Denied. It is denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

43. Denied as stated. It is admitted that neither the troopers nor Corporal Devlin provided physical assistance with the manual task of hooking and strapping the vehicle to the tow truck. It is denied that these individuals provided no assistance to bring about the repossession. (Defendants' Exhibit P).

44. Denied. Ms. Johnson testified that when the police arrived, the first thing they did was approach Plaintiff. (Johnson Dep. at pp. 30:23–31:03).

45. Admitted.

46. Admitted in part, denied as part. To the extent this averment suggests that Plaintiff referred to Ms. Johnson as the "female" in the vehicle, this averment is denied. Plaintiff told Trooper Black that she was married to Ms. Johnson. (Hyman Dep. 62:19–63:07). The remainder of this averment is admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. Admitted.

53. Admitted.

54. Admitted.

55. Admitted.

56. Admitted.

57. Denied. It is denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

58. Admitted.

59. Admitted.

60. Denied. Corporal Devlin was responding to the scene of a repossession where the spouse of the vehicle owner refused to get out of the car. It is undisputed that everyone on the scene— including Corporal Devlin—understood from the beginning that they were dealing with a civil repossession. (Devlin Dep. at pp. 51:05–07, 55:06–11; Morris Dep. at p. 14:21–25; Black Dep. at p. 12:12–14; Hertzog Dep at p. 18:02–04).

When Ms. Gaines first pleaded with Corporal Devlin to explain why he was taking sides, he responded by *admitting* he was there to help the repo man repossess the vehicle: "Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay." (Defendant's Exhibit P). Ms. Gaines protested again that this was a "civil issue," but Corporal Devlin brazenly requested Ms. Gaines to ask Ms. Johnson "to get out *so these men can do their job*." (Defendant's Exhibit P, emphasis added).

6

Additionally, Corporal Devlin *knew* that Ms. Johnson was the spouse of the vehicle owner—not some "unknown lady." (Black Dep. at pp. 30:12–31:02, stating "Q. Did you tell [Devlin] that the woman in the vehicle was the spouse of the owner of the vehicle? A. I believe I did, yeah.").

Further, the dispatcher created a "CAD" report, which is seen by the dispatched police officer. (Black Dep. 14:03–12; CAD Report). The CAD report referred to a "repo guy" and specified (albeit incorrectly) that the person in the vehicle was the vehicle *owner*, stating, "REPO GUY SAID THE OWNER OF THE VEHICLE REFUSES TO GET OUT OF THE VEHICLE." (CAD Report).

61. Admitted. By way of further answer, before Corporal Devlin arrived to the scene, Trooper Black told him over the phone that Ms. Johnson was the spouse of the vehicle owner. (Black Dep. at pp. 30:12–31:02).

62. Denied as stated. Corporal Devlin knew that the person in the car was the spouse of the vehicle owner. (Black Dep. at pp. 30:12–31:02).

63. Denied. It is denied that the vehicle was strapped down and lifted off the ground, as Plaintiff was 100% certain that the car was not hooked up to the tow truck. (Hyman Dep. at pp. 178:17–20, 194:05–15). Shyree Johnson also testified that the tow truck was not hooked up to the vehicle or lifted off the ground. (Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

64. Admitted.

65. Denied. Corporal Devlin was communicating his threats to Ms. Johnson as well, and at any rate, Ms. Johnson could hear the conversation from inside the vehicle and on the phone. (Defendants' Exhibit P; Johnson Dep. at pp. 27:16–29:04, 35:08–14, 55:21–57:01).

66. Denied.  Corporal Devlin was communicating his threats to Ms. Johnson as well, and at any rate, Ms. Johnson could hear the conversation from inside the vehicle and on the phone. (Defendants' Exhibit P; Johnson Dep. at pp. 27:16–29:04, 35:08–14, 55:21–57:01).

Additionally, Corporal Devlin *knew* that Ms. Johnson was the spouse of the vehicle owner— not some unknown person.  (Black Dep. at pp. 30:12–31:02, stating "Q. Did you tell [Devlin] that the woman in the vehicle was the spouse of the owner of the vehicle? A. I believe I did, yeah.").

Further, Plaintiff denies the implication that Corporal Devlin did not know he was responding to the scene of a repossession where the spouse of the vehicle owner refused to get out of the car. It is undisputed that everyone on the scene—including Corporal Devlin—understood from the beginning that they were dealing with a civil repossession. (Devlin Dep. at pp. 51:05–07, 55:06– 11; Morris Dep. at p. 14:21–25; Black Dep. at p. 12:12–14; Hertzog Dep at p. 18:02–04).

When Ms. Gaines first pleaded with Corporal Devlin to explain why he was taking sides, he responded by *admitting* he was there to help the repo man repossess the vehicle: "Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay." (Defendant's Exhibit P).  Ms. Gaines protested again that this was a "civil issue," but Corporal Devlin brazenly requested Ms. Gaines to ask Ms. Johnson "to get out *so these men can do their job*." (Defendant's Exhibit P, emphasis added).

67. Denied.  Corporal Devlin *knew* that Ms. Johnson was the spouse of the vehicle owner— not some unknown person.  (Black Dep. at pp. 30:12–31:02, stating "Q. Did you tell him that the woman in the vehicle was the spouse of the owner of the vehicle? A. I believe I did, yeah.").

68. Admitted.

69. Denied as stated. Ms. Johnson left the car not on her own volition, but because Corporal Devlin threatened to arrest her for disorderly conduct. (Defendants' Exhibit P; Johnson Dep. at p. 35:08–20).

70. Admitted, except to the extent this averment suggests that Ms. Johnson left the car not on her own volition. She left the car because Corporal Devlin threatened to arrest her for disorderly conduct. (Defendants' Exhibit P; Johnson Dep. at p. 35:08–20).

71. Admitted, except to the extent that this averment suggests that Corporal Devlin did not know who the person in the vehicle was. Trooper Black told him that the person in the vehicle was the spouse of the vehicle owner. (Black Dep. at pp. 30:12–31:02).

72. Denied. Trooper Morris testified that the tow truck probably left with the Plaintiff's at the same time that everyone else left the scene. (Morris Dep. at p. 36:10–16).

73. Denied as stated. Ms. Hyman testified about the troopers touching their guns, and that she was intimidated by this. (Hyman Dep. at 63:23, 98:12, 177:12-17).

74. Denied as stated. It is admitted that neither the troopers nor Corporal Devlin provided physical assistance with the manual task of hooking and strapping the vehicle to the tow truck. It is denied that these individuals provided no assistance to bring about the repossession. (Defendants' Exhibit P).

75. Admitted.

76. Denied as stated. Corporal Devlin was "banging" on the window with his hand. (Johnson Dep. at p. 56:10–15).

77. Admitted.

78. Admitted.

79. Admitted.

80. Denied as stated. When Plaintiff first got the car back, it didn't run.  (Hyman Dep. at p. 191:10).

**NEW MATTER**

*Angela Hyman's Background*

81. Angela Hyman is a 57-year old mother of six children, originally from Virginia.  (Ex. 2, Hyman Dep. at pp. 7:17–21, 86:15–16).

82. Angela is married to her partner Shyree Johnson.  (Id. at pp. 22:22–23:11).

83. In 2016, Angela and Ms. Johnson lived with each other in Angela's home in Nanty Glo, Pennsylvania.  (Id.).

84. About 20 years ago, Angela was diagnosed with panic disorder, which causes her panic attacks and heart palpitations to this day.  (Id. at pp. 11:20–12:19, 98:24–99:06).

85. Angela continues to suffer a host of other medical issues that prevent her from working, including cardiac disorder, asthma, shortness of breath, low potassium, hypertension, headaches, heart failure, and a thoracic aortic aneurysm that requires surgery.  (Id. at pp. 30:20–31:22).

86. In April 2016, Angela's health issues prompted her to purchase her present home in Nanty Glo, Pennsylvania—a "quiet place" where she believed she could live out the rest of her days in peace.  (Id. at pp. 16:07–21, 19:01–16, 190:23–191:05).

87. Although Angela lives in Nanty Glo, she uses her car to commute back to Virginia for her doctors' appointments because they are familiar with her medical conditions.  (Id. at pp. 19:01–20:01).

### *Angela Purchases a Car and Makes Payments for over Two Years*

88. In 2014, Angela purchased a Toyota Corolla, which was financed by Capital One Auto Finance. (Id. at p. 36:04–15).

89. With few exceptions, Angela made regular, timely payments on the car for over two years. (Ex. 3, Transaction History Report).

90. Then, around June 2016, Angela fell behind on payments because of medical problems. (Ex. 3, Transaction History Report; Ex. 2, Hyman Dep. at p. 48:07–10).

91. During that time period, Angela was in the process of making payment arrangements with Capital One. (Ex. 2, Hyman Dep. at pp. 48:22–49:15).

### *The Night of the Repossession*

92. On October 5, 2016, Ms. Hyman and her spouse Shyree Johnson were at home when they heard a noise outside. (Id. at p. 61:17–20).

93. Ms. Johnson rushed downstairs and reported back to Angela that there was "a tow truck at your car." (Id. at p. 61:20–23).

94. At the time, the car was parked in Angela's driveway, which is adjacent to her house. (Id. at p. 59:02–04).

95. After getting dressed, Angela ran downstairs and called her daughter, Makiba Gaines, believing that Ms. Gaines—as a law student—would have a better understanding of Angela's rights. (Id. at pp. 61:24–62:06).

96. In the meantime, Ms. Johnson went to the car and—after asking permission from the repo men—retrieved her personal items from the car. (Ex. 4, Johnson Dep. at pp. 18:18–19:24).

97. When Ms. Johnson returned to the house with her personal items, Angela told her to go sit in the car, which she did. (Id. at pp. 21:20–24, 23:08–17).

98. At the advice of Ms. Gaines, Angela walked over to the repo man and demanded him to leave her property, and she specifically told him he was trespassing. (Ex. 2, Hyman Dep. 69:12–22; Ex. 4, Johnson Dep. 25:19–25).

99. In response, the repo man said, "I do not see a trespassing sign." (Ex. 2, Hyman Dep. 69:20–24; Ex. 4, Johnson Dep. 25:19–25).

100. He refused to leave.  (Ex. 2, Hyman Dep. 70:21–23).

101. At this point, both Angela (in the house) and Ms. Johnson (in the car) were on the phone with Ms. Gaines. (Ex. 2, Hyman Dep. at p. 70:02–08; Ex. 4, Johnson Dep. at p. 22:02–25).

102. At the advice of Ms. Gaines, Angela used her other phone to call 9-1-1.  (Ex. 2, Hyman Dep. at p. 62:12–18).

103. During the call, Angela reported that someone was trying to take her car.  (Id. at p. 73:08–18).

104. The 9-1-1 operator told Angela that the police were already on their way.  (Id. at p. 62:12–18).

105. Unbeknownst to Angela, the repo man had already called the police.  (Ex. 8, Morris Dep. at pp. 47:02–08, 47:24–48:03).

106. While everyone waited for the police to arrive, Angela demanded two more times that the repo men leave her property, but they refused. (Ex. 2, Hyman Dep. at pp. 74:16–75:15).

107. At this time, the tow truck was *not* hooked up to Angela's car.  (Id. at p. 76:07–18).

***The Police Arrive to the Scene and Order Ms. Johnson Out of the Car so the Repo Men Could Carry Out the Repossession***

108. At about 7:40 p.m., Pennsylvania State Police Trooper Brian Black was dispatched to Angela's home "for a female who'd locked herself inside of a vehicle during the process of a repossession." (Ex. 5, Black Dep. 12:02–14, 14:13–15:01; Ex. 6, CAD Report).

109.   Trooper Black was the first trooper on the scene.  (Ex. 5, Black Dep. at p. 50:10–11).

110.   When Trooper Black arrived, he spoke with the tow truck driver, who provided documentation showing that he was there to repossess the vehicle, and "related that there was a black, non-Hispanic female inside the vehicle that refused to get out." (Ex. 2, Hyman Dep. at p. 15:17–21).

111.   Trooper Black then spoke with Angela, who provided her name and driver's license.  (Id. at pp. 62:19–63:07).

112.   Angela also told Trooper Black that she and Ms. Johnson were married.  (Id. at pp. 62:19–63:07).

113.   Trooper Black then called the shift supervisor on duty—Corporal Bryan Devlin.  (Ex. 5, Black Dep. at pp. 30:12–31:02, 40:01–05).

114.   At the time, Corporal Devlin had been a corporal for only one month.  (Ex. 7, Hertzog Dep. at pp. 16:22–17:02).  At the time of his deposition, Corporal Devlin could not recall having ever been dispatched to the scene of a repossession prior to one involved in this case. (Ex. 1, Devlin Dep. 40:19–21).

115.   Trooper Black told Corporal Devlin that he was at the scene of a vehicular repossession, and that a woman who was the *spouse* of the vehicle owner had locked herself in the vehicle.  (Ex. 5, Black Dep. at pp. 30:12–31:02, stating "Q. Did you tell him that the woman in the vehicle was the spouse of the owner of the vehicle? A. I believe I did, yeah.").

116.   After the call, Trooper Black returned to Angela and said, "Tell her [Ms. Johnson] to get out of the car, because we are going to take the car." (Ex. 2, Hyman Dep. at p. 63:05–07).

117.   Ms. Gaines then spoke with Trooper Black over the phone, but according to Angela, "[h]e didn't care about anything that she was saying on the phone. So he is sitting there. He is touching his gun. I'm terrified. I was so scared." (Id. at p. 63:17–23).

118.   Eventually, two other troopers arrived on the scene: Trooper Michael Morris and Trooper Elmer Hertzog. (Ex. 5, Black Dep. at p. 31:09–17; Ex. 6, CAD Report).

119.   When Trooper Morris arrived, Trooper Black told him that the woman in the car was the car owner's "romantic partner." (Ex. 8, Morris Dep. 13:17–14:23).

120.   Before Corporal Devlin arrived, Trooper Morris explained to Ms. Johnson that "this was a civil matter, and she wasn't going to be in any type of trouble right now, that they could get everything straightened out." (Ex. 8, Morris Dep. at p. 17:05–24).

121.   When Corporal Devlin arrived, he "took control of the scene . . . ." (Ex. 5, Black Dep. at p. 32:06–11).

122.   Corporal Devlin went to speak with Angela—who was inside the house. (Ex. 1, Devlin Dep. at pp. 30:21–31:01).

123.   Angela opened the door and gave Corporal Devlin her phone. (Id. at pp. 30:21–31:01).

124.   At this point, Ms. Gaines pleaded with Corporal Devlin over the phone to stop their involvement in the repossession "because the police cannot enforce a civil contract," but Corporal Devlin ignored her pleas. (Defendants' Exhibit P, Cell Phone Video).[1]

125.   Instead, Corporal Devlin threatened to break the window of the car and arrest Ms. Johnson for disorderly conduct unless she got out of the car. (Id.)

126.   The conversation between Corporal Devlin and Ms. Gaines proceeded as follows:

> **Corporal Devlin**: If she [Ms. Johnson] does not willingly come out
> we are going to have to remove her.

---

[1]   The telephone call between Ms. Gaines and Corporal Devlin is reflected in a cell phone video recording already provided by Defendants as Defendants' Exhibit P.

**Ms. Gaines**: Sir, sir – can he hear me mom?

**Angela Hyman**: Yeah, he can hear you.

**Corporal Devlin**: Is she trying to talk? Hello, yes. Maam.

**Ms. Gaines**: Sir, I am just trying to figure out because police cannot enforce a civil contract and it seems as if you're taking sides between my mother and the tow truck driver, but you can also ask him to leave her private property instead of asking her to get out of her car.

**Corporal Devlin**: Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay.

**Ms. Gaines**: Right sir, but listen this is a civil issue.

**Corporal Devlin**: Maam, maam, okay – if you're talking with the young lady in the car, okay, if you would please tell her to get out so these men can do their job.

**Ms. Gaines**: Sir, listen, you are doing this unlawfully.

**Corporal Devlin**: Okay, you can file a complaint on me later. That's okay.

**Ms. Gaines**: Sir you cannot ask her to get out of the car.

**Corporal Devlin**: Here's what going happen, okay, if she doesn't get out we are going to break the window.

**Ms. Gaines**: Sir. I am recording you sir.

**Corporal Devlin**: It's okay you can record it, I'm tell you what's going to happen. She is going to be removed, she going to be arrested for disorderly conduct and the car is still going to get taken.

**Ms. Gaines**: And Sir you are breaking the law.

**Corporal Devlin**: That's okay.

**Ms. Gaines**: And we will bring a complaint against you and this is possible discrimination.

**Corporal Devlin**: Are you not going to ask the young lady to get out of the vehicle?

**Ms. Gaines**: Well, no she is going to comply with you. You're enforcing a civil contract without authority of a court order.

**Corporal Devlin**: Okay well then you can contact the state police talk to my sergeant, I am the shift supervisor tonight, you can file the complaint against me.

**Ms. Gaines**: Have you spoken to any legal counsel about what you're doing?

**Corporal Devlin**: Maam, that is not what is happening tonight. Okay?

**Ms. Gaines**: Have you spoken to any legal counsel. You are breaking the law, you cannot do this.

**Corporal Devlin**: Did you tell the young lady to get out?

**Ms. Gaines**: I haven't spoken to her yet.

**Corporal Devlin**: Well you said she was going to comply.

15

> **Ms. Gaines:** Well of course she is going to comply with your order.
> **Corporal Devlin:** Well you call her and tell her to do that and once I know that she is going to get out we will be okay.
> **Ms. Gaines:** I am going to call you right back.
> **Angela Hyman:** Okay.
> **[Ms. Gaines calls Ms. Johnson]**
> **Ms. Johnson:** Ok they are getting anxious.
> **Ms. Gaines:** Tell them ok. What county are you in?
> **Ms. Johnson:** Nanty Glo, Cambria.
> **Corporal Devlin:** I'm not going to wait all day.
> **Ms. Johnson:** I understand.
> **Corporal Devlin:** - You got about 30 more seconds.
> **Ms. Johnson:** He said I got 30 more seconds then he is going to bust the window and take me in. She said. My lawyer is on the phone with the State Police.
> **Trooper Devlin:** What? You've got 30 seconds to come out or we breaking the window and coming in, how long have we been here dealing with this? I asked nicely, I explained to you what is going to happen, okay?
> **Ms. Johnson:** Okay
> **Trooper Devlin:** If you refuse to come out we are going to have to remove you and I do not want to do that for a repossessed vehicle.
> **Ms. Johnson:** Okay. Hello.
> **Trooper Devlin:** Are you getting out? Your time is up. Yes or no?
> **Ms. Johnson:** Alright. Hello. I am getting out. I'm getting out, y'all.

(Defendants' Exhibit P).

127. Thereafter, the tow truck driver hooked up the car and towed it away. (Ex. 2, Hyman Dep. at pp. 80:23–81:18).

128. Despite Corporal Devlin's threats of violence and arrest, no trooper witnessed any sort of violence, threats, or destruction of property on the part of Angela or Ms. Johnson. (Ex. 7, Hertzog Dep. 21:11–21; Ex. 5, Black Dep. at p. 37:07–38:10; Ex. 8, Morris Dep. at pp. 29:18–30:03).

129. Corporal Devlin likewise admits that he did not witness any violence, property destruction, or threats. (Ex. 1, Devlin Dep. at pp. 58:15–59:03).

### *Corporal Devlin's Explanations for his Conduct Lack Credibility*

130.  Corporal Devlin claims he told Ms. Johnson to get out of the car "[b]ecause we didn't know who she was." (Id. at p. 34:15–17).

131.  He attempts to justify his assistance with the repossession by claiming he was responding to a "disturbance" involving "an unknown lady locked inside of a car." (Id. at pp. 50:12–22, 52:11–13).

132.  This oblique explanation makes no sense, and contradicts facts known to Corporal Devlin at the time of the repossession.

133.  It is undisputed that everyone on the scene—including Corporal Devlin—understood from the beginning that they were dealing with a civil repossession. (Id. at pp. 51:05–07, 55:06–11; Ex. 8, Morris Dep. at p. 14:21–25; Ex. 5, Black Dep. at p. 12:12–14; Ex. 7, Hertzog Dep at p. 18:02–04).

134.  Additionally, the dispatcher created a "CAD" report, which is seen by the dispatched police officer.  (Ex. 5, Black Dep. 14:03–12; Ex. 6, CAD Report).

135.  The CAD report referred to a "repo guy" and specified (albeit incorrectly) that the person in the vehicle was the vehicle *owner*, stating, "REPO GUY SAID THE OWNER OF THE VEHICLE REFUSES TO GET OUT OF THE VEHICLE." (Ex. 6, CAD Report).  In fact, it was Ms. Johnson, the owner's wife.

136.  There was never any "disturbance"—everyone on the scene admits that Angela and Ms. Johnson did not make any threats of violence or act out violently. (Ex. 1, Devlin Dep. at pp. 58:15–59:03; Ex. 7, Hertzog Dep. at p. 21:11–21; Ex. 5, Black Dep. 37:07–38:10; Ex. 8, Morris Dep. at pp. 29:18–30:03).

137.  When Ms. Gaines first pleaded with Corporal Devlin to explain why he was taking sides, he responded by *admitting* he was there to help the repo man repossess the vehicle: "Maam, well what's going to happen here today is we already spoke with the tower they have to get the vehicle tonight, okay." (Defendant's Exhibit P, Cell Phone Video).

138.  Ms. Gaines protested again that this was a "civil issue," but Corporal Devlin brazenly requested Ms. Gaines to ask Ms. Johnson "to get out *so these men can do their job*." (Id., emphasis added).

139.  Before arriving to the scene, Corporal Devlin already *knew* that Ms. Johnson was the spouse of the vehicle owner because Trooper Black relayed this to him over the phone.  (Ex. 5, Black Dep. at pp. 30:12–31:02).

140.  Even crediting Corporal Devlin's claim that he had no idea who was in the car, he does not (and cannot) dispute that he never asked for the identity of the person in the car. (Ex. 1, Devlin Dep. at p. 63:04–06).  This goes to show that Corporal Devlin was *never* concerned about investigating the identity of the vehicle occupant.

141.  No one at the scene told the tow truck driver to leave Angela's property.  (Ex. 1, Devlin Dep. 34:03–05).

142.  The state police did not investigate Angela's complaint that the tow truck driver was trespassing on her property. (Ex. 8, Morris Dep. 46:13–22).

143.  Indeed, Corporal Devlin admits that his involvement was necessary to accomplishing the repossession, because if he "didn't get her out of the car, the repo man wouldn't have been able to take the vehicle." (Ex. 1, Devlin Dep. at p. 52:20–23).

144.  Trooper Morris likewise admits that the repossession would not have occurred without the assistance of the Pennsylvania State Police. (Ex. 8, Morris Dep. at p. 37:15–24, stating "Q.

Would the repo man been able to take the vehicle were it not for the state police to ask the woman to leave the car? . . . . A. Well, not without driving away with her in it.").

145.  Similarly, the repo man on the scene admits that he would not have been able to take the car without the assistance of the police. (Ex. 9, Brunner Dep. at p. 61:11–17, stating "Q.  If the police didn't show up that night, sir, would you have been able to repossess that car? . . . . A. I would have had to sit there.  I wouldn't have been able to do anything.  It would have been a stalemate.").

146.  Although Corporal Devlin testified that the car was one to two feet off the ground when he arrived (Ex. 1, Devlin Dep. at p. 49:18–21), his testimony conflicts with that of his own colleagues—Troopers Hertzog and Black.

147.  Trooper Hertzog did not see the car lifted off the ground.  (Ex. 7, Hertzog Dep. 13:16–19).

148.  Trooper Black does not recall seeing the car lifted up in the air.  (Ex. 5, Black Dep. 17:03–12).

149.  By contrast, Ms. Johnson testified that the car was not hooked up to the car or lifted off the ground. (Ex. 4, Johnson Dep. at pp. 23:03–05, 41:15–21, 43:02–11, 43:18–21, 59:10–12, 64:01–07).

150.  Similarly, Angela was 100% certain that the car was not hooked up to the tow truck. (Ex. 2, Hyman Dep. at pp. 178:17–20, 194:05–15).

151.  Within days after the incident, Angela complained to internal affairs. (Id. at pp. 181:14–182:11).

152.  The person she spoke with in internal affairs told Angela "that the police statements **did not match up**." (Id. at p. 182:06–11, emphasis added).

153.  Corporal Devlin and the other troopers admit that they are well aware that they (law enforcement) cannot involve themselves in a civil repossession.  (Ex. 1, Devlin Dep. at p. 50:12–14; Ex. 8, Morris Dep. at p. 24:17–21; Ex. 7, Hertzog Dep. at p. 20:05–12; Ex. 5, Black Dep. at p. 26:05–14).

Respectfully submitted:

Date:  7/20/18

/s/ Andrew M. Milz
CARY L. FLITTER
ANDREW MILZ
JODY THOMAS LÓPEZ-JACOBS
Attorneys for Plaintiff

**FLITTER MILZ, P.C.**
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
(610) 822-0782

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANGELA HYMAN, | CIVIL ACTION |
| Plaintiff, | |
| vs. | |
| MICHAEL MORRIS, | NO. 3:17-cv-00089(KRG) |
| BRYAN DEVLIN, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS** was filed with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to all CM/ECF participants, including:

OFFICE OF ATTORNEY GENERAL
1251 Waterfront Place
Mezzanine Level
Pittsburgh, PA 15222
(*Counsel for Defendants*)

　　　　　　　　　　　　　　/s/ Andrew M. Milz
　　　　　　　　　　　　　Andrew M. Milz, Esquire
Dated: July 20, 2018　　　(*Counsel for Plaintiff*)