## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANGELA HYMAN,** | ) | Case No. 3:17-cv-00089 |
| | ) | |
| Plaintiff, | ) | DISTRICT JUDGE KIM R. GIBSON |
| | ) | |
| vs. | ) | |
| | ) | |
| **BRYAN DEVLIN,** | ) | ***Electronically Filed*** |
| | ) | |
| Defendant. | ) | |

### BRIEF IN SUPPORT OF DEFENDANT'S MOTION
### FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL OR
### <u>REMITTITUR TO REDUCE THE EXCESSIVE PUNITIVE DAMAGE AWARD</u>

Pursuant to Federal Rules of Civil Procedure 50(b), 59(a) and 59(e), Defendant respectfully submits this Brief in Support of his Motion for Judgment as a Matter of Law or New Trial or Remittitur to Reduce the Excessive Punitive Damages awarded in this case.

### I.   Introduction

The jury trial in this matter was held January 29, 2019 through February 1, 2019. The jury found the Defendant violated Plaintiff's constitutional rights and awarded $5,000 in compensatory damages and $500,000 in punitive damages. The jury's $500,000 award of punitive damages against Corporal Devlin cannot stand. There is no explanation or evidentiary support for this extreme amount; in fact, there is evidence demonstrating the award of punitive damages is against the clear weight of the evidence. A new trial is required because the grossly excessive punitive award is clearly the product of the jury's passion and prejudice. The jury was exposed to improper argument from Plaintiff's counsel that severely prejudiced Corporal Devlin. The only way to prevent a miscarriage of justice is for the Court to allow a new trial in order to correct the manifest errors (regarding the improper argument) that led to the unfair prejudice against the Defendant,

1

and to correct the clearly excessive verdict.  Alternatively, based on the evidence presented at trial, Corporal Devlin is entitled to qualified immunity and this case should be dismissed.

## II.   Standard of Review

### A.   Federal Rule of Civil Procedure 50(b):
### Renewed Motion for Judgment as a Matter of Law

Where, as here, the Court denies a party's Rule 50(a) motion, "the court is considered to have submitted the action to the jury subject to the courts later deciding the legal questions raised by the motion." Fed.R.Civ.P. 50(b). In the event an adverse judgment is entered, the movant may renew the motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). "In order to prevail, the moving party must show that the jury's findings, presumed or expressed, are not supported by substantive evidence, or if they [are], that the legal conclusions implied [by] the jury's verdict cannot in law be supported by the findings." *Moore v. Susequehanna Area Regional Airport Authority*, No. 2-0535, 2005 WL 2430790, at *2 (M.D.Pa. Sept. 30, 2005) (citing *Valenti v. Allstate Ins. Co.*, 243 F.Supp.2d 221, 223 (M.D.Pa. 2003)).

### B.   Federal Rule of Civil Procedure 59:
### Motion for a New Trial

Federal Rule of Civil Procedure 59(a)(1)(A) provides that the Court may grant a new trial on all or some of the issues "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Under Rule 59, motions for a new trial must be filed within twenty-eight (28) days of the date the judgment was entered. Courts have granted motions for a new trial where: "(1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury." *Mulero v. Walsh*, No. 3:15-1406, 2018 WL 1084235, at *3 (M.D.Pa. Feb. 28, 2018)

(citing *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F.Supp. 477, 480 (E.D.Pa.), *aff'd* 983 F.2d 1051 (3d Cir. 1992).

### C. Federal Rule of Civil Procedure 59(e): Remittitur

"Under Rule 59(e), a party may seek alteration or amendment of the verdict." *Borrell v. Bloomsburg Univ.*, 207 F.Supp.3d 454, 471 (M.D.Pa. 2016). "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986). "The use of remittitur is committed to the sound discretion of the district court judge." *Hall v. Pennsylvania Dept. of Corrs.*, No. 02-1255, 2006 WL 2772551, at *20 (M.D.Pa. Sept. 25, 2006). "[W]hen considering and fixing a remittitur, the court is to 'consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being mindful that the determination of that amount may not be precisely calculated." *Borrell*, 207 F.Supp.3d at 471. (quoting *Evans v. Port Auth. Of N.Y.*, 273 F.3d 346, 352 (3d Cir. 2001).

### III. Argument

### A. Defendant's Renewed Motion for Judgment as a Matter of Law Should Be Granted Because the Evidence Does Not Support the Jury's Award

Defendant Devlin renews his motion for Judgment as a Matter of Law and submits the evidence did not support the jury's verdict. At the close of Plaintiff's case-in-chief, Defendant moved for Judgment as a Matter of Law pursuant to Rule 50(a) on all claims advanced by Plaintiff.

On the Fourth and Fourteenth Amendment claims, Defendant submits there was no evidence proffered at trial to support a conclusion that Corporal Devlin unreasonably seized any property from Plaintiff in the 15 or 20 minutes he was on the scene or that he denied Plaintiff any

due process rights to which she may have been entitled. Instead, the evidence demonstrated that when he arrived at the scene, Corporal Devlin was faced with an "unsafe" situation with a woman locked in a car that had been repossessed by a tow truck driver with the tow truck extending out into the roadway obstructing a travel lane in the dark of night. (Exhibit B, Trial Transcript, 1/30/2019, p. 195). To defuse the situation that had the potential to be extremely volatile, Corporal Devlin considered his available options and opted to have the woman exit the vehicle to resolve the "unsafe" situation and let the self-help repossession, that had been in progress until the woman locked herself in the vehicle, to continue. He was not at the scene to make property possession decisions. He was not present to decide who was right and who was wrong. (Exhibit B, p. 164).

The police were called to the scene that night by the tow truck driver **and** the Plaintiff because they **both** knew the situation needed addressed; they **both** knew something had to be done. Based on the totality of the surrounding circumstances, the evidence supported the conclusion that Corporal Devlin assessed the situation and reasonably acted to defuse the situation that potentially posed risk of harm and injury to the parties involved and others in the community. Any reasonable officer facing the same situation would have acted the same as Corporal Devlin. The evidence did not support a finding of any constitutional violation.

Also in its Rule 50(a) motion, Defendant asked for judgment as a matter of law on Plaintiff's claim for punitive damages. As argued, punitive damages are only warranted if the defendant acts maliciously or wantonly. A malicious act is defined as one "prompted by ill will or spite toward the plaintiff" in a "conscious desire to violate rights or injure plaintiff unlawfully." THIRD CIRCUIT MODEL CIVIL JURY INSTRUCTIONS, § 4.8.3, p. 93 (October 2018). A wanton act is defined as one that "recklessly or callously disregarded the plaintiff's rights." *Id*.  These factors were not present in this case and the evidence failed to support any finding of malicious or wanton

actions on the part of Defendant, Corporal Devlin. As set forth later in this Brief in greater detail, Plaintiff presented her entire case for punitive damages without even suggesting (much less proving) that Corporal Devlin bore any grudge, ill will, or malice toward her. Instead Plaintiff's entire "case" on punitive damages was based on innuendo and improper argument of counsel directed toward the State Police, a non-party to this case. Even over a sustained objection to Plaintiff counsel's improper argument, counsel continued to plead that the jury needed to send a message to the State Police. The evidence did not establish and/or support a claim of punitive damages against the actual Defendant, Corporal Devlin. Accordingly, Defendant renews his Motion for Judgment as a Matter of Law and respectfully submits that judgment should be entered in his favor and against the Plaintiff.

### B. Judgment in Favor of Defendant is Warranted Since Defendant is Entitled to Qualified Immunity Based on the Evidence

Defendant Devlin submits judgment should be entered in his favor based on the doctrine of qualified immunity. Devlin raised this argument in his Answer to Plaintiff's Amended Complaint [ECF No. 63, "Third Defense," p. 20] and in the Brief Supporting his Motion for Summary Judgment [ECF No. 92, p. 11]. Having appropriately pleaded and preserved the affirmative defense of qualified immunity, Devlin is entitled to "establish his right to immunity at any point in the proceeding, including at trial." *Adams v. City of Phila.*, No. 95-3960, 1996 WL 138092, 1 (E.D.Pa. Mar. 26, 1996) (collecting cases).

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). "Qualified immunity balances . . . the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and

liability when they perform their duties reasonably." *Id.* It applies "regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id* (citing *Butz v. Economou*, 438 U.S. 48, 507 (1978) (qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law.")).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.*; *see also Behrens v. Pelletier*, 516 U.S. 299, 306 (1996) (qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation.") However, "the last possible opportunity to raise qualified immunity is by a motion for judgment as a matter of law." *Adamo v. Dillon*, 900 F.Supp.2d 499, 506 (M.D.Pa. 2012), aff'd, 539 F. App'x 51 (3d Cir. 2013).

"When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 637 (3d Cir. 2015); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("[q]ualified immunity gives government official breathing room to make reasonable but mistaken judgments about open legal questions.") A government official, such as a police officer, will be entitled to qualified immunity from suit unless (1) the officer's conduct violated a constitutional right possessed by the plaintiff; and (2) the right was "clearly established" at the time of the officer's allegedly unconstitutional conduct. *Giles v. Kearney*, 571 F.3d 318, 325-26 (3d Cir. 2009). "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was ***clearly established*** at the time of the challenged conduct." *Taylor v. Barkes*, 135 S.Ct. 2042, 2044 (2015) (emphasis added); *Spady*, 800 F.3d at 637 (in a qualified immunity analysis, Courts must engage in a two-prong analysis of "whether the facts that a plaintiff has shown make out a violation of a constitutional right," and "whether the right at issue was

clearly established at the time of the defendant's misconduct.") A clearly established right is one which "a reasonable officer would understand that [his actions violate.]" *McLaughlin v. Watson*, 271 F.3d 566, 571 (3d Cir. 2001).

On February 1, 2019, a jury found that Defendant violated Plaintiff's federally protected constitutional rights by affirmatively aiding in the repossession or playing a principal or active role in the repossession. (Exhibit "D," Trial Transcript, 2/1/2019, p. 131). Accordingly, Defendant does not dispute the first prong of the analysis has been satisfied.

With respect to the second prong of the analysis, it is axiomatic that "[t]o be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he was doing violates that right." *Taylor*, 135 S.Ct. at 20144; *see also Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012), *cert. denied*, 11-1357, 2012 WL 1657210 (June 25, 2012). "Whether an asserted federal right was clearly established at a particular time, so that a public official who allegedly violated the right had no qualified immunity from suit, presents a question of law." *Spady*, 800 F.3d at 637. To demonstrate that a right is clearly established, plaintiffs must proffer persuasive case law. *Id.* And, while "a case directly on point" is not required to demonstrate a clearly established right, "existing precedent must have placed the statutory or constitutional questions **beyond debate**." *White v. Pauly*, 137 S.Ct. 548, 551 (2017). In other words, "for a right to be clearly established there must be applicable precedent from the Supreme Court," or "a ***robust consensus of cases*** of persuasive authority in the Court of Appeals . . ." *Spady*, 800 F.3d at 639 (emphasis added); *Olschefski v. Red Lion Area Scho. Dist.*, 2012 WL 6003620, *10 (M.D.Pa. Nov. 30, 2012) ("A plaintiff . . . may meet the burden by referencing closely analogous case law which demonstrates that the allegedly violated constitutional or statutory right was clearly established when the alleged violation took place.")

7

For purposes of qualified immunity, in determining whether the constitutional right at issue is clearly established, the Court "must first frame the precise contours of that right." *Spady*, 800 F.3d at 638. The Court is "not to define clearly established law at a high level of generality," rather; it "must define the right allegedly violated at the appropriate level of specificity." *Id.* Stated otherwise, the Court is "required to frame the right . . . 'in a more particularized, and hence, more relevant, sense . . . in light of the case's specific context, not as a broad general proposition." *Id.* The "clearly established law must be 'particularized' to the facts of the case." *White*, 137 S.Ct. at 552.

The essential inquiry is whether a reasonable officer in the Defendant's position at the relevant time "could have believed, in light of clearly established law, that his or her conduct comported with established standards." *McLaughlin v. Watson*, 271 F.3d 566, 570-71 (3d Cir. 2001). In other words, it is not only the evidence of "clearly established law" that is for the Court to decide, but also whether a reasonable officer could have believed that his conduct was lawful, in light of the information the officer had. *Sharrar v. Felsing*, 128 F.3d 810, 826-28 (3d Cir. 1997).

Instantly, as the case law establishes, there is no violation of rights when the police are present during a private repossession. *See Breiner v. Litshiler*, 245 F.Supp.2d 614, 626 (M.D.Pa. 2003) (In the context of a private repossession of property, the mere presence of a police officer does not, alone, constitute state action causing a deprivation of a protected property interest.) Moreover, Corporal Devlin's conduct was reasonable, particularly in light of the information known to him at the time.

Corporal Devlin responded to a situation, a "disturbance," after receiving a call from Trooper Black, who was already on the scene, stating he was unable to resolve the issue. (Exhibit "B," Trial Transcript, 1/30/19, pp. 150, 165, 202). When he arrived, Corporal Devlin had to

evaluate a "situation that was just not good." (Exhibit B, p. 164). The situation was "unsafe" and was a "potentially volatile situation." (Exhibit B, p. 195). He observed a tow truck extending onto the roadway obstructing traffic at night (Exhibit B, pp. 161, 164, 175), hooked up to a vehicle that was "already repossessed" (Exhibit B, pp. 164, 169, 175), with the back end of the vehicle lifted off the ground approximately one and a half to two feet (Exhibit B, p. 159), with a person sitting in the driver's seat who would not talk to him (Exhibit B, p. 164), and three (3) people not cooperating. (Exhibit B, p. 175). He "had to make a choice." (Exhibit B, p. 175). Based on what he saw when he assessed the surrounding circumstances, Corporal Devlin made the informed decision that police involvement was required to "bring a peaceful settlement" to the "unsafe" situation. (Exhibit B, pp. 202, 195). He was "not deciding who was right and who was wrong. [He was] trying to make the best decision [he] could with the situation that [he was] handed that night." (Exhibit B, p. 164). He "had to resolve the situation with how it was presented to [him] when [he] arrived on scene." (Exhibit B, p. 189).

Corporal Devlin considered the possible resolutions to the situation and chose to act in accordance with the most reasonable option presented under the surrounding circumstances. The options he considered included the following:

1.  *Order Tow Truck Driver To Leave With Person Still In The Car*: This was not a feasible option, since it would have been illegal for the tow truck to pull out with the woman in the car. (Exhibit B, p. 193);

2.  *Do Nothing And Leave The Scene*: This was not a feasible option because he already knew there was a problem based on the placement of a phone call to the police and the recognition of an obvious issue between the tow truck driver and the woman in the car. If he left the scene and the situation

escalated, it was going to be his fault for not resolving the situation. (Exhibit B, p. 192). Also, with the tow truck extending out into the roadway and obstructing a lane of travel, if he did not resolve that dangerous condition, he could be responsible if a vehicle hits the tow truck, causing damages and injuries to the tow truck and driver, the woman inside the car, and/or the person who struck the tow truck. (Exhibit B, p. 192);

3.    _Order The Tow Truck Driver To Lower The Car And Let The Woman Out Of The Car_: Again, this option was not feasible, since if the person inside the car gets injured or claims an injury from the action of lowering the car, then it would be his fault for ordering that the car be moved with her still inside. (Exhibit B, p. 193);

4.    _Order The Tow Truck Driver To Lower The Car, Let The Woman Out And Disconnect From The Car_: This option was ruled out, since the lender, or possibly the tow truck driver, could alleged he took sides in a civil repossession by requiring the tow truck driver to return a vehicle that had already been repossessed. (Exhibit B, p. 193);

5.    _Instruct A State Police Unit To Stay At The Scene And Stand By To Keep The Peace While The Repo Man And The Woman In The Car Resolve The Situation_: This unwise option was not deemed feasible, since the situation would have just been prolonged for some undefined period of time and would have not been a "wise use of state funds to keep an officer at that situation and have it prolonged." (Exhibit B, p. 204); or

10

6.     <u>*Get The Woman To Exit The Car That Has Already Been Repossessed*</u>: Recognizing the "unsafe" situation that existed because the lady was locked inside the car, thus rendering the tow truck motionless while partially blocking the roadway, Corporal Devlin chose this potential option since it resolved the situation with no physical injuries and/or damages to anyone. (Exhibit B, p. 193).

Corporal Devlin's conduct did not infringe on Plaintiff's constitutional rights. There is absolutely no evidence to support a finding that Corporal Devlin knew, or should have known, that his action translated into participation in a private repossession to a degree tantamount to state action. *See Haverstick Enterprises, Inc. v. Financial Fed. Credit, Inc.,* 32 F.3d 989 (6th Cir. 1994). To the contrary, Corporal Devlin's language and conduct in addressing the woman in the car, while the vehicle was repossessed and controlled by the tow truck driver, demonstrated objective good faith actions consistent with his job of defusing a volatile situation, that had the potential to escalate into a more violent and dangerous confrontation.

In *Moore v. Carpenter*, 404 F.3d 1043 (8th Cir. 2005), the Circuit Court found police officers were entitled to qualified immunity when they permitted the private repossession of a boat. Factually, plaintiff-Moore contracted with Jackson to buy a boat, *inter alia*, and entered into an installment contract for the purchase. A subsequent breach allegedly occurred and, after unsuccessfully suing Moore for alleged failure to pay, Jackson went to Moore's home to repossess the property himself. Moore resisted and the police were called to the scene. Officers Carpenter and Ward responded "to a radio call concerning a disturbance of the peace at the Moore residence." *Id.* at 1045. When the officers arrived, Jackson had already backed his van into the Moore's driveway and, depending on which version of the facts you believe, had either already hooked the

boat and trailer to the van or was preparing to hitch the boat and trailer to the van. *Id.* at 1045. The officers ran the license plate on the boat and learned that Jackson held the boat's title. The officers told Jackson to leave the premises and Jackson left with the boat in tow, over objections from Moore. Moore sued under § 1983 asserting the officers deprived him of his property without due process. The district court the officers were entitled to qualified immunity and granted judgment in their favor as a matter of law. The court concluded that although Moore had a protected property interest, the officers could have believed their conduct was lawful. An appeal followed. The Circuit Court acknowledged it must first decide whether, "[t]aken in the light most favorable to the party asserting the injury, … the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 1045 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "If so, the court then considers whether that right was so clearly established that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* at 1045 (citing *Saucier v. Katz,* 533 U.S. 194, 202).

The Circuit Court recognized that "[s]tates are held responsible for private conduct only when the state has exercised coercion or significantly encouraged the conduct, not when the state has merely acquiesced in a private party's initiatives." *Moore*, 404 F.3d at 1046 (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). "When a police officer is involved in a private party's repossession of property, there is no state action if the officer merely keeps the peace, but there is state action if the officer affirmatively intervenes to aid the repossessor enough that the repossession would not have occurred without the officer's help." *Id.* at 1046 (internal citations omitted).

After examining the totality of the circumstances, the Circuit Court concluded the officers were not so involved in aiding the repossession that the deprivation of the boat was state action.

The Court noted the following in support of its conclusion: the officers were not asked to accompany Jackson to ensure the repossession went smoothly, the officers did not arrive at the residence with him, the officers were summoned to a scene not of their making only to resolve a breach of the peace that was in progress, Jackson had gained access to the boat prior to the officers arriving, Jackson was already in the process of repossessing the boat when the officers arrived, the officers did not tell the Moores the repossession was legal, and the officers did not threaten to arrest the Moores if they interfered with the repossession. *Id.* at 1046.

The Circuit Court noted that that even if the officers went too far in sanctioning the repossession, there was no genuine issue of material fact about whether reasonable officers, standing in the shoes of officers Carpenter and Ward, could have believed their conduct was unlawful in light of the established law and the information available to them. "The officers were required to make a close decision in the midst of a repossession fracas and could not have determined they were becoming so entangled in Jackson's private self-help remedy that they could be held liable under § 1983." *Id.* at 1046. The officers needed "to diffuse (sic) the volatile situation, which necessarily resulted in one of the parties possessing the property when the public peace was restored." *Id*. at 1046. "Because it would not be clear to a reasonable officer that his conduct was unlawful in the situation confronted here, officers Carpenter and Ward are protected by qualified immunity." *Id*. at 1046-47.

Similarly, in *Goard v. Crown Auto, Inc.*, 2017 WL 2423521 (W.D.Va. June 2017) *appeal filed*, No. 17-1769 (4ᵗʰ Cir. June 27, 2017), the repo man arrived at the plaintiff's house one evening to attempt to repossess her vehicle. The repo man pulled his tow truck behind plaintiff's vehicle, but had not hooked up the vehicle, when plaintiff began objecting to the repossession. Plaintiff's mother then entered the driver's side of the vehicle and refused to get out. The repo man called the

police department because plaintiff and her mother "were getting hostile." *Id.* at *2. Four (4) Lynchburg Police Department officers responded to the call, arriving in four separate police cars. Officer McKinley was the first to arrive. Upon his arrival, Officer McKinley spoke to the repo man and then to the plaintiff. In speaking with the plaintiff, Officer McKinley relayed that the repo man believed he had a right to tow the vehicle and that the repo man would not leave until he took the vehicle with him. After hearing the plaintiff explain why she thought the repossession was a mistake and unlawful, Officer McKinley stated it was a civil issue and suggested that it might be in plaintiff's "interest to go ahead and comply with [the repo man] …. Then she could work it all out with the court." *Id.* at *3. Officer Howard was next to arrive. He had received a "give-assistance call" that involved "a tow truck driver and a disorderly." *Id.* at *3. Upon his arrival, Officer Howard also spoke to the repo man and the plaintiff. In his direct conversation with the plaintiff, Officer Howard threatened multiple times to arrest plaintiff. The reason given for the arrest threats was disputed by the parties. Officer Howard claimed his threats were for the disorderly conduct of the plaintiff. Plaintiff claimed the threats were for objecting to the repossession. The parties acknowledged and agreed, however, that none of the officers assisted the repo man with hooking the car to his truck, physically removed the plaintiff's mother from the car, made any physical contact with plaintiff, drew their weapons, raised their voices, or reached for their handcuffs. *Id.* at *4. Also, none of the officers told the repo man that he was required to stop the repossession because of plaintiff's objections.

The district court in analyzing the liability of Officers McKinley and Howard determined that Officer McKinley was entitled to qualified immunity, but Officer Howard was not. *Id.* at *9. With respect to Officer McKinley, the court concluded the evidence demonstrated that the "unlawfulness of [McKinley's] conduct" was not "manifest." *Id.* at *8 (citing *Wilson v. Layne*, 141

F.3d 111, 114 (4th Cir. 1998), *aff'd*, 526 U.S. 603 (1999). With respect to Officer Howard, the court recognized that he may be entitled to qualified immunity, but since the precise content of the arrest threats was contested, the evidence did not clearly demonstrate a solid foundation for qualified immunity. Simply stated, the court acknowledged a reasonable officer would know that he may not participate or facilitate a private self-help repossession. Moreover, it would be obvious to a reasonable officer that directly threatening the property owner with arrest unless she consented to the repossession was impermissible. Reviewing the evidence in a light most favorable to the nonmoving party, the court determined Officer Howard was not entitled to qualified immunity.

The actions of Corporal Devlin in the instant case are more in line with the actions of Officer McKinley in *Goard* and should be analyzed in accordance with the rationale in *Moore*. Corporal Devlin responded to a scene of an ongoing disturbance. Upon his arrival he was briefed on the situation and then attempted to speak to the Plaintiff. Plaintiff would not speak to him, but handed him a phone with someone on the line stating she was a law student. (Exhibit B, pp. 170, 171, 172). Recognizing the "very limited" choices available to resolve the ongoing disturbance, Corporal Devlin explained to the unknown woman on the telephone that if the female locked inside the vehicle did not get out, the window was going to be broken, she was going to be removed, and she was going to be arrested for disorderly conduct. (Exhibit B, pp. 172; Exhibit "C," Trial Transcript, 1/31/2019, p. 77). At no time during the disturbance did Corporal Devlin raise his voice or physically touch anyone. To the contrary, he maintained a calm demeanor throughout the disturbance.  (Exhibit B, p. 179).

It is beyond dispute that the threat of breaking the window and removing the female from the vehicle was made in order to resolve the situation that was in progress when the Troopers and Corporal arrived at the scene. The situation was volatile and needed to be defused. Regardless of

how the situation was resolved, it was certain one of the parties would be possessing the vehicle when the public peace was restored. Without some action, the situation would have remained unstable with a potential for escalating into a violent confrontation. No reasonable officer, standing in the shoes of Corporal Devlin, could have believed his conduct was unlawful in light of the established law and the information available to him. Corporal Devlin was required to make a close decision in the midst of a repossession fracas and could not have determined he would become so entangled in the private self-help remedy that he could be held liable under § 1983. As the superior officer on the scene, Corporal Devlin needed to defuse the situation. Since it would not be clear to a reasonable officer that his conduct was unlawful in the situation confronted here, Corporal Devlin should be protected by qualified immunity.

There is not a robust consensus of case law establishing that it is unreasonable for an officer to address a potentially volatile situation, a disturbance of the peace, at the scene of a self-help repossession. Because there is no clearly established case law placing Corporal Devlin on notice that his discrete actions were unlawful, and, indeed, because existing case law indicates that his actions were tempered and reasonable, (*See Marcus v. McCollum*, 394 F.3d 813, 819 (10th Cir. 2004) ("[T]he overarching lesson of the case law is that officers may act to diffuse (sic) a volatile situation, but may not aid the repossessor in such a way that the repossession would not have occurred but for their assistance)), Corporal Devlin is entitled to qualified immunity.

While qualified immunity is proper in this instance due to the lack of a robust consensus of case law speaking to the discrete facts of this case, it is also appropriate because it was reasonable for Corporal Devlin to recognize and address the "unsafe" situation with which he was presented when he arrived on scene that night. This "unsafe" situation was created and existed because a woman intentionally locked herself inside a car that was hooked and strapped to a tow

truck and was lifted off the ground by the tow truck, thus rendering the tow truck motionless while it extended out into the roadway and partially blocked a travel lane. Clearly, Corporal Devlin's actions were warranted and reasonable in defusing the situation and restoring peace to the scene.

### C.  A New Trial Should Be Granted Because of the Reasonable Probability That Improper Remarks by Plaintiff's Counsel Prejudiced the Jury

"A court may grant a new trial when counsel's closing argument refers to evidence not in the record or other extraneous matter if the court finds there is a 'reasonable probability of influencing the verdict.'" *Price v. Trans Union, L.L.C.*, 839 F.Supp.2d 785, 806 (E.D.Pa. 2012) (quoting *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977)). The Federal Rules of Civil Procedure provide that a Court may "relieve a party… from a final judgment, order, or proceedings for the following reasons:…(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party…" Fed.R.Civ.P. 60(b)(3). "The prohibition against use in argument of evidence not in the record is straightforward." *Reed v. Phila., Bethlehem & N.E. R.R. Co.*, 939 F.2d 128, 133 (3d Cir. 1991). "Reversible error is committed when counsel's closing argument to the jury introduces extraneous matter which has a reasonable probability of influencing the verdict." *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977).

Prior to trial, the Court, in ruling on a Motion *in Limine*, ordered that evidence of prior repossession-related lawsuits against the Pennsylvania State Police is inadmissible. [ECF No. 123]. The Court found "that evidence of other repossession-related lawsuits involving the Pennsylvania State Police is inadmissible because its probative value is substantially outweighed by the danger of unfair prejudice." [ECF No. 123, p. 5] (citations omitted). The Court found "that this evidence may improperly lead the jury to infer that state troopers have a propensity to unlawfully assist in civil repossessions because the State Police were sued for similar conduct in

the past." [ECF No. 123, p. 5] (citations omitted). The clear intent of the Court's findings was to prohibit evidence and/or argument of other repossession-related actions of the State Police.

However, during his closing argument, Plaintiff's counsel attempted to introduce evidence of other instances whether the Pennsylvania State Police were involved in self-help repossessions in contravention of the Court's motion *in limine* Order. Counsel argued as follows:

> "Perhaps it really did take a complaint to bring this to the forefront, to bring this to the attention of the Pennsylvania State Police, to call attention to the fact that we can't have our police officers helping repo men in civil repossessions. Because it happens. **This isn't the only time it's happened. If there's this laissez faire attitude about it, this is something that the state police is turning a blind eye to, your job here is to send them a message that we're not going to put up with that, we can't put up with that.**"

(Exhibit "D," Trial Transcript, 2/1/2019, p. 52) (Emphasis added).

Counsel for Defendant made a timely objection to these remarks, citing the prior ruling by the Court and noting such remarks were "out of bounds." In addition to the timely objection, Counsel moved to strike these remarks from the record. (Exhibit D, p. 52).

The Court acknowledged there was "nothing before the jury factually that they can look to to determine whether that's correct or not. So [the Court] will sustain the objection." (Exhibit D, pp. 52-53). The Court added "[i]t is just a small excursion there." (Exhibit D, p. 53).

Defendant submits the remarks of counsel "were required to be confined to the evidence admitted in the case and reasonable inferences drawn therefrom" *Watn v. Pennsylvania R. Co.*, 255 F.2d 854 (3d Cir. 1958); *Robinson v. Pennsylvania R. Co.,* 214 F.2d 798 (3d Cir. 1954). To the extent counsel stated that the Pennsylvania State Police are involved in other self-help repossession actions and are "turning a blind eye" to these types of situations, these remarks were improper and were not justified by the record. Plaintiff's counsel knew the Court ordered that such

references were inadmissible. These improper remarks were highly prejudicial to Defendant and mandate a new trial.

Defendant also submits the Court's comments were not sufficient to mitigate the prejudicial effect which may have resulted from these improper remarks. Defendant's counsel objected and moved to have the improper remarks stricken from the record. Apart from merely sustaining the objection, the Court did nothing to instruct the jury to disregard counsel's reference to other matters involving the Pennsylvania State Police and that the jury should not consider these improper remarks in its deliberation of the instant matter. Simply calling the interruption of Plaintiff counsel's closing argument a "small excursion" did not adequately cure and mitigate the potential prejudicial effect which may have resulted from the improper remarks. Moreover, the reference that there was "nothing before the jury factually that they can look to to determine whether that's correct or not" is misleading—the implication to the jury from this remark could be that there was something factual to support plaintiff's counsel's remarks, but it wasn't in the record. Clearly, seeing as how the jury rendered a punitive damages award that was one-hundred times greater than the compensatory award demonstrates the jury was improperly influenced by counsel's indecorous remarks, and /or the court's comments on those remarks. Accordingly, a new trial is warranted and necessary in light of these circumstances.

### D.  The Finding of Punitive Liability is Against the Weight of the Evidence

Under Federal Rule of Civil Procedure 59, "the district judge ha[s] the right, and indeed the duty, to weigh the evidence as he saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in his conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Longbeach*, 914 F.2d 183, 187 (9th Cir. 1990); *see also, e.g., Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999); *American Bearing Co.*

*v. Litton Indus., Inc.,* 729 F.2d 943, 948 (3d Cir. 1984). In performing this duty to weigh the evidence, "the court is entitled to interpret the evidence and judge the credibility of the witnesses for itself" (*Simco v. Ellis*, 303 F.3d 929, 932 (8th Cir. 2002) (internal quotation marks omitted)) and, "[u]nlike for a [Judgment as a Matter of Law] motion, … need not view the evidence in the light most favorable to the verdict winner." (*MLMC, Ltd. v. Airtouch Communications, Inc.*, 215 F.Supp. 2d 464, 470 (D.Del. 2002).

Pennsylvania's punitive-liability standard focuses on "the motive for the tortfeasor's act… not just the nature of the act itself." *Field v. Philadelphia Elec. Co.*, 388 Pa. Super. 400, 426, 565 A.2d 1170, 1183-84 (1989). Succinctly stated, "[t]he state of mind of the actor is vital. The act, or failure to act, must be intentional, reckless or malicious." *Feld v. Merriam*, 506 Pa. 383, 396, 485 A.2d 742, 748 (1984).

In the case *sub judice*, Corporal Devlin's state of mind and motive are abundantly clear from the evidence. Corporal Devlin's actions were focused on resolving a disturbance to which he was called to respond by a tow truck driver (Exhibit "C," Trial Transcript, 1/31/2019, p. 115) **and** by Plaintiff, Angela Hyman, (Exhibit C, p. 18). When he responded to the scene, he noted a woman had locked herself in a repossessed vehicle that was hooked and strapped to a tow truck that was extending into and obstructing a travel lane on the roadway at night. (Exhibit B, p. 175). Corporal Devlin recognized the unsafe situation and appreciated that a vehicle traveling on the roadway could collide with the tow truck and the potential for injuries and damages to the woman in the repossessed car, the tow truck driver and/or the colliding vehicle operator were all realistic possibilities. (Exhibit B, p. 175). Based on the totality of these surrounding circumstances, Corporal Devlin determined the best course of action was to get the woman out of the repossessed vehicle. (Exhibit B, p. 175). His motives in doing so were not driven by malice or recklessness.

Indeed, Plaintiff presented her entire case for punitive damages without even suggesting (much less proving) that Corporal Devlin bore any grudge, ill will, or malice toward Angela Hyman. Plaintiff's entire theory on punitive damages was directed at the Pennsylvania State Police, a non-party to this action. In his closing, Plaintiff's counsel told the jurors that their "job" was to "send **them** a message." (Exhibit D, p. 52). Certainly, Plaintiff counsel's focus on the target for the punitive damage claim was misplaced and improper. The weight of the evidence as to the sole Defendant, being sued in his individual capacity, failed to establish any basis for a punitive damage assessment.

### E.  The Punitive Damages are Grossly Excessive and Should be Reduced, as a Matter of Law, to no More Than the Amount of Compensatory Damages

"[C]ourts recognize that the legal system has an obligation to ensure awards are fair, reasonable, proportional, and predictable, and that excessive punitive awards have the potential to inflict great harm on the defendant and society. These concerns are emphasized when a plaintiff is fully compensated, and when the burden does not fall on the wrongdoer himself, but on the taxpaying public." *Milfort v. Prevete*, No. 10-cv-4467, 2014 WL 988768, at *7 (E.D.N.Y. March 14, 2014) (citing *Payne v. Jones*, 711 F.3d 85 (2d Cir. 2013)).

In this case, the jury awarded Plaintiff $500,000 in punitive damages – one hundred times the compensatory award of $5,000 – in finding that her Constitutional rights were violated by the Defendant. This punitive award is impermissibly excessive under both due process and federal common law and must be reduced. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003). In *Exxon*, a maritime case which involved federal common law – also the authority for punitive damages in § 1983 cases like this one – the Supreme Court held that federal common law contains "more rigorous standards than the constitutional limit" on punitive damage awards. *Exxon*, 554 U.S. at 506. The constitutional

21

limit, the Court has held, should rarely exceed "a single-digit ration between punitive and compensatory damages," and "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *State Farm*, 538 U.S. at 425. But in *Exxon*, where federal common law governed punitive damages, the Supreme Court held that "a 1:1 ratio, which is above the median award, is a fair upper limit." 554 U.S. at 513.

This Court has a duty to scrutinize jury awards of punitive damages to ensure they are not excessive, in violation of federal common law and due process. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416. In addition, federal common law prohibits excessive punitive damage awards as well. *See Exxon*, 554 U.S. 471. Here, the jury's award of $500,000 in punitive damages based on a $5,000 compensatory damage award is so grossly excessive that it violates due process and federal common law, and accordingly must be reduced.

The Third Circuit has stated that "punitive damages in general represent a limited remedy, to be reserved for special circumstances." *Savarese v. Agriss*, 883 F.2d 1194, 1205 (3d Cir. 1989) (citing *Cochetti v. Desmond*, 572 F.2d 102, 105-06 (3d Cir. 1978)). "[D]espite its utility as a deterrent, the punitive damage remedy must be reserved, we think, for cases in which the **defendant's conduct** amounts to something more than a bare violation justifying compensatory damages or injunctive relief." *Cochetti*, 572 F.2d at 106. (Emphasis added.)

A trial court reviewing a punitive award should generally focus on three main guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418; *see also, Exxon*, 554 U.S. at 501.

1.  **While the jury's verdict found that Plaintiff's Constitutional rights were violated, Defendant's conduct falls short of extreme levels of reprehensibility.**

The first guidepost to determining whether punitive damages are excessive is the degree of reprehensibility. But even if a jury has returned a verdict based on finding a violation of the plaintiff's rights, it is still possible – indeed, it is the Court's duty – to make distinctions between the present case and other comparable § 1983 cases with punitive awards. Reprehensibility has to be considered on a spectrum, which can range up to extreme circumstances involving violations that, for example, are committed or encouraged by superior officials, or involve acts that are purely sadistic, or that result in a person's death. *See Exxon*, 554 U.S. at 493 ("Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent.")

The analysis of reprehensibility has been distilled into five main factors: whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *CGB Occupational Therapy, Inc.,* 499 F.3d 184, 190 (3d Cir. 2007) (quoting *State Farm*, 538 U.S. at 419). The verdict in this case cannot support a finding of "reprehensibility" involving all five factors.

While the jury's verdict can support a determination that the harm was physical, four of the factors do not apply in the present case. First, there was no record evidence the conduct of Corporal Devlin evinced an indifference to the health or safety of another. To the contrary, the conduct of Corporal Devlin was focused on reducing or eliminating any potential harm, injury or damage to any person. Secondly, there was no record evidence that Plaintiff was financially vulnerable nor was there evidence that the possibility of such vulnerability played a role in the

events at issue. This was not a case involving attempted extortion or other misconduct involving "behavior driven primarily by desire for gain," which the Supreme Court has called one of the "earmarks of exceptional blameworthiness." *Exxon*, 554 U.S. at 513. Third, on the record of this case, this was an isolated incident with no indication of recidivism. Indeed, it would be improper for the jury to base an award of punitive damages on any suggestion of misconduct directed at any one other than Plaintiff. *See State Farm*, 538 U.S. at 424 ("[B]ecause the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only relevant conduct to the reprehensibility analysis.") *Compare Mathias v. Accor Econ. Lodging, Inc.,* 347 F.3d 672, 677 (7th Cir. 2003) (affirming a punitive award of $186,000 based on compensatory damages of $5,000 per plaintiff, a 37:1 ratio, where a bedbug-infested hotel repeatedly failed to properly clean its rooms and repeatedly attempted to defraud customers as to the existence of the infestation.) Without evidence of repeated misconduct, the record cannot support an extraordinary six-figure punitive award against Corporal Devlin. Lastly, there is absolutely no evidence to demonstrate Corporal Devlin's actions were the result of intentional malice, trickery, or deceit. Absent the reprehensible conduct necessary to support a punitive damage award, Defendant submits the punitive damage award in this case should be negated in its entirety, or at least significantly reduced.

Reducing the punitive award is certainly not equivalent to condoning the violations found by the jury, but it is the function of the Court to ensure that such extraordinary levels of punitive damages are effectively reserved for the most serious violations, in order to avoid the "real problem" identified by the Supreme Court of "the stark unpredictability of punitive awards." *Exxon*, 554 U.S. at 472. A jury is not in a position to place its award in context, given past awards, nor is it expected to consider that its award will set a precedent in future cases. That is the job of

this Court, as the Supreme Court has repeatedly stated. *See State Farm*, 538 U.S. 408; *BMW of N.Am., Inc. v. Gore*, 517 U.S. 559 (1996); *Exxon*, 554 U.S. 471. Accordingly, the punitive award should be reduced in this instance.

> **2.   The 100:1 ratio of punitive damages to compensatory damages in this case exceeds constitutional and common law limits and must be adjusted downward.**

The punitive award in this case violates the principles of proportionality laid down by the Supreme Court, based on due process and federal common law, and must be adjusted downward.

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *CGB Occupational Therapy, Inc.,* 499 F.3d at 192 (quoting *Gore*, 517 U.S. at 580). As the Third Circuit has explained, "the ratio of punitive damages to the harm caused by the defendant is a tool to insure that the two bear a reasonable relationship to each other." *Willow Inn, Inc. v. Public Service Mutual Ins. Co.*, 399 F.3d 224, 233-34 (3d Cir. 2005). "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425; *see also Exxon*, 554 U.S. at 514-15 ("In *State Farm*, we said that a single-digit maximum is appropriate in all but the most exceptional of cases…."); *see also id*. at 510 (noting that, among jurisdictions to have adopted a fixed maximum ratio of punitive damages, the majority of states cap the ratio at 3:1, even in cases "involving some of the most egregious conduct, including malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain.")

The Supreme Court's decision in *Exxon* is an essential guide for assessing the ratio in this case and has been cited by this Court and the Third Circuit in § 1983 cases as such. See *Mejias v. Roth (In re Bayside Prison Litig.)*, 331 F.App'x 987, 994 (3d Cir. 2009); *Hayduk v. City of*

*Johnstown*, 580 F. Supp. 2d 429, 484  n. 46 (W.D.Pa. 2008) ("Although *Exxon* is a maritime case, it is clear that the Supreme Court intends that its holding have a much broader application.")[1]

A review of comparable case law demonstrates that the ratio here is excessive and must be reduced.

In *Mejias v. Roth (In re Bayside Prison Litig.)*, 331 F. App'x 987 (3d Cir. 2009), the Third Circuit reversed and remanded a $200,000 punitive award based on $45,000 in compensatory damages, or a 4.5 to 1 ratio. The plaintiff was a prison inmate who was "severely beaten" during a prison lockdown, resulting in "extensive bruising" as determined by prison investigators; there was evidence that the defendant – a prison administrator who, the Third Circuit noted, "occupied a unique position of authority and responsibility" – was aware of but "failed to respond to

---

[1] The punitive award must be reduced in this case regardless of whether the analysis is conducted under due process precedents like *State Farm* and *Gore*, or the federal common law, as in *Exxon*. While due process principles are relevant, Defendant maintains that federal common law should control as a matter of law. As in *Exxon*, authority for awarding punitive damages in § 1983 cases derives from federal common law, as determined by the Supreme Court: "In the absence of more specific guidance, we looked first to the common law of torts (both modern and as of 1871), with such modification or adaptation as might be necessary to carry out the purpose and policy of the statute." *Smith v. Wade*, 461 U.S. 30, 51 (1983); *see also id.* ("As for punitive damages, however, in the absence of any persuasive argument to the contrary based on the policies of § 1983, we are content to adopt a policy judgment of the common law…."). The Third Circuit Model Jury Instructions note that the *Exxon* "Court's concern with the predictability and consistency of punitive damage awards may apply to § 1983 cases as well." Third Circuit Model Jury Instruction at 87 (citation omitted). To be sure, the Model Instructions assert that the due process "precedents presumably govern a court's review of punitive damages awards in Section 1983 cases; there is no reason to think that a different constitutional standard applies to Section 1983 cases…." *Id.* at 86. However, while this assertion cites *Exxon*, it does not address *Exxon*'s observation that "[o]ur due process cases, on the contrary, have all involved awards subject in the first instance to state law." 554 U.S. at 502; *see also Basista v. Weir*, 340 F.2d 74, 86-87 (3d Cir. 1965) ("Federal common law must be applied to effect uniformity, otherwise the Civil Rights Act would fail to effect the purposes and ends which Congress intended….We are of the opinion, as we stated, that the federal common law of damages commands the issue of damages in the case at bar," including punitive damages.) As explained above, punitive awards in § 1983 cases are not viewed as a creation of state law, and so are properly subject to the "more rigorous standards" announced by the Supreme Court in *Exxon*.

numerous allegations of inmate abuse," and was held liable for deliberate indifference under §
1983. *Id.* at 988. Despite being "cognizant of facts supporting a punitive damages verdict here,"
the Third Circuit was troubled by the district court's failure to consider whether a 4.5 to 1 may be
close to the line of constitutional impropriety. *Id*. at 993-994. Recommending *Exxon* and other
precedents such as *State Farm* and *Gore* as providing "helpful guidance to district courts," the
Third Circuit remanded the case for "close scrutiny" and a "hard look." *Id.* Indeed, one member
of the panel, Judge Garth, would have held "that the maximum constitutional limit for punitive
damages is a ratio of 1:1." *Id*. at 993 n. 11. After remand, the total judgment was reduced to
$112,500 by agreement of the parties, *see* Case No. 07-3913, Doc. 1108 – a ratio of 1.5 to 1, which
is far below the ratio of the punitive award to the compensatory award in this case.

In *Kerwin v. McConnell*, No. 05-93, 2008 WL 4525369 (W.D.Pa. Sept. 30, 2008), this
Court found that a $100,000 punitive damage award was excessive for a § 1983 violation where
the compensatory damages were only $5,000. *Kerwin* took place against a background of
allegations and evidence of official misconduct by prison officials (including assaults and
humiliating strip searches), and the defendant, a prison official, was held liable for violating the
plaintiff's First Amendment rights by issuing a misconduct citation in retaliation for the plaintiff's
filing of a lawsuit. *Id*. at *2-3. The Court reduced the punitive award to $7,500, or a ratio of 1.5 to
1 (i.e., the same outcome as occurred in the *Mejias* case following remand from the Third Circuit).
*Id.* at *9.

Recently, in a case concerning a police officer involved in a "road rage incident," *Johnston
v. City of Pittsburgh*, No. 12-1689, 2014 WL 4649863, at *2 (W.D.Pa. Sept. 16, 2014), District
Judge Terrence McVerry awarded $5,000 in punitive damages to a plaintiff based on a $5,302
compensatory award for "assault, battery, and malicious prosecution" causing economic damages

and "bodily harm and emotional distress caused by Defendant Brown's conduct." *Id.* at *1. The facts of that case are set forth in the Memorandum Opinion addressing Defendants' motion for summary judgment. *See Johnston v. City of Pittsburgh*, No. 12-1689, 2014 WL 2718818 (W.D.Pa. June 16, 2014). The plaintiffs alleged that, as they were making a delivery run in a bakery van early one morning in the Oakland section of Pittsburgh, Officer Brown (off duty at the time) grew enraged after they turned left in front of his car. *Id*. at *1. At that point,

> Officer Brown began to follow Plaintiffs' vehicle. Officer Brown then overtook Plaintiffs' vehicle on the left hand side by entering the opposing traffic lane and yelled profanities at Plaintiffs. Officer Brown then pulled his vehicle back behind Plaintiffs' vehicle, overtook them again and threw a handful of coins at Plaintiffs' vehicle as the parties continued driving on Morewood Avenue. Plaintiffs and Officer Brown came to a subsequent traffic light and Officer Brown exited his vehicle and approached Plaintiffs' car, again yelling profanities at Plaintiffs and at one point reached behind him and placed his hand on his waistband while walking toward Plaintiffs' vehicle. Officer Brown then punched and broke the driver's side mirror with his fist, punched the driver's side window, punched the back side of Plaintiffs' van, opened the driver's side door and violently grabbed Plaintiff Johnston by his left arm. Plaintiffs immediately drove away and turned left onto Baum Boulevard. Officer Brown pursued. Officer Brown again overtook Plaintiff's vehicle and drove the right side of his vehicle into the left driver side of Plaintiffs' vehicle thereby forcing Plaintiffs' vehicle off of the road and onto the adjacent sidewalk.

*Id.* at *1. The plaintiffs sued Officer Brown (who defaulted), along with the City of Pittsburgh and other police officers under § 1983. *Id.* at *3. (The other defendants were granted summary judgment, in part because the Court determined that Officer Brown was not acting under color of state law at the time.) The Court noted that "the record is replete with Office of Municipal Investigations ("OMI") reports pertaining to complaints filed against Officer Brown relating to excessive force." *Id*. at *7. Based on these facts, the Court found that "the conduct displayed by [Officer Brown] during the road rage incident was certainly intentional and reckless and arguably

malicious such that punitive damages are appropriate." *See Johnston v. City of Pittsburgh*, Civil Action No. 12-1689, 2014 WL 4649863, *2 (W.D.Pa. Sept. 16, 2014). Yet the Court ultimately awarded – on a compensatory amount of $5,302 – only $5,000 in punitive damages. *Id.* at *1 (W.D.Pa. Sept. 16, 2014).

These cases demonstrate the punitive award in this case is grossly excessive, and far out of line with awards in comparable cases of alleged police or other official misconduct in the Third Circuit, in the Western District of Pennsylvania, and in other Pennsylvania federal courts. *See also Sheedy v. City of Philadelphia*, 184 F. App'x 282, 285 (3d Cir. 2006) (per curiam) (in vacating a jury verdict against a defendant police officer for malicious prosecution and false arrest under § 1983, noting that "the District Court erred in failing to reduce the punitive damages to a single-multiplier of the jury's compensatory award") (citing *State Farm*, 538 U.S. at 425); *Jacobs v. Pennsylvania Dep't of Corrections*, No. 04-1366, 2011 WL 2295095 (W.D.Pa. June 7, 2011) (approving ratio of less than 2 to 1, based on compensatory damages of $35,005, in a *pro se* prisoner case alleging § 1983 claims for violations of constitutional right to access to the courts, retaliation and conspiracy, and state-law defamation claim); *Shrey v. Kontz*, 981 F. Supp. 2d 333, 351 (M.D.Pa. 2013) (approving ratio of 3.09 to 1, based on compensatory damages of $14,553.09, in a case of a police officer's illegal seizure of property); *Sallitt v. Stankus*, 720 F. Supp. 2d 645, 650-51 (M.D.Pa. 2010) (approving ratio of 0.4 to 1, with punitive award of $100,000 on a compensatory award of $255,000, in a case alleging employment retaliation for supporting political opponents: "Therefore, the punitive damages award is less than the compensatory award and the ratio is appropriate under *Exxon*.")

Neither of the two main exceptions to *Exxon's* golden ratio of 1 to 1 – (1) injury that is hard to detect or determine, or (2) nominal or low compensatory damages (especially economic in nature) – is applicable here.

First, a higher ratio may be acceptable "in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582; *see also Exxon*, 554 U.S. at 494. This exception is not applicable in this case, in which the injury is not "hard to detect." Plaintiff here was awarded a not insignificant sum of $5,000 based in part on the testimony of Plaintiff and her spouse concerning the injuries Plaintiff had suffered. Therefore this exception cannot rescue the punitive award here.

Second, a higher ratio may be acceptable "when the value of injury and the corresponding compensatory award are small (providing low incentives to sue)." *Id.* As an example of such an exception, the Supreme Court has focused on nominal damages, such as may be awarded in a § 1983 case. *See id*; *Allah v. Al-Hafeez*, 226 F.3d 247, 252 (3d Cir. 2000) ("Punitive damages may … be awarded based solely on a constitutional violation, provided the proper showing is made.") "Because actions seeking vindication of constitutional rights are more likely to result only in nominal damages, strict proportionality would defeat the ability to award punitive damages at all." *Williams v. Kaufman County*, 352 F.3d 994, 1016 (5th Cir. 2003). But this is not a case involving nominal damages and so this basis cannot save the excessive ratio here.

Another example of this second exception is if "a particularly egregious act has resulted in only a small amount of economic damages." *Gore*, 517 U.S. at 582; *see also Exxon*, 554 U.S. at 494. In the present case, however, this exception also does not apply as Plaintiff's alleged injuries are not economic.

Fundamentally, Plaintiff's injuries were not small – they were certainly not billed as such by counsel in closing argument (*see* Exhibit D, pp. 57-58) – and Plaintiff's compensatory award of $5,000 is not "small," either. Further, the special circumstances of § 1983 litigation, with attorney's fees available to a prevailing party, mean that any importance of punitive damages as providing "incentive to sue" – which *Exxon* viewed as highly relevant – is not significant in this case.

Thus none of the possible exceptions to the Supreme Court's guidance on proportionality of punitive awards apply here. This Court must therefore adjust the punitive award downward, in order to avoid the stark unpredictability the Supreme Court warned of in *Exxon*.

A further reason for reducing the punitive award is to avoid punishing the innocent taxpayers of the Commonwealth of Pennsylvania. "If the individual defendant will be indemnified,… there may be an even more pressing need to ensure that jury awards are not inflated … to the detriment of innocent taxpayers." Third Circuit Model Jury Instruction at 93 (citing *Keenan v. City of Philadelphia*, 983 F.2d 459, 479-480 (3d Cir. 1992) (Higginbotham, J., dissenting in part)). This is a case where the Commonwealth agreed before trial to indemnify the Defendant, and thus the taxpayers will ultimately bear the burden of the punitive award. Indeed, in part because of the unfairness in punishing taxpayers in this matter, the Supreme Court held that punitive damages are never available against a municipality defending itself in a § 1983 suit. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267 (1981) (calling punitive damages "a windfall to a fully compensated plaintiff"); *see also Payne v. Jones*, 711 F.3d 85, 94 (2d Cir. 2013) ("Apart from impairing the fairness, predictability and proportionality of the legal system, judgments awarding unreasonable amounts as damages impose harmful, burdensome costs on

society. As an initial matter, an excessive verdict that is allowed to stand establishes a precedent

for excessive awards in later cases….Municipalities can be drained of essential public resources.")

This concern about punishing innocent taxpayers is also highly relevant in this case, given

Plaintiff's counsel's closing argument that improperly forced the jury's attention away from the

actual individual Defendant in the case to "send a message" to larger institutions, with their

corresponding larger resources. Numerous times throughout his closing, Plaintiff's counsel asked

the jury to "send a message" to the State Police: "your job here is to send **them** a message that

we're not going to put up with that, we can't put up with that" (Exhibit D, p. 52) (Emphasis added);

"The state police have to feel pain. Feel pain like Angela felt. Fear, fear, the state police have to

feel fear. Fear that if they cross the line again like this, jurors like you are going to hold them

accountable. So you have got to send a message with your verdict. A tiny message isn't going to

get it done. It's got to be something that **they** feel." (Exhibit D, p. 58) (Emphasis added);

"Deterrence. You need to send the **state police** a message." (Exhibit D, p. 61) (Emphasis added).

These improper comments constitute plain errors that "seriously affect the fairness, integrity or

public reputation of judicial proceedings." *Noble Biomaterials v. Argentum Med., LLC,* 2011 WL

4458796, at *5 (M.D.Pa. Sept. 23, 2011) (citing *Osei-Afriyie v. Med. Coll. of Pa.*, 937 F.2d 876,

881 (3d Cir. 1991); *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555

(1936).

Defense counsel promptly objected to this line of argument, and the Court sustained the

objection (Exhibit D, p. 53), but the damage was done. Rather than confining the jury's attention

to the individual Defendant, Plaintiff's counsel improperly induced them to consider the larger

financial resources of the State Police – and the correspondingly larger damage award it might

take to "send a message" to the State Police who were not a party in the case. For this reason as well, the punitive award is improper and must be reduced.

### 3. This Court is not required to remand this case for a new trial but may order a reduction in punitive damages.

This Court has the authority to order a reduction in the punitive award without offering Plaintiff the option of retrying the issue to a jury. "Because the jury's award of punitive damages does not constitute a finding of 'fact,' appellate review … does not implicate the Seventh Amendment." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 437 n. 11 (2001). Therefore, when a district court orders a reduction in punitive damages (whether under the label of "remittitur" or some other procedural name), it is well-established that the court may make its own determination as to a proper amount and then order such an amount. *See, e.g., Exxon*, 554 U.S. at 295 ("As for procedure, in most American jurisdictions the amount of the punitive award is generally determined by a jury in the first instance, and that determination is then reviewed by trial and appellate courts to ensure that it is reasonable.") (internal quotation marks omitted); *see also id*. at 515 (remanding for punitive award to be remitted, not retried); *Ross v. Kansas City Power & Light Co.,* 293 F.3d 1041, 1049-50 (8th Cir. 2002); *Johansen v. Combustion Engr'g, Inc.*, 170 F.3d 1320, 1331-32 (11th Cir. 1999).

Because the excessive punitive award does not represent a "fact" found by the jury here, the Court should remit the award to a lower number and enter judgment accordingly.

## IV.    Conclusion

For the reasons set forth above, Defendant respectfully request that this Court enter Judgment as a Matter of Law in favor of the Defendant, or grant a new trial, or reduce the excessive punitive damage award to no more than $5,000.

Respectfully submitted,

JOSH SHAPIRO
Attorney General


/s/ J. Eric Barchiesi
J. Eric Barchiesi, SDAG
Pa. I.D. 55825

OFFICE OF ATTORNEY GENERAL                Keli M. Neary, Chief Deputy Attorney General
1251 Waterfront Place                     Civil Litigation Section
Mezzanine Level
Pittsburgh, PA 15219
T: 412-565-3573

Dated: March 7, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2019, the within *BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL OR REMITTITUR TO REDUCE THE EXCESSIVE PUNITIVE DAMAGE AWARD* was electronically filed with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to all CM/ECF participants, including the following:

**Andrew M. Milz, Esquire**
FLITTER MILZ, P.C.
450 N. Narberth Avenue, Suite 101
Narberth, PA 19072
*(Counsel for Plaintiff)*

/s/ J. Eric Barchiesi
J. Eric Barchiesi, SDAG

*Counsel for Defendant*