IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANGELA HYMAN, | ) | CIVIL ACTION NO. 3:17-89 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| BRYAN DEVLIN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.  Introduction

Before the Court are post-trial motions regarding a jury verdict rendered in this case on February 1, 2019. The jury ruled in Plaintiff Angela Hyman's favor—finding that Defendant Corporal Bryan Devlin violated her constitutional rights by aiding in the repossession of Hyman's vehicle. (ECF No. 143.) The jury awarded Hyman $5,000 in compensatory damages and $500,000 in punitive damages. (*Id.*)

After trial, Hyman filed a Motion for Attorney Fees and Costs. (ECF No. 145.) Defendant Bryan Devlin filed a Motion for Judgment as a Matter of Law, New Trial, and to Alter Judgment. (ECF No. 148.) These Motions are fully briefed (*see* ECF Nos. 146, 149, 154-55, 160) and are ripe for disposition. For the following reasons, Hyman's Motion for Attorney Fees and Costs is **GRANTED** and Devlin's Motion for Judgment as a Matter of Law, New Trial, and to Alter Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## II. Background

### A. Factual History[1]

#### 1. Hyman Defaults on Her Loan

Hyman received a loan to finance the purchase of a new car. (ECF No. 93 ¶ 1; ECF No. 96 ¶ 1; ECF No. 152 at 13:25-14:12.) Hyman granted the lender, Capital One, a security interest in her car. (ECF No. 93 ¶ 3; ECF No. 96 ¶ 3; ECF No. 152 at 14:9.) The loan agreement gave Capital One the right to repossess Hyman's car if she defaulted on loan payments. (ECF No. 93 ¶ 3; ECF No. 96 ¶ 3.)

Hyman eventually fell behind on her monthly payments. (ECF No. 93 ¶ 4; ECF No. 96 ¶ 4; ECF No. 152 at 13:25-14:12.) Capital One sent Hyman a notice of default and advised her that if she failed to pay the amount due, it might repossess her car. (ECF No. 93 ¶¶ 7, 9; ECF No. 96 ¶¶ 7, 9.) Hyman submitted a loan modification request, which Capital One denied, instead deciding to exercise its right to repossess Hyman's car. (ECF No. 93 ¶ 16; ECF No. 96 ¶ 16.)

Capital One hired Jeff Brunner of Commonwealth Recovery Group to carry out the repossession. (ECF No. 93 ¶ 17; ECF No. 96 ¶ 17; ECF No. 152 at 101.)

#### 2. Brunner Arrives to Repossess Hyman's Vehicle

Brunner arrived at Hyman's home on October 5, 2016, around 7:20 p.m. (ECF No. 93 ¶ 20; ECF No. 96 ¶ 20; ECF No. 152 at 104:5-19.) While the parties agree that Brunner ultimately repossessed Hyman's car, they disagree about when the repossession occurred. Devlin states that

---

[1] The Court repurposes this Factual History from its Memorandum Opinion on Defendants' Motion for Summary Judgment. (*See* ECF No. 99.) At summary judgment, the Court derived these facts from Devlin's Concise Statement of Material Facts (ECF No. 93), Plaintiff Angela Hyman's Responsive Concise Statement of Material Facts (ECF No. 96), and Devlin's Response to "New Matter" Set Forth in Plaintiff's Concise Statement of Material Facts (ECF No. 98). The Court also cites to the transcript of trial. (ECF Nos. 150-53.)

-2-

Brunner immediately backed his tow truck into Hyman's driveway, hooked and strapped both sides of Hyman's car, and lifted the vehicle into the air without incident.[2] (ECF No. 93 ¶¶ 21-27; ECF No. 151 at 159:1-8.) Hyman and her wife, Shyree Johnson, on the other hand, assert that Brunner did not hook and lift her car until after the police arrived. (ECF No. 96 ¶¶ 22-23; ECF No. 152 at 17:20-18:3.)

Johnson exited the house and requested to remove items from the vehicle. (ECF No. 93 ¶¶ 10, 12; ECF No. 96 ¶¶ 10, 12; ECF No. 152 at 113:9-11.) Brunner helped her remove her items. (ECF No. 93 ¶¶ 28-29; ECF No. 96 ¶¶ 28-29; ECF No. 152 at 113:9-17.) Johnson brought the items inside the house and, shortly thereafter, returned to the vehicle, got into the driver's seat, locked the car door, and refused to exit. (ECF No. 93 ¶¶ 30-32; ECF No. 96 ¶¶ 30-32.) The parties dispute whether Johnson locked the doors from the inside or whether Hyman locked them remotely. (ECF No. 93 ¶ 32; ECF No. 96 ¶ 32.)

At this point, Hyman called her daughter, a law student, and asked her for advice about how to handle the situation. (ECF No. 96 ¶ 95; ECF No. 152 at 15:22.) Hyman claims that, on the advice of her daughter, she approached Brunner, informed him that he was trespassing, and demanded that he vacate her property. (ECF No. 96 ¶ 98; ECF No. 152 at 16:9-13.) Brunner denies that Hyman or Johnson told him he was trespassing or demanded that he leave the property. (ECF No. 98 ¶¶ 98-99; ECF No. 152 at 116:6-7.)

At this point, Brunner called the Pennsylvania State Police. (ECF No. 93 ¶ 35; ECF No. 96 ¶ 35; ECF No. 152 at 116:8-11.) Hyman also called the police, and reported that someone was

---

[2] At trial, Devlin testified that "the back end [of the car] was lifted off the ground approximately one and a half to two feet." (ECF No. 151 at 159:4-6.)

trying to take her car. (ECF No. 96 ¶¶ 102-04; ECF No. 98 ¶¶ 103-04; ECF No. 152 at 18:10-12.) Before the police arrived, Hyman stood in the doorway to her house and Johnson remained inside Hyman's vehicle. (ECF No. 93 ¶¶ 37, 41; ECF No. 96 ¶¶ 37, 41.)

### 3. The State Police Arrive

After approximately 20 minutes, Trooper Brian Black arrived. (ECF No. 93 ¶¶ 37-38; ECF No. 96 ¶¶ 37-38; ECF No. 151 at 6:8-19.) Black spoke with Brunner, who provided documentation of the repossession, and with Johnson, who refused to exit the vehicle. (ECF No. 93 ¶ 41; ECF No. 96 ¶ 41; ECF No. 151 at 9:2-23.) Black then approached Hyman and requested that she ask Johnson to exit the vehicle so he could talk to her. (ECF No. 93 ¶ 46; ECF No. 96 ¶ 46; ECF No. 151 at 14:3-6.) Hyman told Black that Johnson was her wife and refused to ask her to exit the car. (ECF No. 96 ¶ 112; ECF No. 98 ¶ 112.) Black returned to his cruiser and contacted Devlin. (ECF No. 93 ¶¶ 46-47; ECF No. 96 ¶¶ 46-47; ECF No. 151 at 16:5-8.) Black waited in his cruiser for Devlin to arrive. (ECF No. 93 ¶ 47; ECF No. 96 ¶ 47.)

Trooper Michael Morris arrived at the scene to assist Black. (ECF No. 93 ¶ 48; ECF No. 96 ¶ 48; ECF No. 151 at 17:6-11.) Morris attempted to speak with Johnson, but she did not respond. (ECF No. 93 ¶ 53; ECF No. 96 ¶ 53; ECF No. 151 at 17:10-12.) Morris then abandoned his efforts to speak with Johnson and waited for Devlin to arrive. (ECF No. 93 ¶ 54; ECF No. 96 ¶ 54.)

### 4. Corporal Devlin Intervenes

Devlin arrived with Trooper Elmer Hertzog. (ECF No. 93 ¶¶ 55-56; ECF No. 96 ¶¶ 55-56; ECF No. 151 at 71:21-24.) After arriving, Devlin "was briefed on the situation" and then attempted to speak to Hyman who handed Devlin a cellphone. (ECF No. 93 ¶ 61; ECF No. 96 ¶ 61; ECF No. 151 at 170:22-24.)

-4-

The parties dispute whether Devlin knew that Johnson was Hyman's wife and whether he understood that he was at the scene of a repossession. Black testified that, when he called the barracks and spoke with Devlin, he informed Devlin that he was at "the scene of a repo" and that the woman in the car was the owner of the vehicle. (ECF No. 97-5 at 30:12-31:02; ECF No. 151 at 17:24-25.) By contrast, Devlin testified that he believed he was responding to a scene of a disturbance with an unknown woman locked inside a car. (ECF No. 94-15 at 53:12-13; ECF No. 151 at 171:22-24.)

Devlin approached the car, still speaking to the woman on the phone. (ECF No. 93 at ¶ 64; ECF No. 96 at ¶ 64.) Cell phone video captures the interaction that ensued. (*See* ECF No. 94-16.) The Court notes that while Devlin was speaking on the phone to Hyman's daughter, the conversation was clearly audible to Johnson—whose cell phone video, taken from inside the car, recorded the conversation. (*See id.*) What is produced below is not an official transcription, but rather the Court's impression of what occurred based on its viewing of the cell phone video.

The woman on the phone informs Devlin that police may not enforce a civil contract or take sides in civil disputes. (*Id.* at 0:25.) Devlin responds, "[m]a'am, what's going to happen here today is that I've already spoken with the tower, they need to get the vehicle tonight, okay? If you're talking with the young lady in the car . . . would you please tell her to get out so these gentlemen can do their job?" (*See id.* at 0:45-1:05.)

The woman reiterates that the police may not assist in a civil repossession. (*Id.*) Devlin replies, "you can file a complaint on me later." (*Id.*) He continues, "[h]ere's what's going to happen. If she doesn't get out, we're going to break the window . . . she's going to be removed, she's going to be arrested for disorderly conduct, and the car is still going to get taken." (*Id.* at

-5-

0:58-1:00.) After the woman on the phone reiterates that Devlin is breaking the law, Devlin repeats that she can file a complaint against him. (*Id.* at 1:55.)

Devlin asks the woman on the phone if she has told Johnson to get out of the car yet. (*Id.* at 2:07-2:10.) The woman responds that she has not spoken with Johnson but that Johnson will comply with Devlin's order. (*Id.* at 2:10-2:17.) Devlin tells the woman, "[y]ou call her, tell her to do that, and once she gets out, we'll be okay." (*Id.* at 2:20-2:27.)

After a few seconds, Devlin taps the window of the car and tells Johnson, "I'm not going to wait all day . . . you've got about 30 more seconds." Johnson responds, "[m]y lawyer's on the phone with the State Police." Devlin replies, "[y]ou've got 30 seconds to come out or we're breaking the window and coming in. How long have we been here dealing with this? . . . If you refuse to come out, we're going to have to remove you, and I do not want to have to do that over a repossessed vehicle." (*Id.* at 3:10-3:26.)

After Johnson failed to obey Devlin's order, Devlin taps on the window again and asks, "are you coming out? Your time is up . . . yes or no? Are you coming out?" At this point, Johnson complies with Devlin's order and exits the vehicle.

Devlin spent approximately 18 minutes at Hyman's residence. (ECF No. 93 ¶ 68; ECF No. 96 ¶ 68.) Devlin admits that he "did not witness any violence, property destruction, or threats." (ECF No. 93 at ¶ 129; ECF No. 151 at 173:20-22.)

Devlin and the other officers left Hyman's residence shortly after Johnson exited the vehicle. (ECF No. 93 ¶ 71; ECF No. 96 ¶ 71; ECF No. 151 at 53:19-20.) Hyman testified that, after Johnson left the car, Brunner attached the car to the tow truck, lifted it up from the rear end, and towed the car away. (ECF No. 97-2 at 80:21-81:10; ECF No. 152 at 32:15-25.) Devlin disputes this

account and states that Hyman's car had been hooked up before the police arrived at the scene. (ECF No. 98 ¶ 127; ECF No. 151 at 160:13-15.)

Devlin and the other officers present at Hyman's residence were aware that law enforcement may not assist in a civil repossession. (ECF No. 96 ¶ 153; ECF No. 98 ¶ 153; ECF No. 151 at 41:25-42:3, 42:5-7, 78:24-79:1, 113:21.)

## B.  Procedural History

Hyman filed her Complaint on May 30, 2017 (*see* ECF No. 1) and an Amended Complaint on August 4, 2017 (*see* ECF No. 27). Hyman asserted six counts in her Amended Complaint.[3] Originally, Hyman sued Capital One, Commonwealth Recovery, Devlin, Trooper Morris, the Pennsylvania State Police, Col. Tyree C. Blocker, and "John Doe Troopers 1-10." (*Id.*)

Capital One and Commonwealth Recovery moved for partial dismissal of Hyman's claims against them.[4] (ECF No. 41.) The Commonwealth Defendants—Devlin, Morris, the Pennsylvania State Police, Col. Tyree C. Blocker, and John Doe Troopers 1-10—moved to dismiss Hyman's § 1983 claims, which alleged that they had violated her Fourth Amendment right

---

[3] Specifically, Hyman asserted: (1) a Fair Debt Collection Practices Act claim against Commonwealth Recovery (ECF No. 21 at ¶¶ 83-87); (2) a claim under the Pennsylvania Uniform Commercial Code against Capital One (*id.* at ¶¶ 88-91); (3) a conversion/trespass against chattels claim against Capital One and Commonwealth Recovery (*id.* at ¶¶ 92-96); (4) a trespass claim against Capital One and Commonwealth Recovery (*id.* at ¶¶ 97-100); (5) a § 1983 claim against the Pennsylvania State Police, Defendants Blocker, Morris, Devlin, and John Doe Troopers 1-10 in their official capacities (*id.* at ¶¶ 101-111); and (6) a § 1983 claim against the Pennsylvania State Police, Blocker, Morris, Devlin, and John Doe Troopers 1-10 in their individual capacities (*id.* at ¶¶ 111-119). Additionally, Hyman sought punitive damages against Capital One and Commonwealth Recovery for her conversion/trespass against chattels (Count III) and trespass (Count IV) claims.

[4] Capital One and Commonwealth Recovery did not ask this Court to dismiss Plaintiff's Fair Debt Collection Practices Act Claim (Count I) or her claim under the Pennsylvania Uniform Commercial Code (Count II).

against unreasonable seizure and her Fourteenth Amendment right to procedural due process. (ECF No. 39.)

The Court disposed of these motions via Memorandum Opinion and Order. (ECF No. 59.) The Court denied Capital One and Commonwealth Recovery's Motion to Dismiss in its entirety. (*Id.*) The court granted in part and denied in part the Commonwealth Defendants' Motion to Dismiss. (*Id.*) Specifically, the Court granted the Motion with respect to Hyman's official-capacity claims and all claims against the Pennsylvania State Police, Blocker, and John Doe Troopers 1-10 in their individual capacities. (*Id.*) Accordingly, the only remaining claims against any of the Commonwealth Defendants were the § 1983 claims against Defendants Morris and Devlin in their individual capacities.

Subsequently, Hyman accepted Capital One and Commonwealth Recovery's Offer of Judgment. (ECF No. 82.) The Clerk of Court entered judgment against these Defendants and dismissed them from the case. (ECF No. 84.)

The remaining Defendants—Morris and Devlin—filed a Motion for Summary Judgment on the remaining claims under § 1983. (ECF No. 91.) In her Response Brief, Hyman stated that she "no longer pursues her claim against Trooper Michael Morris." (ECF No. 95 at 3, n.3.) Therefore, the only remaining claim was Hyman's § 1983 claim against Devlin in his individual capacity. In a Memorandum Opinion and Order, the Court denied Devlin's Motion for Summary Judgment. (*See* ECF No. 99.)

The Court held a jury trial beginning on January 29, 2019.[5] (*See* ECF No. 135.) The trial

lasted for four days. (ECF No. 140.) On February 1, 2019, the jury returned a verdict in Hyman's

favor—finding that Defendant Bryan Devlin violated her constitutional rights by aiding in the

repossession of Hyman's vehicle. (ECF No. 143.) The jury awarded Hyman $5,000 in

compensatory damages and $500,000 in punitive damages. (*Id.*)

After trial, the parties filed the instant post-trial Motions.

## III. Legal Standard

### A. Motion for Attorney Fees

"Under 42 U.S.C. § 1988, a 'prevailing plaintiff' in a civil rights action should ordinarily

recover her attorney's fees." *Mancini v. Northampton Cty.*, 836 F.3d 308, 320 (3d Cir. 2016) (citing

*Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)). A plaintiff is a "prevailing party" under § 1988 if

she succeeds "on any significant issue in litigation which achieves some of the benefit the parties

sought in bringing suit." *Id.* at 321 (citing *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir.

2002); *Hensley*, 461 U.S. at 433.). A district court has discretion over the award of attorney fees to

a prevailing party. *Hensley*, 461 U.S. at 436-37.

The Supreme Court has held that where a plaintiff does not succeed on every claim, the

fee calculation is not determined by comparing the total number of issues in the case with the

number of issues upon which the plaintiff prevailed. *Mancini*, 836 F.3d at 321 (citing *Hensley*, 461

U.S. at 435 n.11). "Rather, where the plaintiff's claims involve a 'common core of facts,' or are

---

[5] The Court held a pretrial conference on December 17, 2018. (ECF No. 102.) Before trial, the parties filed Motions *in Limine*. (ECF Nos. 104, 106-15.) The Court ruled on these Motions before trial. (ECF Nos. 120-23.) The parties also submitted witness lists, proposed voir dire, proposed verdict forms, and proposed jury instructions. (*See* ECF Nos. 101, 103, 119, 125-30.)

based on 'related legal theories,' but the plaintiff obtained only partial or limited success, the district court may choose to reduce the award if a full compensatory fee would be unreasonable in consideration of the degree of success obtained." *Id.* at 321 (quoting *Hensley*, 461 U.S. at 435-36).

## B. Motion for Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure provides that:

If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50.

A court should grant a motion for judgment as a matter of law only if "'there is no legally sufficient basis for a reasonable jury' to find in favor of the non-moving party. In making this determination, the District Court 'must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or waive evidence.'" *Sullivan v. Cty. of Allegheny*, 112 F. App'x 176, 178 (3d Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000)); *see Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (internal quotation marks omitted) (quoting *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133-34 (3d Cir. 1985) (stating that a court should grant a motion for judgment as a matter of law "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief")). When deciding a motion for judgment as a matter of law, a district court "must refrain from weighing the evidence, determining the credibility of

-10-

witnesses, or substituting [its] own version of the facts for that of the jury." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citing *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

Still, "[f]ederal courts do not follow the rule that a scintilla of evidence is enough" to defeat a motion for judgment as a matter of law. *Sullivan*, 112 F. App'x at 178 (citing *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993)). As the Third Circuit has repeatedly held, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* at 178 (quoting *Walter*, 985 F.2d at 1238); *Foster v. Nat'l Fuel Gas Co.*, 316 F.3d 424, 428 (3d Cir. 2003) (quoting *Walter*, 985 F.2d at 1238); *Vincler & Knoll v. Paul*, 54 F. App'x 66, 68 (3d Cir. 2002) (quoting *Walter*, 985 F.2d at 1238); *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

## C. Motion for New Trial

The decision to grant a new trial is committed to the sound discretion of the district court. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *United States v. Schiffer*, 836 F. Supp. 1164, 1169 (E.D. Pa. 1993), *aff'd*, 31 F.3d 1175 (3d Cir. 1994). Under Federal Rule of Civil Procedure 59, a motion for a new trial may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1). "Such reasons include prejudicial erroneous judicial rulings or misconduct by opposing counsel." *Houser v. Folino*, No. 2:1-CV-416, 2016 U.S. Dist. LEXIS 25165, at *4 (W.D. Pa. Mar. 1, 2016) (citing *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289-90 (3d Cir. 1993); *Schiffer*, 836 F. Supp. at 1169). "[T]he court must assess whether an error was, in fact, committed, and whether the error was so

-11-

prejudicial that denying a new trial would be inconsistent with substantial justice." *Houser*, 2016 U.S. Dist. LEXIS 25165, at *4-5 (citing *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989), *aff'd*, 922 F.2d 184 (3d Cir. 1990)).

A motion for a new trial may also be granted "when the verdict is contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand,'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (quoting *Olefins Trading*, 9 F.3d at 289), or "when the court believes the verdict results from jury confusion." *Brown v. Nutrition Mgmt. Servs. Co.*, Nos. 08-CV3840 and 09-CV-1779, 2010 U.S. App. LEXIS 5535, at *4 (3d Cir. Mar. 17, 2010). When reviewing a jury's verdict, the District Court has an "obligation . . . to uphold the jury's award if there exists a reasonable basis to do so." *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989). In determining whether a new trial should be granted, the court must draw all reasonable inferences in favor of the party who prevailed at trial. *See Moyer v. United Dominion Indus.*, 473 F.3d 532, 545 n.8 (3d Cir. 2007).

### D. Motion for Remittitur

"[R]emittitur is well-established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive." *Cortez v. TransUnion, LLC*, 617 F.3d 688, 715 (3d Cir. 2010) (quoting *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986)); *Dee v. Borough of Dunmore*, 474 F. App'x 85, 87 (3d Cir. 2012).

"[T]he court may not vacate or reduce the award merely because it would have granted a lesser amount of damages." *Motter*, 883 F.2d at 1230. The district court may only disturb a jury verdict if "the damages assessed by the jury [are] so unreasonable as to offend the conscience of the Court." *Id.* (internal quotation marks omitted) (quoting *Murray v. Fairbanks Morse*, 610 F.2d

149, 152 (3d Cir. 1979)); *Keenan v. City of Philadelphia*, 983 F.2d 459, 469 (3d Cir. 1992) (quoting *Gumbs v. Pueblo Int'l Inc.*, 823 F.2d 768, 771 (3d Cir. 1987) (holding that a court may remit only if the verdict is "so grossly excessive as to shock the judicial conscience")). If the Court remits, "[t]he reduction may not be less than the maximum amount that does not 'shock the judicial conscience.'" *Dee*, 474 F. App'x at 87 (quoting *Evans v. Port Authority of N.Y. & N.J.*, 273 F.3d 346, 355 (3d Cir. 2001)); *see also Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983).

Punitive-damages awards violate the Fourteenth Amendment's Due-Process Clause where they are grossly excessive or arbitrary. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 437 (2001). "To the extent that a [punitive-damages] award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 42 (1991) (O'Connor, J., dissenting)).

In some cases, a district judge that remits a jury verdict must offer the plaintiff the option of a new trial. *See Cortez*, 617 F.3d at 716. This is because "the choice between a reduced award and a new trial is required by the Seventh Amendment, and a court cannot reduce an award without affording the plaintiff the option of a new trial." *Id.* (citing *Hetzel v. Prince William Cty.*, 523 U.S. 208, 211 (1998)); *see also Dee*, 474 F. App'x at 87. Both *Hetzel* and *Dee* involved the reduction of a compensatory damages award due to insufficient evidence. *Hetzel*, 523 U.S. at 210-11; *Dee*, 474 F. App'x at 86-88.

However, the Court is not required to offer a new trial when it reduces an unconstitutionally large punitive-damages awards. The Third Circuit explained that:

a court must afford a plaintiff the option of a new trial when it attempts to reduce a jury award because it believes the amount of the verdict is not supported by the evidence. These reductions are frequently referred to as conditional remittiturs. The same is not true when a court must reduce a damages award to avoid a denial of due process. In that case, the award is reduced as a matter of law and there is no interference with the Seventh Amendment right to have a jury make findings of fact.

*Cortez*, 617 F.3d at 716 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 587 (1996)); *see also Cooper*, 532 U.S. at 437 ("Because the jury's award of punitive damages does not constitute a finding of 'fact,' appellate review of the district court's determination that an award is consistent with due process does not implicate the Seventh Amendment concerns.").

If the Court believes that "the jury verdict resulted from passion or prejudice, a new trial, rather than a remittitur, [is] the proper remedy." *Dunn v. HOVIC*, 1 F.3d 1371, 1383 (3d Cir. 1993). However, "the size of the award alone [is not] enough to prove prejudice and passion." *Evans*, 273 F.3d at 352 (internal quotation marks omitted) (affirming district court's denial of a motion for a new trial when the district court remitted $640,000 of a $1,150,000 jury verdict). "If the award is excessive, but did not result from passion or prejudice, remittitur . . . is the proper remedy." *Marcus v. PQ Corp.*, 458 F. App'x 207, 213 (3d Cir. 2012) (citing *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 114 (3d Cir. 1999)). The Third Circuit "review[s] for abuse of discretion the decision not to grant a new trial requested because of jury passion and prejudice." *Id.* at 210. (citing *Evans*, 273 F.3d at 351-52.)

"The trial judge's decision to grant or withhold a remittitur cannot be disturbed absent a manifest abuse of discretion." *Smith v. Katz*, 696 F. App'x 582, 591 (3d Cir. 2017) (internal quotation marks omitted) (quoting *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1100 (3d Cir. 1995)). The Third Circuit explains that this deference stems from the fact that "[t]he district judge

is in the best position to evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Id.* (quoting *Spence*, 806 F.2d at 1201). Accordingly, the Third Circuit's "role in reviewing the District Court's decision to remit the damage award . . . is 'severely limited.'" *Id.* (quoting *Evans*, 273 F.3d at 354). Furthermore, as the Third Circuit has repeatedly stated, it "must give the benefit of every doubt to the judgment of the trial judge" when reviewing a decision to remit a jury award. *Id.* (quoting *Evans*, 273 F.3d at 354). However, if the Third Circuit determines that even after remittitur the award still has no reasonable basis, the Third Circuit may order further remittitur. *See Dunn*, 1 F.3d at 1383 (reducing $2,000,000 punitive damage award to $1,000,000 after trial court originally granted remittitur and reduced it from $25,000,000 to $2,000,000).

As one commentator has noted, "[a]uthorities agree that the use in the United States federal courts of the remittitur procedure was initiated by Mr. Justice Story, while sitting on circuit, in the case of *Blunt v. Little*."[6] In *Blunt*, the jury found that the plaintiff had been maliciously arrested and awarded him $2,000. *Blunt v. Little*, 3 F. Cas. 760, 761 (C.C.D. Mass. 1822). The defendant moved for a new trial on various grounds, one of which was that the jury verdict was excessive. *Id.* Justice Story agreed that the jury awarded an excessive verdict. *Id.* Citing two English cases, Justice Story held that "the court may grant a new trial for excessive damages." *Id.* But Justice Story did not simply order a new trial. *Id.* Instead, he made plaintiff an offer: remit $500 of the jury award *or* proceed to a new trial. *Id.*

---

[6] Irene Deaville Sann, *Remittiturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives*, 38 Case W. Res. L. Rev. 157, 169 (1987); *see also* Irene Sann, *Remittitur Practice in the Federal Courts*, 76 Colum. L. Rev. 299, 300 (1976).

Justice Story appears to have acknowledged the tenuous legal basis for his innovative solution—he admitted that his decision approached "the very limits of the law." *Id.* Nevertheless, in the century after *Blunt*, the United States Supreme Court repeatedly upheld remittitur, often mentioning the procedure in passing while apparently assuming its constitutionality. *See, e.g., Gila Valley, G. & N. Ry. Co. v. Hall*, 232 U.S. 94, 104 (1914); *Koenigsberger v. Richmond Silver Min. Co.*, 158 U.S. 41, 46 (1895); *Ark. Valley Land & Cattle Co. v. Mann*, 130 U.S. 69, 75 (1889); *N. Pac. R. Co. v. Herbert*, 116 U.S. 642, 643 (1886).

The Supreme Court's first thorough examination of remittitur came in 1935 in *Dimick v. Schiedt*, 293 U.S. 474 (1935). The Court criticized Justice Story's opinion in *Blunt*—and the Court's prior jurisprudence—for failing to examine the English common-law which decisively rejected the practice of remittitur. *Id.* at 484.[7] The Court speculated that "if the question of remittitur were now before us for the first time, it would be decided otherwise." *Id.* However, the Court upheld remittitur, reluctant to disturb a practice that "has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time." *Id.*

To this Court's knowledge, the Supreme Court has never again directly confronted the constitutional issue posed by remittitur.[8]

---

[7] The Supreme Court observed that the practice of remittitur "has been condemned as opposed to the principles of the common law by every reasoned English decision, both before and after the adoption of the Federal Constitution." *Dimick*, 293 U.S. at 484.

[8] *See* Sann, *Remittitur Practice, supra* note 6, at 301.

## IV. Discussion

### A. Plaintiff is Entitled to Attorney Fees

Hyman argues that she is entitled to attorney fees and costs as the prevailing party in this civil-rights lawsuit. (ECF No. 146 at 2.) Hyman specifically requests that the Court award her $189,279.00 in attorney fees and $7,881.14 in costs. (*Id.*) Hyman's request is based on her attorneys' market hourly rate in the Eastern District of Pennsylvania—the district in which the Flitter Milz law firm is located. (*Id.* at 5-8.) Hyman argues that her request for attorney fees is reasonable given the specialized nature of the case and the extensive litigation required to prosecute it. (*Id.* at 14-18.)

In response, Devlin argues: (1) that Hyman's requested hourly rates are not reasonable in the western Pennsylvania legal community; (2) that Hyman's claim for maximum hourly rates for all work is neither fair nor reasonable; (3) that the hours requested by Hyman's attorneys are excessive; and (4) that Hyman is not entitled to attorney fees for work regarding unsuccessful claims and defendants other than Devlin.[9] The Court will address these arguments in turn.[10]

As a preliminary matter, the parties do not dispute that Hyman is entitled to attorney fees as the prevailing party in a civil-rights lawsuit. (*See* ECF No. 154 at 2.) Under 42 U.S.C. § 1988, a "prevailing plaintiff" in a civil rights action should ordinarily recover her attorney fees. *Mancini,*

---

[9] Devlin also argues that Hyman's Motion for Attorney Fees is premature because the Court may reverse judgment or order a new trial if it grants Devlin's Motion for Judgment as a Matter of Law, New Trial, and Remittitur. (ECF No. 154 at 5-6; *see* ECF No. 148.) However, as discussed in the following subsections, Devlin is not entitled to judgment as a matter of law or a new trial. Therefore, Devlin's argument about the timeliness of Hyman's Motion for Attorney Fees is not persuasive.

[10] The Third Circuit has held that "[a] district court should not decrease a fee award based on factors not raised at all by the adverse party." *McKenna v. City of Philadelphia,* 582 F.3d 447, 459 (3d Cir. 2009) (quoting *Bell v. United Princeton Props., Inc.,* 884 F.2d 713, 720 (3d Cir. 1989)).

836 F.3d at 320. Accordingly, the Court must determine whether Hyman's request for attorney fees is reasonable.

First, the Court finds that Hyman's attorneys are entitled to the requested Eastern District of Pennsylvania rates. Generally, "reasonable fees under § 1988 are to be calculated according to the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). This general rule is known as the "forum-rate" rule. *See* Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 260-62 (1986). Under the forum-rate rule, "an out-of-town lawyer would receive not the hourly rate prescribed by his district but rather the hourly rate prevailing in the forum in which the litigation is lodged." *Pub. Interest Research Grp. N.J. v. Windall*, 51 F.3d 1179, 1186 (3d Cir. 1995) (quoting *Court Awarded Attorney Fees*, 108 F.R.D. at 260-62). "Deviation from this rule should be permitted only when the need for the special expertise of counsel from a distant district is shown or when local counsel are unwilling to handle the case." *Id.*

Here, the exception to the forum-rate rule applies. This case involved a complex combination of secured-transactions law, constitutional law, consumer law, and trial advocacy. Hyman submitted an affidavit of Makiba Gaines stating that Hyman attempted to hire an attorney in Cambria County, Pennsylvania, but that no law firms were willing to take her case. (ECF No. 146-2.) Further, Hyman submitted the declarations of two experienced attorneys in the Western District of Pennsylvania who state that, based on the nature of Hyman's case, neither are aware of attorneys located near Johnstown, Pennsylvania who would have handled her case. (ECF Nos. 146-4, 146-5.) Devlin does not provide any evidence suggesting that an attorney near Johnstown, Pennsylvania or within the Western District of Pennsylvania would have accepted

Hyman's case.[11] Moreover, in a case in the Middle District of Pennsylvania, the court approved an attorney fee award for attorneys from Flitter Milz based on their Eastern District of Pennsylvania rate. *See Richards v. Client Servs., Inc.*, No. 14-cv-1402, 2015 WL 5836274, at *3 (M.D. Pa. Oct. 15, 2015). The Court there applied the specialization exception to the forum-rate rule because the case required an attorney with experience with specialized consumer-law issues. *Id.* Accordingly, the Court finds that the Eastern District of Pennsylvania rates for Hyman's attorneys are reasonable given the specialized nature of this case.

Second, the Court finds that Hyman's attorneys requested reasonable rates given the nature of the work they performed. Devlin argues that Hyman's attorneys should not have charged their standard hourly rates for travel and unspecified clerical tasks. (ECF No. 154 at 10-13.) Neither of these arguments are persuasive. The Third Circuit has held that travel time and costs are generally not compensable. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 426 F.3d 694, 710 (3d Cir. 2005). However, "where forum counsel are unwilling to represent plaintiff, such [travel] costs are compensable." *Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 311-12 (3d Cir. 2008) (citing *Interfaith Cmty.*, 426 F.3d at 710). Here, Hyman's attorney's travel costs are compensable because, as previously discussed, forum counsel were unwilling to represent Hyman.

---

[11] Devlin attached the fee petitions for two Pittsburgh-based civil-rights attorneys to his opposition to Hyman's Motion for Attorney Fees. (*See* ECF Nos. 154-1, 154-2.) Devlin argues that the hourly rates of these attorneys indicate that Hyman's attorneys request unreasonable hourly rates. (ECF No. 154 at 9.) However, one of these Pittsburgh-based civil-rights attorneys—Margaret S. Coleman—submitted a sworn declaration stating that "[d]ue to the complex overlap of consumer finance law with § 1983 litigation, the lack of physical injuries or assault, and the significant risks involved in bringing Ms. Hyman's case, I do not believe my firm would have accepted her case." (ECF No. 160-1 ¶ 7.) This further indicates that Hyman's case reasonably required specialized counsel from outside the Western District of Pennsylvania.

Further, the Court will not reduce Hyman's attorney's requested fees based on her attorneys performing "clerical tasks." Devlin points out that Attorney Flitter spent .2 hours checking the status of service in the case. (ECF No. 154 at 11; ECF No. 146-3 at 20.) He does not list other impermissible timesheet entries that correspond to clerical tasks, but instead points out that the Court has an affirmative obligation to scrutinize the fee request. (ECF No. 154 at 13.) The Court's review of Hyman's attorney's timesheet entries does not reveal excessive time spent on clerical tasks. (*See* ECF No. 146-3.) Rather, her attorneys spent their time conducting legal research, drafting filings, conducting discovery, and preparing for trial—none of which constitute clerical tasks. Paralegals performed administrative and clerical tasks such as service of process, e-filing, drafting non-substantive documents, and arranging depositions. (*See, e.g., id.* at 28-30, 33, 36.)

Third, the Court finds that the number of hours requested by Hyman's attorneys is generally reasonable. At the outset, the Court notes that this case involved complex legal theories and a significant amount of litigation. Hyman's attorneys defended against two rounds of dispositive motions (*see* ECF Nos. 59, 99) and conducted a four-day jury trial. (ECF No. 140.)

Devlin argues that Hyman's counsel billed excessively for routine legal research, time spent reviewing local court rules, and that multiple attorneys billed for the same work. His brief includes a list of objectionable time entries. (ECF No. 154 at 14-17.) His summary of these time entries shows that Attorney Flitter, whose billing rate is the highest, spent 3.1 hours conducting legal research, reviewing local rules, and participating in conferences. (*Id.* at 18.) Attorneys Milz and Lopez, whose billing rates are lower, spent a combined 46.5 hours on legal research, reviewing the local rules, and participating in conferences. (*Id.*) Given the complex legal issues

involved in this case and the extensive briefing on dispositive motions, the Court finds that Hyman's attorneys spent a reasonable amount of time conducting legal research.

Further, the Court will not reduce Hyman's counsel's fee award for conferences between her attorneys. Devlin seems to argue that Hyman's counsel is not entitled to these fees because they are duplicative. (*Id.* at 14.) However, the Third Circuit has held that "[a] reduction for duplication 'is warranted only if the attorneys are unreasonably doing the same work.'" *Rode v. Dellarciprete*, 892 F.2d 1177, 1187-88 (3d Cir. 1990) (quoting *Jean v. Nelson*, 863 F.2d 759, 773 (11th Cir. 1988)). Here, Hyman's attorneys did not unreasonably perform the same work. Rather, Devlin points to two instances where Hyman's attorneys billed for the same conference. (ECF No. 154 at 16.) First, Hyman's three attorneys each billed .2 hours for a conference related to settlement on May 2, 2018. (*Id.*) Second, two attorneys met for a total of .3 hours to discuss case strategy on May 14, 2018. (*Id.*) The Court finds that it was not unreasonable or excessive for Hyman's attorneys to meet for brief periods of time to discuss case strategy. *See Huyett v. Colvin*, No. 11-cv-7228, 2014 WL 3676961, at *3 (E.D. Pa. July 24, 2014) (finding that five hours of inter-office conferences between attorneys was unreasonable given that the conferences occurred after necessary briefs were filed). Devlin does not point out any other duplicative timesheet entries and the Court's review of the fee petition does not reveal unreasonable duplicative entries.

And finally, Hyman's counsel is entitled to attorney fees for work expended on claims involving defendants other than Devlin. Generally, "[a] defendant should not 'be required to compensate a plaintiff for attorney hours devoted to the case against other defendants . . . who are found not to be liable." *Rode*, 892 F.2d at 1185 (quoting *Baughman v. Wilson Freight Forwarding Co.*, 583 F.2d 1208, 1214 (3d Cir. 1978)). However, "[w]here a plaintiff does not succeed on every

-21-

claim, the Supreme Court has rejected a fee calculation approach that compares the total number of issues in the case with the number of issues on which the plaintiff prevailed." *Mancini*, 836 F.3d at 321 (citing *Hensley*, 461 U.S. at 435 n.11). Where a case involves a common core of facts and related legal theories, the district court has discretion to award a full compensatory fee. *Mancini*, 836 F.3d at 321; *Rode*, 892 F.2d at 1185. Here, the Court finds that each of Hyman's claims against the Defendants in this case involves a common core of facts and related legal theories. Namely, all the claims in this case involve a singular event—the repossession of Hyman's vehicle. Hyman was required to take discovery from various sources involving this event. Hyman was also required to litigate dispositive motions that involved her claims against each Defendant in this case. (*See* ECF No. 59.) Accordingly, the Court will not reduce Hyman's counsel's fee request for work regarding her claims against Defendants other than Devlin.

In conclusion, the Court finds that Hyman's request for attorney fees and costs is reasonable given the nature of this case and the extensive litigation involved. Therefore, Hyman's Motion for Attorney Fees and Costs (ECF No. 145) is **GRANTED**. Hyman is entitled to $189,279.00 in attorney fees and $7,881.14 in costs.

## B.    Defendant is Not Entitled to Judgment as a Matter of Law

In his omnibus post-trial motion, Devlin seeks judgment as a matter of law on two separate grounds. First, he argues that the evidence at trial did not create a legally sufficient basis for the jury's verdict. (ECF No. 149 at 3-5.) Second, he argues that Devlin is entitled to qualified immunity. (*Id.* at 5-17.) For the following reasons, the Court finds that Devlin is not entitled to judgment as a matter of law.

### 1. There was a Sufficient Basis for the Jury's Verdict

Devlin argues that he is entitled to judgment as a matter of law because "there was no evidence proffered at trial to support a conclusion that Corporal Devlin unreasonably seized any property from Plaintiff in the 15 or 20 minutes that he was on the scene or that he denied Plaintiff any due process rights to which she may have been entitled." (*Id.* at 3-4.) Devlin argues that he acted reasonably to defuse a potentially dangerous situation. (*Id.* at 4.) He further argues that there was no evidence that he wantonly or recklessly disregarded Hyman's rights, and therefore that Hyman is not entitled to punitive damages as a matter of law. (*Id.* at 4-5.) Rather, Devlin states that the jury's punitive-damages award resulted from improper argument by Hyman's counsel. (*Id.* at 5.)

In response, Hyman identifies specific evidence that supports (1) the jury's finding that Devlin violated Hyman's constitutional rights by affirmatively aiding in the private repossession and (2) the jury's finding that Devlin recklessly disregarded Hyman's constitutional rights, thereby entitling her to punitive damages. (ECF No. 155 at 2-7.)

First, the Court finds that the evidence sufficiently supported the jury's finding that Devlin violated Hyman's constitutional rights. In the Third Circuit, an officer causes a constitutional deprivation in a private repossession where "the officer takes an active role in the repossession resulting in an unconstitutional deprivation." *Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609-10 (3d Cir. 2011) (citing *Abbott v. Latshaw*, 164 F.3d 141, 147 (3d Cir. 1998)). The relevant inquiry "is whether an officer affirmatively aided a repossession such that he can be said to have caused the constitutional deprivation." *Id.* at 610 (citing *Abbott*, 164 F.3d at 147). This aid "may take the form of facilitation, encouragement, direction, compulsion, or other affirmative

assistance in the repossession." *Id.* (internal citations omitted). By contrast, "[t]he mere presence of police at the scene of a private repossession does not, alone, constitute state action." *Id.* (citing *Abbot,* 164 F.3d at 147). Rather, "liability will only attach when an officer plays a 'principal role' in the seizure." *Id.* (citing *Abbott,* 164 F.3d at 147).

Hyman presented evidence at trial that reasonably led the jury to conclude that Devlin deprived Hyman of constitutional rights by affirmatively aiding in the repossession. At trial, Hyman repeatedly played a cell phone video that shows Devlin approaching Hyman's car, in which Shyree Johnson had locked herself. *(See, e.g.,* ECF No. 151 at 30:16.) Shyree Johnson took the video, which reflects a conversation between her, Devlin, and Makiba Gaines—Hyman's law-student daughter who was on the phone with Johnson during the video. *(Id.* at 30-33.)

In the video, Devlin threatened to break the vehicle's window, remove Johnson from the car, and arrest her for disorderly conduct if she did not accede to Devlin's demands. Devlin stated that she needed to get out of the car to enable the towing company to take the car away.[12] Troopers Black and Morris testified that Devlin threatened to break the car's window and arrest Johnson for disorderly conduct. *(Id.* at 33:6-18, 112:3-17.) Each of these acts can be reasonably viewed as unlawful "facilitation, encouragement, direction, compulsion, or other affirmative assistance in the repossession." *Harvey,* 635 F.3d at 610.

---

[12] The trial transcript in this case does not contain a stenographic recording of the cell phone video from the night of the repossession. The video was difficult to hear in the courtroom and the court reporter did not transcribe the conversations in the video. Judge Gibson stated that "[t]he court reporter is not going to try to take down this conversation from the video. I am just pointing out to [Hyman's counsel] that at this point in time I heard nothing [of the conversations in the video] that I could understand." *(See* ECF No. 151 at 30:17-31:16.) Therefore, when referring to the conversation in the video, the Court will transcribe the conversation to the best of its ability or refer to the testimony of witnesses referring to or describing the video.

Further, testimony by the troopers indicates that Devlin affirmatively aided in the repossession. Hyman's counsel asked Morris, "That night Trooper Devlin decided who was going to prevail in that dispute, didn't he?" Morris replied, "Ultimately I guess, yes." (*Id.* at 115:24-116:1.) Hyman's counsel also asked Morris, "The woman [Johnson] was talked out of the vehicle after Corporal Devlin threatened to break the window and arrest her, correct?" Morris replied, "Yes." (*Id.* at 121:15-18.) This testimony provided the jury with a reasonable basis to find that Devlin unlawfully assisted in the repossession by directing Johnson to leave the car, threatening to break the window of the car, and threatening to arrest her. Accordingly, Devlin is not entitled to judgment as a matter of law because there is sufficient evidence for the jury to reasonably conclude that he violated Hyman's constitutional rights.

Second, the Court finds that the evidence sufficiently supported the jury's finding that Hyman is entitled to punitive damages. "[P]unitive damages may be awarded under 42 U.S.C. § 1983 when the defendant's conduct . . . involves reckless or callous indifference to the federally protected rights of others." *Allah v. Al-Hafeez*, 226 F.3d 247, 251-52 (3d Cir. 2000) (quoting *Coleman v. Kaye*, 87 F.3d 1491, 1497 (3d Cir. 1996)). The Court instructed the jury that:

> Punitive damages are designed to punish defendant and to deter defendant and others like defendant from committing such conduct in the future. You may only award punitive damages if you find that defendant acted maliciously or wantonly in violating plaintiff's federally protected rights. A violation is malicious if it was prompted by ill will or spite toward plaintiff. A malicious violation of rights occurs when a defendant consciously desires to violate federal rights of which he is aware. A wanton violation occurs when a defendant commits the violation recklessly or by callously disregarding the plaintiff's rights.

(ECF No. 153 at 84:21-85:7.)

-25-

Based on the evidence at trial, the jury reasonably concluded that Hyman is entitled to punitive damages. Specifically, evidence reasonably suggested that Devlin maliciously and wantonly violated Hyman's constitutional rights.

First, the evidence at trial could have led a reasonable jury to conclude that Devlin maliciously violated Hyman's rights by consciously aiding in the repossession, despite knowing that it was unconstitutional to do so. Devlin testified that he was trained on constitutional rights like due process of law. (ECF No. 151 at 146:6-9.) Devlin testified that he knew, based on this training, that the Pennsylvania State Police should not take sides in a civil private repossession. (*Id.* at 146:20-24.)

Devlin made several remarks that could have led the jury to reasonably conclude that he consciously violated Hyman's rights by assisting in the repossession. Devlin threatened to break the car window, remove Johnson from the car, and arrest her for disorderly conduct. (*Id.* at 33:6-18, 112:3-17.) Hyman's daughter repeatedly told Devlin that his conduct was unlawful. (*Id.* at 122:8-13.) Devlin responded by stating that "that's not going to happen tonight, the [repossession] man is going to take the vehicle." (*Id.*) Devlin also stated that "we already spoke with the tow [truck driver] and they have to get the vehicle tonight." (*Id.* at 168:14-17, 169:5-12.) Each of these comments reasonably indicate that Devlin affirmatively resolved the situation in favor of the tow truck driver. From these comments, the jury could reasonably conclude that he consciously violated Hyman's rights despite knowing that it was unlawful to aid in a repossession.

Second, the evidence at trial could have led a reasonable jury to conclude that Devlin wantonly violated Hyman's rights by recklessly and callously disregarding her rights. Devlin

-26-

testified that he was trained not take sides in a civil private repossession. (*Id.* at 146:20-24.) Based on Devlin's comments at the scene, the jury could reasonably infer that he recklessly and callously disregarded his training by forcing Johnson out of the car. The jury could reasonably infer that Devlin's actions ultimately enabled the tow truck driver to repossess Hyman's vehicle—thereby violating Hyman's constitutional rights.

In conclusion, the evidence at trial reasonably supports the jury's determination that Hyman is entitled to punitive damages. A reasonable jury could conclude that Devlin maliciously or wantonly violated Hyman's rights by affirmatively aiding in the repossession. Accordingly, Devlin is not entitled to judgment as a matter of law on this issue.

### 2. Devlin is Not Entitled to Qualified Immunity

Devlin also argues that he is entitled to judgment as a matter of law because the qualified-immunity doctrine shields him from liability. (ECF No. 149 at 5-17.) The Court articulated the standard for qualified immunity in its prior memorandum opinions in this case. The Court stated that:

The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has explained that '[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.' *Pearson*, 555 U.S. at 231.

To resolve a claim of qualified immunity, courts engage in a two-pronged inquiry: (1) whether the plaintiff sufficiently alleged the violation of a constitutional right, and (2) whether the right was 'clearly established' at the time of the official's conduct. *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 241 (3d Cir. 2016) (citing *Pearson*, 555 U.S. at 232).

(ECF No. 99 at 17); *Hyman v. Capital One Auto Fin.*, 306 F. Supp. 3d 756, 771-72 (W.D. Pa. 2018).

In his Motion, Devlin focuses on the second prong of the qualified-immunity analysis. (ECF No. 149 at 11-17.) Specifically, he argues that he is entitled to qualified immunity because "there is no clearly established case law placing Corporal Devlin on notice that his . . . actions were unlawful." (*Id.* at 16.) The Court disagrees.

In its Memorandum Opinion and Order Denying Summary Judgment, the Court held that in October 2016, it was clearly established that law enforcement officers assisting in a private repossession could constitute state action under § 1983. (ECF No. 99 at 19.) The Court provided a more detailed statement of the law on when a right is clearly established for qualified-immunity purposes:

> "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *Mammaro v. New Jersey Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016), as amended (Mar. 21, 2016), *cert. denied*, 137 S. Ct. 161 (2016) (same). "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro*, 814 F.3d at 169 (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001)) (internal quotation marks omitted).

> "In conducting the inquiry into whether a right is clearly established, we look first for 'applicable Supreme Court precedent.'" *Barna v. Bd. of Sch. Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 142 (3d Cir. 2017) (quoting *Mammaro*, 814 F.3d at 169). "If no applicable Supreme Court authority exists, courts consider whether there is a case of controlling authority in [their] jurisdiction or a 'robust consensus of cases of persuasive authority' in the Courts of Appeals [that] could clearly establish a right for purposes of qualified immunity. *Barna*, 877 F.3d at 142 (quoting *Mammaro*, 814 F.3d at 169). As the Third Circuit has explained, "[t]he authority need not be directly on point, but existing precedent must have placed

the statutory or constitutional question beyond debate." *Barna*, 877 F.3d at 142 (quoting *al-Kidd*, 563 U.S. at 741).

(ECF No. 99 at 19.)

The qualified-immunity analysis in this case therefore depends on precedent in the private-repossessions context. In *Harvey*, published in 2011, the Third Circuit held that in the private-repossessions context, "the test for whether a police officer acts under the color of state law is whether the officer maintains neutrality or [instead] takes an active role in the repossession resulting in an unconstitutional deprivation." *Harvey*, 635 F.3d at 609–10 (noting that the relevant inquiry is whether an officer affirmatively aided a repossession such that he can be said to have caused the constitutional deprivation, and explaining that "[s]uch aid may take the form of facilitation, encouragement, direction, compulsion, or other affirmative assistance in the repossession"); *see also Mitchell v. Gieda*, 215 F. App'x 163, 165 (3d Cir. 2007) (holding that an officer's presence at a private repossession may constitute state action if "accompanied by affirmative intervention, aid, intimidation, or other use of power which converts him from a neutral third party to, in effect, an assistant of the repossessing party").

In *Harvey*, the Third Circuit cites to its 1998 decision in *Abbott*. *Harvey*, 635 F.3d at 609-10 (citing *Abbott*, 164 F.3d at 147). In *Abbott*, three police officers were called to the contested repossession of a van. *Abbott*, 164 F.3d at 147. At the scene of that repossession, an attorney protested an attempt to repossess a van that allegedly belonged to his client. *Id.* at 145. After arguing with the attorney, one of the three police officers threatened to arrest the attorney and eventually arrested him for disorderly conduct. *Id.* That officer also informed the repossessor that she had a right to take the van. *Id.* at 147. While the attorney was detained, the repossessor

-29-

drove away in the van. *Id.* at 145. The Third Circuit held that two officers were entitled to qualified immunity because they maintained neutrality and did not assist the private repossessor in any way. *Id.* at 147 (citing *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511-13 (5th Cir. 1980)). However, the officer who arrested the attorney and told the repossessor that she had a right to the van was not entitled to qualified immunity because his "affirmative intervention and aid constitute[d] a sufficient basis for a reasonable trier of fact to find that [the officer] played a role in the seizure and resulting violation of [the plaintiff's] constitutional rights."[13] *Id.* at 147.

These cases collectively indicate that there is a "robust consensus of cases of persuasive authority in the Court of Appeals" establishing that law-enforcement officers may not affirmatively aid in a private repossession. *Spady v. Bethlehem Area Sch. Dist.,* 800 F.3d 633, 639 (3d Cir. 2015). The *Abbott, Mitchell,*[14] and *Harvey* decisions show that as of October 5, 2016, the Third Circuit had clearly established that it was unlawful for a law-enforcement officer to affirmatively aid in a private repossession.

---

[13] In *Abbott,* the Third Circuit also stated that the Supreme Court's decision in *Fuentes* put law-enforcement officers on notice that they could not deprive an individual of a possessory interest without due process of law. *Abbott,* 164 F.3d at 149 (citing *Fuentes v. Shevin,* 407 U.S. 67, 87 (1972) ("Clearly [the] possessory interest in the goods, dearly bought and protected by contract, was sufficient to invoke the protection of the Due Process Clause.")). The Court finds that after the Third Circuit's decision in *Abbott,* not only is the right to procedural due process well-established, but also that it is well-established that law-enforcement officers cannot affirmatively aid in a private repossession.

[14] In *Mitchell v. Gieda,* the Third Circuit affirmed the district court's dismissal of a § 1983 claim against a police officer who assisted in a private repossession. 215 F. App'x 163, 166. However, the *Mitchell* decision nonetheless illustrates that an officer may not affirmatively aid in a repossession. *Id.* The Court cited *Harvey, Abbott,* and cases from other circuits when it noted that "an officer's presence at the scene of, and acquiescence in a private repossession is not state action unless accompanied by affirmative intervention, aid, intimidation, or other use of power which converts him from a neutral third party to, in effect, an assistant of the repossessing party." *Id.* at 165 (citing *Harvey,* 421 F.3d at 190-91; *Barrett v. Harwood* 189 F.3d 297, 302-03 (2d Cir. 1999); *Abbott* 164 F.3d at 146-47; *Jones v. Gutschenritter,* 909 F.2d 1208, 1213-14 (8th Cir. 1990); *Booker v. City of Atlanta,* 776 F.2d 272, 273-74 (11th Cir. 1985); *United States v. Coleman,* 628 F.2d 961, 964 (6th Cir. 1980); *Menchaca,* 613 F.2d at 513). Further, *Mitchell* is readily distinguishable from the instant case because the police officer there did not contribute to the repossession in any way. *Id.* at 166-67.

And as the Court noted in its prior decisions in this case, the Third Circuit's law on private

repossessions is consistent with precedent in other circuits, which further indicates that this case

law is clearly established. The Court noted that:

> [O]ther Courts of Appeals apply the same test as applied by the Third Circuit, indicating a "robust consensus of cases of persuasive authority" on the issue of police involvement in private repossessions. *See, e.g., Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004) ("officers are not state actors during a private repossession if they act only to keep the peace, but they cross the line if they affirmatively intervene to aid the repossessor."); *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981) (state action exists "when the officer assists in effectuating a repossession over the objection of a debtor or so intimidates a debtor as to cause him to refrain from exercising his legal right to resist a repossession. While mere acquiescence by the police to 'stand by in case of trouble' is insufficient to convert a repossession into state action, police intervention and aid in the repossession does constitute state action."); *Hensley v. Gassman*, 693 F.3d 681, 689 (6th Cir. 2012) (noting that "the likelihood that state action will be found increases when officers take a more active role in the repossession" because "[a]t some point, as police involvement becomes increasingly important, repossession by private individuals assumes the character of state action."); *Barrett v. Harzoood*, 189 F.3d 297, 302 (2d Cir. 1999) (stating that "[w]hen an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action").

(ECF No. 99 at 20); *Hyman*, 306 F. Supp. 3d at 773 n.16.

Devlin relies on two cases from outside the Third Circuit—*Moore v. Carpenter*, 404 F.3d

1043 (8th Cir. 2005) and *Goard v. Crown Auto, Inc.*, No. 6:15-cv-35, 2017 WL 2423521 (W.D. Va. June

2, 2017). The Court finds these cases unpersuasive. If anything, they indicate that Devlin is

entitled to qualified immunity.

In *Moore*, two police officers arrived at the repossession of a boat. *Moore*, 404 F.3d at 1044.

The police officers charged the repossessor with various criminal charges and ordered him to

leave the property. *Id.* However, the officers allowed the repossessor to take the boat after

learning that the boat's title was in the repossessor's name. *Id.* The Eighth Circuit held that the officers were entitled to qualified immunity because the repossessor was already in possession of the boat and because the officers did not threaten to arrest the plaintiffs if they resisted the repossession. *Id.* at 1046. It held that "we cannot say the officers helped [the repossessor] enough that the repossession would not have occurred but for their assistance." *Id.* The instant case is distinguishable. Devlin never ordered the repossessor to leave Hyman's property. Devlin threatened to arrest Johnson for resisting the repossession. And Devlin's threats played a pivotal role in allowing the repossessor to take Hyman's vehicle. As the Court held in its summary judgment opinion, "Devlin unquestionably played a larger role in the repossession than the officers in *Moore*." (ECF No. 99 at 22.) Accordingly, the Court is not persuaded by Devlin's citation to *Moore*.

Next, Devlin cites *Goard*. In *Goard*, two police officers arrived on the scene of a repossession. *Goard*, 2017 WL 2423521, at *3. One officer spoke with the plaintiff and repossessor, informing both that he could not take sides in the repossession. *Id.* That officer stated "there was nothing that [he] could do to keep [the repossessor] from repossessing the vehicle and there was nothing [he] could do to keep [the plaintiff] from sitting in the vehicle because, you know, it's her vehicle and it's on private property." *Id.* The district court held that the first officer was entitled to qualified immunity. *Id.* at *8. A second officer had arrived on the scene. *Id.* at *3. The second officer told the plaintiff that if she did not give the repossessor her keys, the towing would cost her an additional "rekeying" fee. *Id.* The second officer threatened to arrest the plaintiff. *Id.* at *4. The district court there held that the second officer was not entitled to qualified immunity because "[t]hreatening arrest unless the property in dispute is surrendered is unequivocally

supportive of the repossession." *Id.* at *10 (citing *Abbott*, 164 F.3d at 144). The Court finds that Devlin's actions resemble those of the second officer in *Goard*. Devlin told Johnson that Hyman's car would be repossessed that evening and threatened to arrest her if she did not assent to the repossession. Therefore, as the Court stated at summary judgment, "Devlin fails to appreciate that *Goard* actually *supports* Hyman's argument that Devlin is not entitled to qualified immunity." (ECF No. 99 at 22.)

Finally, and perhaps most persuasively, four Pennsylvania State Police troopers, including Devlin, testified at trial that they knew the Fourth and Fourteenth Amendments prohibited them from taking sides in a civil dispute.[15] Each testified that they received training on the Fourth and Fourteenth Amendments, including in the private-repossession context. This testimony further reinforces the Court's conclusion that as of October 5, 2016, it was clearly established that law-enforcement officers could not affirmatively aid in a private repossession.

In sum, the Court finds that Devlin is not entitled to qualified immunity. Accordingly, Devlin is not entitled to judgment as a matter of law on immunity grounds.

---

[15] First, Hyman's counsel asked Trooper Black, "If the government takes people's stuff or is involved in taking people's stuff without that notice and a hearing, it can constitute a violation of an individual's due process right, is that your understanding?" (ECF No. 151 at 41:25-42:3.) Black replied, "Correct." (*Id.* at 42:3.) Hyman's counsel then asked Black whether "[f]or that reason . . . the Pennsylvania State Police cannot get involved in a civil dispute between private parties, isn't that true?" (*Id.* at 42:5-7.) Black replied, "That's true." (*Id.* at 42:8.) Second, Hyman's counsel asked Trooper Hertzog, "You know it is not the Pennsylvania State Police's job to determine who is right or who is wrong in a civil dispute, correct?" (*Id.* at 78:24-79:1.) Hertzog replied, "Right. We're there to just stop the disturbance or whatever action is going on there as far as why we got called there." (*Id.* at 78:2-4.) Hyman's counsel also asked Hertzog, "It is certainly not the Pennsylvania State Police's job to assist a repo man in a civil repossession, right?" (*Id.* at 78:9-10.) Hertzog replied, "Right." (*Id.* at 78:11.) Third, Hyman's counsel asked Trooper Morris, "In the video, the young lady says . . . police cannot enforce a civil contract. Is that an accurate statement?" (*Id.* at 113:18-20.) Morris replied, "Yes." (*Id.* at 113:21.) Finally, Trooper Devlin testified that he knew he could not take sides in a civil repossession. Hyman's counsel asked him, "You testified that . . . on October 5, 2016, you knew that the Pennsylvania State Police should not take sides in a private repossession, isn't that true?" (*Id.* at 146:20-22.) Devlin replied, "In a strictly civil private repossession, that is correct." (*Id.* at 146:23-24.)

## C. Defendant is Not Entitled to a New Trial

Devlin argues that he is entitled to a new trial for two reasons. (ECF No. 149 at 17-21.) He argues that he is entitled to a new trial (1) because Hyman's counsel made an inappropriate remark during his closing argument and (2) because jury's finding of punitive liability is against the weight of the evidence. The Court will consider these arguments in turn.

First, Devlin argues that he is entitled to a new trial because Hyman's counsel made an inappropriate remark during closing argument. (ECF No. 149 at 17 (citing *Ayoub v. Spencer*, 550 F.2d 164, 170 (3d Cir. 1977) ("Reversible error is committed when counsel's closing argument to the jury introduces extraneous matter which has a reasonable probability of influencing the verdict.")).) During his closing, Hyman's counsel argued:

> Perhaps it really did take a complaint to bring this to the forefront, to bring this to the attention of the Pennsylvania State Police, to call attention to the fact that we can't have our police officers helping repo men in civil repossessions. Because it happens. *This isn't the only time it's happened.* If there's this laissez faire attitude about it, this is something that the state police is turning a blind eye to, your job here is to send them a message that we're not going to put up with that, we can't put up with that.

(ECF No. 153 at 52:4-14 (emphasis added).)

Devlin's counsel objected to this argument at trial because the statement "this isn't the only time it's happened" ran afoul of the Court's ruling on a motion *in limine*. (*Id.* at 52:15-53:2.) Before trial, the Court ruled that evidence of prior repossession-related lawsuits against Devlin and the Pennsylvania State Police were inadmissible at trial. (ECF No. 123 at 2-5.) In his post-trial Motion, Devlin argues that "[t]hese improper remarks were highly prejudicial to Defendant and mandate a new trial." (ECF No. 149 at 19.)

In response, Hyman argues that counsel's isolated remark was not prejudicial enough to influence the jury's outcome. (ECF No. 155 at 12.) Hyman also argues that "any potential prejudice stemming from counsel's remark was mitigated by the Court's jury instructions." (*Id.* (citing *Drozdowski v. Northland Lincoln Mercury*, No. 04-756, 2007 WL 4563520, at *4 (W.D. Pa. Dec. 21, 2007)).) The Court agrees.

The Court finds that Hyman's counsel did improperly refer, albeit vaguely, to prior repossession-related incidents involving the Pennsylvania State Police. However, this single improper remark was not prejudicial enough to justify a new trial. "Rather than reviewing for a single instance or impropriety, courts consider the argument as a whole when determining whether it is reasonably probable that counsel's remarks prejudiced the jury." *Harker v. Chan*, No. 15-cv-277, 2018 WL 3588734, at *9 (W.D. Pa. July 27, 2018) (Gibson, J.) (citing *Vandenbraak v. Alfieri*, 209 F. App'x 185, 189 (3d Cir. 2006)).

Devlin cites only one improper remark by Hyman's counsel, which weighs against granting a new trial. The Third Circuit has consistently held that a single improper remark does not justify a new trial. *Vandenbraak*, 209 F. App'x at 189-90; *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1236 (3d Cir. 1994) (holding that one improper remark that "took up only a few moments" did not demonstrate reasonable probability of jury influence); *Forrest v. Beloit Corp.*, 424 F.3d 344, 352 (3d Cir. 2005) (holding that an isolated improper remark by counsel referring to excluded evidence did not justify a new trial); *Salas v. Wang*, 846 F.2d 897, 908 (3d Cir. 1998); *Anastasio v. Schering Corp.*, 838 F.2d 701, 706-07 (3d Cir. 1988). On the other hand, the Third Circuit has authorized new trials where counsel made a series of improper remarks. *See Draper v. Airco,*

*Inc.*, 580 F.2d 91, 96 (3d Cir. 1978); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 207 (3d Cir. 1992); *Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253, 264 (3d Cir. 1995).

The single improper remark by Hyman's counsel, quoted above, was very brief. After Devlin's counsel objected, the Court clearly instructed the jury to disregard the improper remark by Hyman's counsel. In response to the objection, the Court specifically stated that "[w]ell, it's clear that [the remark 'this isn't the only time it's happened'] is [Hyman's counsel's] opinion and there's nothing before the jury factually that they can look to to determine whether that's correct or not. So I will sustain the objection." (ECF No. 153 at 52:24-53:2.) The Court therefore mitigated any prejudicial effect of Hyman's counsel's remark by sustaining the objection and informing the jury that there was no evidentiary basis for the improper comment.

Further, any prejudice caused by Hyman's counsel's inappropriate remark was cured by the Court's jury instructions. The Court presumes that the jury followed the Court's instructions. *Citizens Fin. Group v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 133 (3d Cir. 2004) (citing *United States v. Givan*, 320 F.3d 452, 462 (3d Cir. 2003); *United States v. Syme*, 276 F.3d 131, 155 (3d Cir. 2002)). The Court instructed the jury that "your conclusions must be based on the evidence in the case" and that "[b]asing your verdict on any other information would be a violation of your sworn duty." (ECF No. 153 at 68:11-13, 68:24-69:2.) The Court further instructed the jury to consider various types of evidence, but that "[t]he following things are not evidence: statements arguments, and questions of the lawyers for the parties in this case [and] objections." (*Id.* at 69:15-25.) The jury was clearly instructed that they were to base their verdict on the evidence introduced, and not on the parties' closing arguments. Therefore, the Court's jury instructions further cured any prejudice caused by the improper remark.

-36-

Second, Devlin argues that he is entitled to a new trial because the weight of the evidence did not support a punitive-damages award. (ECF No. 149 at 19-20.) As previously discussed in this Section, the Court finds that the evidence at trial could lead a reasonable jury to award punitive damages.

Devlin suggests that Hyman's counsel included improper remarks relating to punitive damages in his closing argument. Specifically, Devlin argues that it was improper to direct argument towards the Pennsylvania State Police, which was not a defendant at trial. Hyman's counsel implored the jury to "send the [Pennsylvania State Police] a message" by awarding punitive damages. (ECF No. 153 at 52:12-13.)

The Court finds that Hyman's counsel argued for punitive damages appropriately. "There is no per se rule against invitations to a jury to send a message." *Harker*, 2018 WL 3599734, at *9 (quoting *Burlington v. News Corp.*, No. 09-1908, 2016 WL 1221426, at *9 (E.D. Pa. Mar. 29, 2016); *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364 (3d Cir. 1999)). Accordingly, Hyman's counsel did not commit reversible error by encouraging the jury to send the Pennsylvania State Police a message by awarding punitive damages.

Further, it was proper for the jury to award punitive damages to deter future unlawful conduct by the Pennsylvania State Police, even though the Pennsylvania State Police was not a party at trial. It is well-established that "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986). Devlin does not cite authority holding that it is improper to argue for punitive damages to deter non-parties from engaging in similar conduct in the future. (ECF No. 149 at 21.) Here, the Court instructed the jury to "consider

the degree to which defendant should be punished for his wrongful conduct toward plaintiff and the degree to which an award of one sum or another will deter defendant or others from committing similar wrongful acts in the future." (ECF No. 153 at 85:8-15.) This instruction is consistent with the law and the Third Circuit's Model Civil Jury Instructions. *See Stachura*, 477 U.S. at 306 n.9; MODEL CIV. JURY INSTR. 3RD CIR. § 4.8.3 (2019) ("A jury may award punitive damages to punish a defendant, or to deter the defendant and others like the defendant from committing such conduct in the future."). Therefore, Devlin is not entitled to a new trial based on argument about punitive damages at trial.

In conclusion, the Court finds that Devlin is not entitled to a new trial. Devlin has not proven that remarks by Hyman's counsel at trial were prejudicial enough to justify a new trial.

### D. Defendant is Entitled to Remittitur; The Court will Reduce the Jury's Punitive-Damages Award to $30,000

Finally, Devlin argues that the jury's punitive-damages award was grossly excessive and that it should be reduced. (ECF No. 149 at 21-33.) Devlin argues (1) that his actions were not reprehensible enough to justify the jury's punitive-damages award and (2) that the 100:1 ratio of punitive damages to compensatory damages exceeds common law and constitutional limits.

In response, Hyman argues (1) that the jury's punitive-damages award did not exceed constitutional limits because it corresponds to the potential harm in this case, punitive-damages awards in other cases, and the reprehensibility of Devlin's conduct, and (2) that there is no federal common law limitation on punitive damages.[16] (ECF No. 155 at 17-26.)

---

[16] Devlin points out that federal common law places limitations on punitive-damages awards and argues that the punitive-damages award here is excessive under federal common law. (ECF No. 149 at 21 (citing *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)).) Hyman argues that there is no federal common law limitation on punitive damages and that *Exxon* is inapposite because it was a maritime case, whereas the

The Court finds that the jury's damages award is constitutionally excessive and will remit its punitive-damages award to $30,000. The Supreme Court has instructed district courts reviewing punitive-damages awards to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive-damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 587). The Court will analyze each factor in turn.

### 1. Degree of Reprehensibility

"[T]he most important indicium of the reasonableness of a punitive-damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. Courts utilize a five-factor balancing test to gauge reprehensibility: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit. *CGB Occupational Therapy v. RHA Health Servs. Inc.*, 499 F.3d 184, 190 (3d Cir. 2007) (quoting *State Farm*, 538 U.S. at 419); *Austin v. Norfolk S. Corp.*, 158 F. App'x 374, 384 (3d Cir. 2005).

---

instant case involves a statutory cause of action under 42 U.S.C. § 1983. (ECF No. 155 at 25-26.) Because the Court finds that the punitive-damages award in this case is constitutionally excessive, the Court will not address the federal common law limits on punitive damages and whether the award in this case runs afoul of it.

These factors indicate that Devlin's conduct is reprehensible enough to support a punitive-damages award. First, Devlin caused Hyman to sustain some degree of physical harm. At trial, Hyman's counsel asked her, "You are not here to say Corporal Devlin caused you any physical pain or any medical conditions or caused your aneurysm to grow or anything like that, are you?" (ECF No. 152 at 33:15-18.) Hyman responded, "No. I am not blaming him for that. It is not his fault that I have these conditions. I blame none of my conditions on him. It is not his fault." (*Id.* at 33:19-21.)

However, Hyman did testify that she sustained physical harm from the stress caused by the repossession. Hyman testified that she felt "panicky" and scared on the evening of the repossession. (*Id.* at 22:25-23:3.) Hyman was concerned that the stress of the situation would cause her heart condition to worsen.[17] (*Id.* at 23:2-3.) Hyman also testified that she did not sleep or eat for three days after the repossession due to stress. (*Id.* at 33:25-34:8.) Three days after the repossession, her blood pressure spiked to a level that required hospitalization. (*Id.* at 33:25-34:8.) Further, Hyman testified that without a car, she was unable to attend her medical appointments or pick up her medications, which caused her additional stress.[18] (*Id.*) Therefore, the Court finds that the repossession caused Hyman a great deal of emotional harm and some degree of physical harm, which indicates that Devlin's harm was reprehensible. However, the Court recognizes that

---

[17] Hyman testified that when Devlin knocked on her door, "I'm feeling so panicky. I am so hurt because now I don't know why he's banging on the door like this, this is really scaring me, my heart is beating fast and I am thinking that my aneurysm is going to break because I'm so afraid." (ECF No. 152 at 22:25-23:3.)
[18] Hyman also testified that the repossession caused her a great deal of additional of stress and emotional harm. For instance, she testified that she had recurring panic attacks and nightmares as a result of the repossession. (*Id.* at 35:9-36:8.) She also testified that her fragile emotional condition after the repossession caused her wife to leave her. (*Id.* at 36:10-20.)

-40-

it is difficult to discern whether Devlin's actions were the sole cause of Hyman's injuries after the repossession.

Second, Devlin's conduct evinced some indifference to the health and safety of others. At trial, Devlin admitted that he threatened to break the window of Hyman's car and forcibly remove Johnson from the car.[19] (ECF No. 151 at 172:20-25.) This threat shows some degree of indifference to Johnson's health and safety. Johnson could have been harmed if Devlin had actually broken the window and forcibly removed her from the car. However, Devlin testified that he would have minimized the potential harm to Johnson by breaking a window away from where she was sitting. (*Id.* at 173:3-8.) Moreover, Devlin merely threatened to break the window and remove Johnson. He did not follow through on those threats nor take other physical action that exhibited an indifference to health and safety. The Court finds that this factor weighs slightly in favor of finding that Devlin's conduct was reprehensible.

Third, the Court finds that the target of the conduct was financially vulnerable. Hyman (and Johnson) clearly did not possess significant financial resources. Hyman testified that she fell behind on her auto loan payments because she was sick and unable to work. (ECF No. 152 at 13:25-14:6.) She also testified that "money was tight" at the time of the repossession. (*Id.* at 14:7-8.) The Court agrees that "the jury could have made the common sense conclusion that [Devlin] targeted Hyman because he believed she was a deadbeat who did not pay her bills." (ECF No. 155 at 19.) But there is no evidence that Devlin's behavior was affected by his perception of

---

[19] Devlin testified that "I told [Johnson] her options. I said, here's my situation, here's what I got. If you comply, you are out of the car on your own accord. If you refuse to comply, my hand is going to be forced, I will have to break a window—and I did not say pull her out. I stated that she would be removed." (ECF No. 151 at 172:20-25.)

Hyman's financial condition. Therefore, if anything, Hyman's financial vulnerability indicates that Devlin's conduct was reprehensible to some degree.[20]

Fourth, it is unclear whether Devlin's conduct involved repeated actions or was an isolated incident. As the Court pointed out, there was no evidence at trial that indicated whether Devlin or the Pennsylvania State Police acted similarly during other repossessions. (ECF No. 153 at 52:24-53:2.)

Finally, it is not clear that Devlin acted with intentional malice, trickery, or deceit. Hyman argues that the jury could have found that that Devlin acted with intentional malice because he testified inconsistently about the night of the repossession. (ECF No. 155 at 19-21.) While the jury may have chosen not to accept Devlin's testimony, Hyman did not introduce evidence that Devlin acted utilized trickery, deceit, or any other type of deception.

The Court finds that Devlin acted maliciously. The Supreme Court has held that malice entails an "actual evil motive." *Smith v. Wade*, 461 U.S. 30, 70-85 (1983); *see also Malice*, BLACK'S LAW DICTIONARY (10th ed. 2016) (defining malice as "[t]he intent, without justification or excuse, to commit a wrongful act" or "[r]eckless disregard of the law or of a person's legal rights"). While courts have allowed punitive damages where the tortfeasor acted with reckless indifference, those same courts have recognized that the reckless indifference must amount to outrageous conduct. *See, e.g., Merced v. Gemstar Grp., Inc.*, No. 10-3054, 2015 WL 1182883, at *4 (E.D. Pa. Mar. 13, 2015); *see also Smith*, 461 U.S. at 71 (quoting *Milwaukee & St. P.R. Co. v. Arms*, 91 U.S. 489, 493

---

[20] The Court notes that Devlin's conduct would have been far more reprehensible had he acted to further his own financial gain. *See Exxon*, 554 U.S. at 513 (noting that, in the punitive-damages context, behavior driven primarily by desire for personal economic gain is an "earmark of exceptional blameworthiness within the punishable spectrum).

-42-

(1875)) ("[W]hile 'reckless indifference' may justify some awards of punitive damages, it may do so only in 'that' class of 'reckless indifference . . . which is equivalent to an intentional violation of the plaintiff's rights.'"). Here, the evidence is sufficient for a reasonable jury to find that Devlin was indifferent to Hyman's constitutional rights. The jury reasonably found that he unlawfully assisted in a private repossession, despite the training that Pennsylvania State Troopers receive. However, there is no evidence that Devlin had an actual evil motive. There is no evidence that he intentionally executed a premeditated plan to commit an illegal act. Therefore, the Court finds that Devlin acted maliciously through his callous indifference to Hyman's rights, but not maliciously enough to classify his conduct as extremely reprehensible.

In sum, the Court finds that Devlin acted reprehensibly. Four of the five reprehensibility factors are present in this case—which justifies an award of punitive damages. However, none of these factors indicate that Devlin's actions were extremely reprehensible.

### 2. The Disparity Between the Harm, or Potential Harm to Plaintiff, and the Punitive-Damages Award

With respect to the second guidepost, the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm*, 538 U.S. at 425 (citing *Gore*, 517 U.S. at 582). Generally, though, "[s]ingle-digit multipliers [between punitive damages and compensatory damages] are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution." *State Farm*, 538 U.S. at 425 (citing *Gore*, 517 U.S. at 581); *Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co.*, 399 F.3d 224, 234 (3d Cir. 2005) ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

However, greater ratios "may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'" *State Farm*, 538 U.S. at 425 (quoting *Gore*, 518 U.S. at 582).

Here, the jury awarded Hyman $500,000 in punitive damages and $5,000 in compensatory damages—a 500:1 ratio. (ECF No. 143.) On its face, this award is arbitrary and excessive. *See, e.g., Gore*, 518 U.S. at 582 (finding that a 500:1 ratio of punitive damages to compensatory damages was unconstitutional); *Cooper*, 532 U.S. at 437; *State Farm*, 538 U.S. at 417. The jury was justified in awarding $5,000 for harm that Devlin caused Hyman. However, the jury did not have a basis to award 500 times that amount in punitive damages. There was not significant unrealized potential harm in this case. And as discussed in the preceding subsection, the evidence justifies the jury's finding that Devlin's conduct was reprehensible and that Hyman is entitled to punitive damages. However, his conduct was not egregious enough to justify a 500:1 ratio of punitive damages. Therefore, the Court finds that the jury's punitive-damages award in this case does not comport with due process.

### 3. Punitive-Damages Awards In Comparable Cases

Third, courts reviewing punitive-damages awards must analyze the disparity between the punitive-damages award and civil penalties authorized or imposed in comparable cases. *State Farm*, 538 U.S. at 428; *Austin*, 158 F. App'x at 386. The parties do not cite to repossession lawsuits under § 1983, and the Court is not aware of any comparable case where the jury awarded punitive damages. (*See* ECF No. 155 at 23.) Devlin cites several cases where the Court reduced punitive-damages awards levied against defendants in lawsuits under § 1983. (ECF No. 149 at 25-30.) Hyman points out that these cases are distinguishable from the instant case. (ECF No. 155 at 24-

27.) Accordingly, the Court finds that punitive-damages awards in other cases are not especially insightful here.

### 4. The Court will Reduce the Punitive-Damages Award to $30,000

The Court finds that the punitive-damages award in this case is unconstitutionally excessive. While the jury could have reasonably concluded that Devlin acted with some degree of reprehensibility, his conduct does not justify a 500:1 ratio of punitive damages to compensatory damages. Accordingly, the Court will remit the jury's punitive damages to an award of $30,000. The Court finds that a punitive-damages award of $30,000 is reasonable based on Devlin's conduct. Further, the Court finds that $30,000 is sufficient to deter similar future conduct by law enforcement.

## V. Conclusion

For the preceding reasons, Hyman's Motion for Attorney Fees and Costs (ECF No. 145) is **GRANTED** and Devlin's Motion for Judgment as a Matter of Law, New Trial, and to Alter Judgment (ECF No. 148) is **GRANTED IN PART** and **DENIED IN PART**. The Court finds that the jury's punitive-damages award was unconstitutionally large, and will therefore reduce that award to $30,000. Devlin's Motion is denied in all other respects.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANGELA HYMAN,** | ) | **CIVIL ACTION NO. 3:17-89** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE KIM R. GIBSON** |
| **v.** | ) | |
| | ) | |
| **BRYAN DEVLIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER

**AND NOW**, this 28th day of May, 2019, upon consideration of Plaintiff Angela

Hyman's Motion for Attorney Fees and Costs (ECF No. 145) and Defendant Bryan Devlin's

Motion for Judgment as a Matter of Law, New Trial, and to Alter Judgment (ECF No. 148), **IT IS**

**HEREBY ORDERED** as follows:

(1) Hyman's Motion for Attorney Fees and Costs (ECF No. 145) is hereby **GRANTED**. Hyman is entitled to $189,279.00 in attorney fees and $7,881.14 in costs;

(2) Devlin's Motion for Judgment as a Matter of Law, New Trial, and to Alter Judgment (ECF No. 148) is **GRANTED IN PART** and **DENIED IN PART**. The Court will reduce the jury's punitive-damages award from $500,000 to $30,000. Devlin's Motion is denied in all other respects, and the Jury Verdict (ECF No. 143) otherwise remains intact.

**BY THE COURT:**

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**